**HAGNER & ZOHLMAN, LLC**
Commerce Center
1820 Chapel Ave. West
Suite 160
Cherry Hill, New Jersey  08002
(856) 663-9090
Attorney for:   Plaintiff

By:  Thomas J.  Hagner, Esquire

---

ROBERT S. CONRAD, SR.                          UNITED STATES DISTRICT COURT
                                                              FOR THE DISTRICT OF NEW JERSEY
              Plaintiff,

       vs.                                                   CIVIL ACTION NO. 1:08-cv-05416

THE WACHOVIA GROUP LONG-
TERM DISABILITY PLAN;

              Defendant.

---

**PLAINTIFF'S STATEMENT OF UNCONTESTED MATERIAL FACTS IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## PREFACE

References to Exhibits to the Certification of Thomas J. Hagner, Esq., 1 through 3, consist of the following:

    (1)       Wachovia Corp. STD and LTD Plans effective 2002;

    (2)       Wachovia Corp. STD and LTD Plans effective 2004;

    (3)       2006 Summary Plan Descriptions.

Arguably, one or more of these exhibits are controlling, but it is not believed that there are any differences between and among these exhibits which are significant to the issues raised herein.   In the event Defendant raises any such issues, Plaintiff reserves the right to argue which of the Plans are controlling.

For the convenience of reference, the page references are those of Exhibit A.

## STATEMENT OF UNCONTESTED MATERIAL FACTS

1.      Plaintiff, Robert S. Conrad, Sr., ("Mr. Conrad") resides in Sicklerville, New Jersey.   Mr. Conrad is a participant in the Health and Welfare Plans offered by Wachovia Corporation, which includes the Wachovia Group Long Term Disability Plan ("LTD Plan").   He was employed as a commissioned securities broker.  (Certif. of Plaintiff)

2.      Liberty Mutual Life Insurance Company of Boston ("Liberty Mutual") was engaged to provide administrative services including claims administration, with respect to the LTD Plan. (Exhibit 5)

3.      Commencing September, 2003 Conrad began suffering with various chronic ailments, the symptoms of which included unexplained sweating, fatigue, diarrhea, sudden weight loss, lack of appetite and short term memory loss.    (Certif. of Plaintiff)

4.      In November, 2003 while in the office, Mr. Conrad needed to suddenly excuse himself from an extremely important meeting with two of his wealthiest clients and rushed to the hospital.  He was admitted for a five day admission undergoing numerous tests to determine the cause of his symptoms, which included abdominal pains and chest discomfort. (Certif. of Plaintiff)

5.      Thereafter, Mr. Conrad's symptoms worsened and, as a result, he was unable to perform most of his major work tasks.  He was only able to answer phone calls and to minimally service existing clients.  He was virtually unable to produce new business which had a devastating effect on his commission income.   (Certif. of Plaintiff)

6.      Commencing in September, 2003 Mr. Conrad missed the following days from work due to his illness:

a.      In September, 2003 Mr. Conrad was out on the 8th in order to see a physician with respect to his symptoms and then remained out of work for the rest of the week; he had a follow up visit with his doctor on the 15th; he required another doctor visit on the 19th missing a half of day; he was out of work on the 23rd; a half day on the 24th; the entire day of the 25th and the entire day of the 30th.

b.      In October, 2003 Mr. Conrad was out of work on the 2nd, 7th, 9th, 10th, 13th, 15th, 16th, 17th, 20th, 22nd, 24th and 28th.

c.      In  November, 2003 Mr. Conrad was out for a half day on the 6th and then completely on the 10th, 12th, 13th, 17th, 19th, 20th and 21st.    On the 24th Mr. Conrad  reported for work but it was on that date that he needed to rush to the hospital where he remained hospitalized through Friday the 28th.

d.      In December, 2003 Mr. Conrad was out the 1st, 2nd, 3rd, 5th, 8th, 12th, 16th, 18th and 22nd.    (Exhibit 41)

7.      Mr. Conrad continued to be absent either for full days or partial days throughout the period of January, 2004 through August, 2004 at the same rate i.e. approximately 10 days per month.  (Exhibit 41)

8.      As of August, 2004 Mr. Conrad was totally absent from the office through November, 2005 at which time he began working again pursuant to the "Return to Work" program.  (Exhibit 41)

9.      As of December, 2003, the then Office Manager of the office in which Plaintiff worked, was fully aware of Plaintiff's symptoms and had discussions with Plaintiff concerning his health and the impact on his ability to work.   Rather than advise Plaintiff concerning the Short Term Disability Plan's features and benefits, the Office Manager recommended that Plaintiff exercise a "look back" option to supplement his income.  (Certif. of Plaintiff)

10.     Mr. Conrad continuously inquired to his Wachovia Office Manager about disability benefits through the fall of 2003, but was told initially that no such benefit plan existed.  (Certif. of Plaintiff)

11.     After a substantial delay, Mr. Conrad determined that a disability benefits plan did exist and he submitted a claim for short-term disability benefits in December, 2003. (Certif. of Plaintiff)

12.     After filing the claim, Plaintiff was informed over the phone by Liberty Mutual that he was not covered, because he remained at work answering his incoming calls.   (Certif. of Plaintiff)

13.     Although Plaintiff requested information concerning benefits, he was not given a copy of the Summary Plan Description until January, 2005.  (Exhibit 5)

14.     Pursuant to the applicable Employment Benefits Plan, STD benefits begin upon an absence as a result of an injury or sickness.  In pertinent part, the STD Plan provides that "If your absence lasts for 8 or more consecutive calendar days, you may apply for STD benefits." (Exhibit 1, pg. 49)

15.     Under the heading of "Intermittent Chronic Disability" the STD Plan provides for coverage of intermittent disabilities which are defined as a "disability of long duration characterized as a disease showing little change or slow progression."  (Exhibit 1, pg. 52)

16.     In pertinent part, the Employment Benefits Plan provides that "Employees who suffer from intermittent chronic disabilities may obtain STD benefits for days when they are out of work, even though the days are not consecutive."  (Exhibit 1, pg. 52)

17.     Also under the heading "Intermittent Chronic Disability", the Disability Plan provides that "You and your manager will be responsible for tracking the days of absence from work as they occur." (Exhibit 1, pg. 52)

18.     Under the heading of "Partial Disability", the Disability Plan provides that "In calculating the 8 days of absence from work (which are required to establish entitlement to

STD benefits), you also may include absences of partial work days due to disability." (Exhibit 1, pg. 52)

19.     The STD Plan includes a section entitled "Return to Work Program."  In pertinent part, the provision states that "This Program enables a partially disabled employee to rejoin the workforce sooner and be more productive while still receiving disability benefits.  If you are able to work and earn more than 80% of your Pre-Disability Earnings you are no longer considered disabled." (Exhibit 1)

20.     After receiving STD benefits for a six month period of time Mr. Conrad applied for long-term disability (LTD) benefits.   (Certification of Plaintiff)

21.     According to the LTD Plan as it pertains to Mr. Conrad, the amount of LTD benefits is based upon the benefits eligible compensation ("BEC") which has the same meaning as pre-disability earnings.  (Exhibit 1, pg. 60-61)

22.     For purposes of calculation and entitlement to LTD benefits, BEC is determined on the business day immediately preceding the date a disability is incurred. (Exhibit. 1, pg. 60-61)

23.     According to the Plan, BEC means the greatest of the following amounts, divided by 52 weeks:

        (a)     Your grandfathered annual benefits base rate;

        (b)     Your comp rates;

        (c)     Your rolling 12 month amount.

(Exhibit 1, pg. 60-61)

24.     For purposes of the LTD Plan, the BEC in this instance represents Mr. Conrad's "rolling 12 month amount". (Exhibit 1, pg. 60-61)

25.     Pursuant to the LTD Plan, Mr. Conrad's rolling 12 month amount represents the sum of Mr. Conrad's earnings, as defined in the Plan, for the 12 consecutive months immediately preceding the onset of disability.  (Exhibit 1, pg. 60-61)

26.     Pursuant to the terms of the LTD Plan, compensation is defined as 70% of Mr. Conrad's "Eligible Function Incentive Pay."   (Exhibit 1, pg. 60-61)

27.     With respect to the calculation of Mr. Conrad's BEC, or pre-disability earnings, his eligible functional incentive pay for the months of September, 2002 through August, 2003 equaled $151,294.39.   Accordingly, his BEC, calculated as 70% of that amount, equaled $105,906.07.  Mr. Conrad's short term disability benefit equaled 100% of his BEC for 26 weeks, or $2,036.88 per week, totaling $52,953.04 for the 26 week period.   According to the Long Term Disability Plan, the monthly benefit amount is equal to the lesser of 60% of your monthly BEC or 66 2/3% of your monthly BEC reduced by income received by other sources. Those sources include payments of any kind from Wachovia.   (Certification of Plaintiff)

28.     Attached hereto and made a part hereof is a schedule of monthly earnings on the part of Mr. Conrad from September, 2003 through September, 2008 when this suit was filed. The schedule reflects:

Line 1.    The amount of Mr. Conrad's monthly earnings for the months of October, 2003 through September, 2008;

Line 2.    The disability benefit due based upon a BEC of $105,906.07 calculated as 60% of BEC or 66 2/3% of BEC less monthly earnings;

Line 3.    Disability benefit received;

Line 4.     The difference, or underpayment of benefits.

29.     It should be noted that all months utilize the "66 2/3% less earnings received" except for the months of December, 2004, May, 2007, October, 2007, April, 2008 and July, 2008 when there were no earnings.

30.     Pursuant to the terms of the Plan, a participant is entitled to partial benefits in the event of a partial disability, which is defined in the Plan as the ability to perform one or more, but not all, of a participant's material and substantial duties. (Exhibit 1, pg. 66)

31.     The LTD Plan provides for a "Return to Work Program" available to partially disabled participants. (Exhibit 1, pg. 66)

32.     Pursuant to the "Return to Work Program" a participant is entitled to full benefits if monthly earnings are less than 20% of pre-disability earnings.  During the first 12 months of a return to employment if earnings are greater than or equal to 20% of pre-disability earnings, but less than 80% of pre-disability earnings, the full LTD benefit will continue to be paid providing it does not exceed 100% of pre-disability earnings.  (Exhibit 1, pg. 66)

33.     After the first 12 months of a return to employment under the Return to Work Program, if monthly earnings are greater than or equal to 20% of pre-disability earnings, but less than 80% of pre-disability earnings, the LTD benefit otherwise payable will be reduced by 50% of monthly earnings from all employment, and, if monthly earnings are greater than or equal to 80% of pre-disability earnings, LTD benefits will end.  (Exhibit 1, pg. 66)

34.     Under the Return to Work Program, Mr. Conrad was entitled to his full monthly disability payment of $5,883.66 during all months in which his monthly earnings did not exceed $1,765.29 and he was entitled to partial benefits during all months in which his monthly earnings did not exceed $7,061.18.   (Exhibit 1)

35.     Mr. Conrad's disability claim was initially approved based upon a disability date of August 3, 2004 and LTD benefits commenced as of February 1, 2005.  (Exhibit 6)

36.     On December 31, 2004, Mr. Conrad sent a letter to the Wachovia Benefits Committee objecting to the calculation of his BEC stating that it should be higher based upon a disability onset date of September 2003, rather than August, 2004.  (Exhibit 4)

37.     In his December 31, 2004 letter Mr. Conrad explained that he was initially hired by Wheat First Butcher & Singer in May, 1995, achieved the status of Senior VP in 1997 and had been a loyal Wheat First/First Union Securities/Wachovia Securities Broker since that time.  (Exhibit 4)

38.     In his December 31, 2004 letter Mr. Conrad explained that since September 15, 2003 he had been struggling with various chronic ailments and that his symptoms included spontaneous perspiring, fatigue, diarrhea, sudden weight loss, lack of appetite and short term memory loss, among other things.   Mr. Conrad explained that he attempted to continue to work his regular hours, but that his production gradually declined as his symptoms persisted.   In his December 31, 2004 letter Mr. Conrad explained that "Then, in November, 2003, I was in the office and had to excuse myself from a very important meeting of two of my wealthiest clients. I went to the hospital and was admitted with abdominal pains and chest discomfort.  I stayed in the hospital for 5 days undergoing numerous tests to determine the cause of these symptoms. These tests included stress tests, EKG and heart catheterization."   (Exhibit 4)

39.     Mr. Conrad explained that he was released from the hospital in November, 2003 and submitted a claim for short term disability in December, 2003.  He was contacted by a representative from Liberty Mutual in January, 2004 advising him that he would "probably get

turned down for benefits." Nothing in writing was ever received from Liberty Mutual or Wachovia determining Mr. Conrad's initial STD claim. (Exhibit 4)

40.    The LTD Plan also includes a section entitled "Intermittent Chronic Disability." That provision provides that "If you suffer from an intermittent chronic disability as defined on page 52 of the STD Summary, you may be entitled to receive LTD benefits after you have been absent from work due to your disability for a total of 26 weeks (130 work days) during any rolling 12 month period." (Exhibit 1, pg. 67)

41.    On January 11, 2005 Mr. Conrad received a letter from Liberty Mutual indicating that his short term disability benefits ended on January 31, 2005 and if his disability extended beyond that period of time he may be eligible for long term disability (LTD) benefits. (Exhibit 5)

42.    The January 11, 2005 letter from Liberty Mutual specifically referenced "Work Incentive Benefits", stating "To encourage Participants to return to work, a participant who has satisfied the Elimination Period may be eligible to continue to receive a Disability Benefit while engaging in Active Employment in accordance with the provisions of this Section 3.7." (Exhibit 5)

43.    The January 11, 2005 letter also indicated that the LTD Plan pays a benefit equal to 60% of base monthly salary "at the time your disability commenced." (Exhibit 5)

44.    Liberty Mutual issued a letter to Mr. Conrad dated February 1, 2005 indicating that his LTD benefits were approved and that his first check in the sum of $2,472.57 representing LTD benefits due for the period of February 1, 2005 through February 28, 2005 was being sent. (Exhibit 6)

45.     The February 1, 2005 letter from Liberty Mutual indicated that Mr. Conrad's gross monthly benefit was equal to $3,196.59.   (Exhibit 6)

46.     On June 23, 2005 Wachovia issued a letter to Mr. Conrad indicating that his date of disability had been determined to be August 3, 2004 and therefore his LTD commencement date was February 1, 2005.  (Exhibit 8)

47.     The June 23, 2005 letter from Wachovia acknowledged that Mr. Conrad had indicated that he had never received a Summary Plan Description, and did not contest that fact. (Exhibit 8)

48.     The June 23, 2005 letter from Wachovia indicated that Wachovia believed that the benefit calculation, using a disability date of August, 2004 was correct and rejected Mr. Conrad's assertion that the calculation should have utilized the September, 2003 salary. However, the letter did not explain its decision or give any reasons whatsoever for the decision. (Exhibit 8)

49.     On May 11, 2006 Liberty Mutual issued a letter to Mr. Conrad terminating his benefits on the basis that his monthly earnings as of February, 2006 exceeded 80% of his Pre-Disability earnings which were calculated using the August, 2004 date of disability.  The letter states that "Since you exceeded 80% of your Pre-Disability Earnings, you are no longer eligible to receive Long Term Disability Benefits."  (Exhibit 9)

50.     On May 24, 2006 Mr. Conrad issued a letter to Wachovia, Attn: Office Manager, Stan Hadam.   In the letter Mr. Conrad explained that an examination of his income during the period of September, 2003 through August, 2004 showed a marked decrease and that Mr. Conrad had documentation "That this is the period of time when I first received doctor's care (Sept. 15, 2003)."   (Exhibit 10)

51.    In his letter of May 24, 2006 Mr. Conrad reiterated that in December, 2003 he initially filed his claim for STD benefits and received a call and was told that he would not likely be approved for an STD claim.  ("In December 2003, I filed by initial claim with Liberty for STD benefits, I received a call at the office and was told I would not likely be approved for a STD claim.")   Nothing in writing was received from either Liberty or Wachovia with respect to the December, 2003 STD claim which Mr. Conrad filed.   (Exhibit 10)

52.    In his letter of May 24, 2006 Mr. Conrad further questioned the fact that the amount of his life insurance, tied to his compensation, dropped from $300,000 in 2004 to $190,000 in 2006.   (Exhibit 10)

53.    Mr. Conrad, whose compensation was totally commission-based, was accustomed to earning amounts approaching and in some cases exceeding $300,000 per annum. His compensation for the years 1998 through 2002 was as follows:

| | |
|---|---|
| 1998 | $242,470.91 |
| 1999 | $286,541.32 |
| 2000 | $388,703.56 |
| 2001 | $261,446.66 |
| 2002 (The year of a significant stock market drop) | $135,159.72 |

(Certification of Plaintiff)

54.    On June 1, 2006 Mr. Conrad issued a letter to Liberty Mutual reiterating most of the major points raised in his May 24, 2006 letter to Wachovia.   Mr. Conrad's letter of June 1, 2006 makes multiple references to his interaction with his Office Manager, Stan Hadam. Among the points raised was the fact that his December 2003 claim was "evaluated over the

phone by Tosha Darby from Liberty and she should have instructed me to proceed with the paperwork." (Exhibit 11)

55.    In his letter of June 1, 2006 Mr. Conrad drew attention to the fact that he did not receive a copy of the Summary Plan Description until 2005 and that in fact it was only sent by the Wachovia Benefits Committee "after they received my written appeal." (Exhibit 11)

56.    On June 29, 2006 Mr. Conrad issued another letter to Wachovia, attention Jim Beaver, Wachovia Corporation Safety Disability Benefits Committee, which opened with the sentence "I have been instructed by Liberty Life Assurance Company of Boston to send my appeal to you in regards to my BEC." (Exhibit 14)

57.    In his letter of June 29, 2006 to Mr. Beaver, Mr. Conrad again asserted that his benefits were improperly calculated and that, since he was first treated for the condition on September 15, 2003, that date should be used for the calculation of his benefit amount.   Mr. Conrad further indicated that in an effort to resolve this matter he had submitted inquiries to no less than a dozen Wachovia representatives, the last being a Linda Hudson who finally gave Mr. Conrad the name and address of the Wachovia Corporation Safety & Disability Benefits Committee on December 30, 2004.  (Exhibit 14)

58.    On June 21, 2006 Mr. Conrad had also written to Liberty Mutual seeking to appeal the determination to cancel his LTD benefits.   (Exhibit 12)  Referring to the calculation of his benefit amount, and his part-time status the letter states, in pertinent part, that "When I can generate more commissions than you have calculated were my pre-disability amount in 48 hours a month, you should realize something is wrong with your numbers."

59.    On August 9, 2006 Mr. Conrad submitted a letter to Liberty Mutual indicating that he had a chronic health condition that limited his ability to work full-time.   Mr. Conrad

attached his July, 2006 paystub indicating that his gross commission income for July, 2006 was only $961.66.  (Exhibit 15)

60.     On September 5, 2006 Mr. Conrad received a letter from Wachovia indicating that his claim had been reopened and that "Since this period fell within 6 months from the date your claim was closed, your claim has been reopened with Liberty Mutual for a successive period of disability."  (Exhibit 16)

61.     On September 21, 2006 Mr. Conrad received correspondence from Liberty Mutual responding to his letters of June 1 and June 26, 2006 indicating that his claim had been reopened stating, in pertinent part that, "While continuing to meet all the terms and conditions of the disability contract, you will receive benefits under this 'Partial Disability' provision." The letter does not dispute Mr. Conrad's statement that his initial STD claim was responded to only by a phone call.  (Exhibit 17)

62.     On December 7, 2006 Liberty Mutual issued a letter to Mr. Conrad indicating that it was Wachovia, not Liberty Mutual that needed to address the issue of the calculation of his benefits amount.  (Exhibit 18)

63.     On December 7, 2006 and December 8, 2006, Liberty Mutual issued letters to Mr. Conrad indicating that it needed medical reports from three physicians by January 8, 2006 (sic) just five business days after the holiday season.  (Exhibits 18 and 19)

64.     On December 17, 2006 Liberty Mutual issued a letter to Mr. Conrad stating that the Wachovia LTD Plan "does not provide intermittent chronic disability benefits."  (Exhibit 20)

65.     On January 6, 2007 Mr. Conrad sent a letter to Liberty Mutual enclosing a copy of his December 15, 2006 timesheet and pay statement, signed by his supervisor, indicating that

his gross monthly income was only $2,472.25.   The timesheet indicating that Mr. Conrad was only working part time due to health reasons is signed by his supervisor, Stan Hadam.  (Exhibit 21)

66.     On January 6, 2007 Mr. Conrad sent a letter to Liberty Mutual indicating "I don't understand that you would wait until the last day to call and tell me you are going to have to stop my benefits because I did not comply with your request in Dec.   I interpreted your letter in Dec. as though you had sent a request for information to my Attending Physicians, which you do have a list of their addresses."  (Exhibit 22)

68.     On January 10, 2007 Liberty Mutual issued a letter to Mr. Conrad indicating that since the medical information requested on December 8, 2006 was not received, his benefits were being suspended even though one medical provider, Dr. Petrunzio, had indicated that a request for information purportedly by Liberty Mutual on December 8, 2006 had never been received.  (Exhibit 23)

69.     On January 11, 2007 Mr. Conrad sent a further letter to Liberty Mutual enclosing a copy of his health history for the year 2006 stating "If you need additional information on any of my providers, please give me a call and I will do my utmost to get the information you request." (Exhibit 24)

70.     On February 15, 2007 Liberty Mutual issued a letter to Mr. Conrad indicating that his benefits were terminated as of January 10, 2007 "since we did not receive the necessary proof to verify ongoing disability…"   The letter indicated that "80% of your Pre-Disability earnings is $4,262.13."   (Exhibit 25)

71.     On February 20, 2007 Mr. Conrad forwarded correspondence with medical documentation to Liberty including Dr. Petrunzio's file from July 5, 2006 through February 16,

2007.   Mr. Conrad indicated that "I regret that you could not have updated me on the missing information before the expiration of the extension.   This is a busy time for doctors with the flu and all … I was not made aware of his oversight until you phoned me on February 15, 2007." (Exhibit 26)

72.    In his letter of February 20, 2007 Mr. Conrad further indicated that "Lastly, I would like to appeal the figures you refer to in paragraph 8 of page 3 of your letter.  As you know I have contested this calculation since 2004 and I do not feel that I have been treated fairly in light of my diagnosis."  (Exhibit 26)

73.    On March 23, 2007, Liberty Mutual issued a letter to Mr. Conrad indicating that his claim had been reopened and that he would continue to receive LTD benefits during the review.  (Exhibit 27)

74.    On April 24, 2007, a letter on behalf of Mr. Conrad was directed to Wachovia Corporation requesting Mr. Conrad's attendance records during the months of September, October, November and December 2003.   The purpose of the request was to determine when Mr. Conrad satisfied the 8 day elimination period for STD eligibility.   (Exhibit 28)

75.    By letter dated May 8, 2007 Wachovia refused the request for the information stating that it would not do so "without a subpoena."  (Exhibit 30)

76.    By letter dated April 25, 2007 to Liberty Mutual, Mr. Conrad sent multiple medical reports including the notes of the treatment rendered by Dr. Petruncio between September, 2003 and December, 2003 establishing the commencement of Mr. Conrad's disability in December, 2003.  (Exhibit 29)

77.     The April 25, 2007 letter to Liberty Mutual pointed out that its letter of December 17, 2006 stating that the Wachovia LTD Plan did not provide intermittent chronic disability benefits was erroneous.  (Exhibit 29)

78.     The April 25, 2007 correspondence to Liberty Mutual also drew attention to Dr. Petruncio's medical records which stated in pertinent part that "In September, 2003 Mr. Conrad experienced the onset of symptoms of depression, fatigue and malaise… since the onset of symptoms in September, 2003, he has experienced spontaneous diaphoresis of unknown etiology, depression, myalgias, sleep apnea, etc.   His attempts to return to work only aggravated his condition with a result in total disability."   (Exhibit 29)

79.     The April 25, 2007 letter referenced the terms of the STD/LTD Plans that related to the Return to Work Program, Partial Disability and Intermittent Chronic Illnesses. (Exhibit 29)

80.     Included with the April 25, 2007 correspondence were Mr. Conrad's paystubs commencing September 15, 2002 through March 15, 2007 which, among other things, established Mr. Conrad's "rolling 12 month" compensation for the time period of September, 2002 through August, 2003.   The April 24, 2007 letter indicated that Mr. Conrad was entitled to receive 6 months of short term disability benefits representing 100% of the BEC of $9,290.00 equaling $55,740.00 followed by long term disability benefits thereafter.  (Exhibit 29)

81.     The April 25, 2007 letter further indicated that, in terms of the calculation of Mr. Conrad's BEC, the correct amount of earnings was $13,271.26 per month.   (Exhibit 29)

82.     By letter dated May 17, 2007 Liberty Mutual responded to Mr. Conrad's letter of April 24, 20007.   (Exhibit 31)

83.     Liberty Mutual's letter of May 17, 2007 acknowledged that Mr. Conrad received medical treatment for his condition dating back to September, 2003, but without any reasoning or explanation of any kind, simply stated that "However, our investigation on Mr. Conrad's claim has established that the date of disability applicable to his LTD claim was August 3, 2004."  (Exhibit 31)

84.     With respect to the provisions concerning Intermittent Chronic Disability, Liberty Mutual's letter of May 17, 2007 attempted to explain away its earlier misstatement by explaining the purpose of the language.  (Earlier Liberty Mutual denied that any such provision existed in either the STD Plan or LTD Plan).  (Exhibit 31)

85.     In its letter of May 17, 2007, Liberty Mutual stated again without explanation that "Please note that we have previously established that Mr. Conrad did meet the Elimination Period defined in the LTD Plan.   As such, he began receiving LTD benefits effective February 1, 2005." (Exhibit 31)

86.     Essentially, even after it was brought to Liberty Mutual's attention that the Plan contained an Intermittent Chronic Disability provision  -  which it previously denied  -   Liberty Mutual persisted in maintaining the August, 2004 commencement date of Mr. Conrad's disability and, even after explaining the provision ("Please note the language that you are referencing defines the requirements for fulfilling the elimination period to be eligible for LTD benefits") Liberty Mutual persisted – without explanation – in its refusal to acknowledge September, 2003 as the commencement date of Mr. Conrad's intermittent chronic disability. (Exhibit 31)

87.    The average compensation of the proposed other occupations was less than a third of Mr. Conrad's lowest pre-disability compensation, and only about 15% of his average pre-disability compensation. (Certification of Plaintiff)

88.    Finally, in its letter of May 17, 2007, Liberty Mutual claimed that the calculation of Mr. Conrad's benefits eligible compensation (BEC) was not within its responsibilities and wrote that "We must defer all comments and inquiries directly to the Wachovia Corporation, as we are not able to comment on this." (Exhibit 31)

89.    Even though Liberty Mutual was performing the claims administration, it insisted that "The BEC for each employee who files a claim for disability benefits is calculated by the Wachovia Corporation and then provided to Liberty Mutual." The administrative record reflects that Liberty Mutual never contacted Wachovia about Mr. Conrad's BEC calculation. (Exhibit 31)

90.    By letter dated May 23, 2007 Liberty Mutual terminated Mr. Conrad's benefits. (Exhibit 32)

91.    The May 23, 2007 denial letter begins by misstating that, "a review of your file indicates that your last date worked was August 2, 2004…" In fact, Mr. Conrad continued to work part-time. (Exhibit 32)

92.    Most importantly, the May 23, 2007 denial made no reference whatsoever to the Return to Work Program or the Partial Disability provisions in the LTD Plan and, instead, rested its denial on the results of a transferable skills analysis indicating that Mr. Conrad was capable of working **full time** employed in some **other occupation**. (Exhibit 32)

93.    In essence, the May 23, 2007 denial letter was requiring Mr. Conrad, who continued to be semi-productive, albeit part-time, in his own occupation with Wachovia to

resign and seek full-time employment elsewhere in another occupation essentially as a clerk, making **less** than he was earning **part-time** with Wachovia!   As such, Liberty Mutual completely ignored Mr. Conrad's rights to continued benefits as a part time employee pursuant to the Return to Work Program.  (Exhibit 32)

94.     By letter dated June 6, 2007 a response to Wachovia's letter of April 24, 2007, refusing to release employment records without a Subpoena, was issued.  (Exhibit 34)

95.     The letter to Wachovia dated June 6, 2007 enclosed a copy of the letter to Liberty Mutual dated May 17, 2007 indicating that it was the position of Liberty Mutual that it was Wachovia's obligation to calculate the benefits eligible compensation.   The letter closed with "Therefore, I am requesting that you recalculate the BEC for an effective date of September, 2003."   (Exhibit 34)

96.     By letter dated July 6, 2007 a further letter was issued to Wachovia indicating that a response to the June 6, 2007 letter had not been received.   (Exhibit 35)

97.     On July 17, 2007 Mr. Conrad directed a letter to Liberty Mutual enclosing his timesheet for the pay period of June, 2007.  These timesheets were submitted by Mr. Conrad and Mr. Hadam every month. (Exhibit 36)

98.     The June, 2007 timesheet indicated that Mr. Conrad was working only part time and had only worked 39 hours and 50 minutes during the entire month of June, 2007.  (Exhibit 36)

99.     Significantly, the referenced timesheet indicated that the reason for the part time work was "disability" and the timesheet was signed not just by Mr. Conrad, but also by Mr. Conrad's supervisor, Stan Hadam.  (Exhibit 36)

100.    Mr. Conrad's letter of July 17, 2007 was acknowledged by Liberty Mutual by letter dated July 20, 2007.  (Exhibit 37)

101.    The July 20, 2007 letter from Liberty Mutual including as an attachment further documentation from Mr. Hadam, verifying that due to a disability Mr. Conrad had no earnings for the month of March, 2007.  (Exhibit 37)

102.    Liberty Mutual's letter of July 20, 2007 indicates that it never attempted to communicate with Mr. Hadam directly in order to verify either Mr. Conrad's lack of earnings, or the nature of his disability in spite of the fact that Mr. Hadam was Mr. Conrad's immediate supervisor and had the opportunity to observe him on a close and regular basis.  (Exhibit 37)

103.    By letter dated August 7, 2007 a letter was issued to Wachovia acknowledging receipt of paystubs for the months of September, 2003 through December, 2003 but pointing out that a request had been made for paystubs back to September, 2002 so that the BEC for the time period of September, 2002 and ending September, 2003 could be calculated.   (Exhibit 38)

104.    The letter of August 7, 2007 further pointed out that the earlier request for attendance records which had been made on April 24, 2007 had still not been met.  (Exhibit 38)

105.    By letter dated September 10, 2007 a further request was made to Wachovia for a response to the earlier requests for paystubs from September, 2002 through September, 2003 and attendance records.  (Exhibit 39)

106.    By letter dated September 26, 2007 a letter was issued to Wachovia referencing the multiple requests for Mr. Conrad's attendance records and stating that, "Accordingly, we must conclude that no such attendance records exist." (Exhibit 40)

107.    The provision regarding "Intermittent Chronic Disability" in the STD Plan provides that "You and your manager will be responsible for tracking the days of absence from work as they occur."  (Exhibit 1)

108.    By letter dated November 13, 2007 Mr. Conrad issued an appeal to the denial of long term disability benefits set forth in the letter of May 23, 2007.  (Exhibit 41)

109.    The November 13, 2007 appeal provided medical documentation of the following absences due to Mr. Conrad's medical condition  -  the same medical condition for which disability benefits were approved commencing August, 2004:

(a)    Out of work September 8, 2003/Dr. visit

(b)    Out of work for remainder of the week;

(c)    Follow up visit with Dr. Petruncio September 15, 2003/out of work;

(d)    Work half a day on Friday, September 19th/further doctor visit;

(The disability plan provides that in calculating the 8 days of absence from work, partial work days due to disability may be included.)

(e)    Out of work September 23rd

(f)    Half day September 24th

(g)    Out of work September 25th

(h)    Out of work September 30th

(Exhibit 41)

110.    The letter of November 13, 2007 further pointed out that Mr. Conrad was out of work on October 2nd, 7th, 9th, 10th, 13th, 15th, 16th, 17th, 20th, 22nd, 24th and 28th, 2003.  (Exhibit 41)

111.    The appeal of November 13, 2007 further established that Mr. Conrad was out of work partially on November 6th and then completely on November 10th, 12th, 13th, 17th, 19th, 20th and 21st.  (Exhibit 41)

112.    The appeal of November 13, 2007 includes the following paragraph:  "On November 24th, he reported for work but in the middle of a meeting he began sweating uncontrollably and indicated that he had to leave the meeting and go to the hospital.   He was hospitalized through Friday, the 28th.   He was out again on December 1st (visit with Dr. Petruncio), and also the 2nd, 3rd, 5th, 8th, 12th, 16th, 18th and 22nd."  (Exhibit 41)

113.    The November 13, 2007 appeal explained that Mr. Conrad had been diagnosed as suffering from fibromyalgia by numerous doctors which included Dr. Petruncio, Dr. Dwyer as well as multiple other specialists at Jefferson Hospital and Cooper Hospital.  (Exhibit 41)

114.    The November 13, 2007 appeal explained that "fibromyalgia is a complex, chronic condition which causes widespread pain and fatigue as well as a variety of other symptoms.   The fatigue of fibromyalgia varies from person to person and ranges from a mild tired feeling to the exhaustion of a severe flu-like illness."   (Exhibit 41)

115.    The November 13, 2007 appeal further explained that typical symptoms in addition to pain and fatigue are sleep disturbances, cognitive disorders, depression and anxiety, all of which symptoms were well reported by Mr. Conrad's multiple physicians.  (Exhibit 41)

116.    The November 13, 2007 appeal includes the following request for an explanation:  "If you contend that Mr. Conrad is not suffering from the fatigue, memory and other concentration problems which he has articulated, kindly indicate specifically and in detail why either you do not believe that Mr. Conrad is suffering from these symptoms, or why you

believe that, in spite of the symptoms, Mr. Conrad is capable of working a full-time job on a regular and reliable basis."   (Exhibit 41)

117.   The November 13, 2007 included a report of July 19, 2007 from Dr. James P. Dwyer, D.O.   Dr. Dwyer is a fellow in the American College of Rheumatology and part of the practice known as Arthritis, Rheumatic and Back Disease Associates, P.A.   (Exhibit 41)

118.   In his report of July 19, 2007 Dr. Dwyer stated that "Prior visits to rheumatology at Jefferson and Cooper have resulted in diagnosis of fibromyalgia but no specific auto-immune condition."   Dr. Dwyer further noted that "Neurologic examination shows some light touch sensation changes on his feet."   Dr. Dwyer further noted in his report that "In review of all Dobbs Data, laboratory and x-ray results, it is certainly clear that he has some yet undiagnosed systemic disorder that causes manifestations as mentioned above.   Although he clearly does have fibromyalgia symptoms, I feel that these are largely a secondary manifestation of the primary condition as well as perhaps aggravated by sleep apnea which continues to be an issue." (Exhibit 41)

119.   The November 13, 2007 appeal is also supported by a current report from Dr. Petruncio dated July 17, 2007 which provided a history of the illness as well as current observations including "outbreaks of diaphoresis (sweating) which is still unexplained." (Exhibit 41)

120.   Dr. Petruncio's report of July 17, 2007 indicates that "During this time, he was referred to multiple specialists, and in July, 2005 was given a diagnosis of fibromyalgia and reactive depression resulting from his disability and continued symptoms of unknown etiology." (Exhibit 41)

121.   By letter dated November 16, 2007 further documentation was submitted in support of Mr. Conrad's appeal including 4 more monthly timesheets May, 2007 through June, 2007 **all signed by Mr. Conrad's immediate supervisor, Stan Hadam**, indicating that due to disability Mr. Hadam had authorized Mr. Conrad to work only 52 hours in March, 2007; 58.5 hours in April, 2007; 43 hours and 40 minutes in May, 2007; and 39 hours and 50 minutes in June, 2007.   (Exhibit 42)  This documentation was submitted on a monthly basis to Liberty Mutual as part of the Return to Work Program in which Mr. Conrad was participating.  ("If you are receiving disability benefits from Wachovia, the Liberty Case Manager may develop a return to work plan in conjunction with your attending physician and Wachovia manager"). (Exhibit 3, p. 81)

122.   By letter dated January 18, 2008 Liberty Mutual denied Mr. Conrad's appeal. For the first time in over two years, Liberty claimed that Mr. Conrad's December 2003 STD claim was denied by a letter purportedly dated January 19, 2004.  (Exhibit 43).

123.   Mr. Conrad attempted to appeal the January 18, 2008 denial with a further appeal dated June 26, 2008 including a current sleep study among other things.   The sleep study confirmed that even with the use of a C-Pap machine slow wave sleep was absent as was Stage 3 sleep and Stage 4 sleep.   REM sleep was decreased at 7.1% with 20-25% being normal.  (Exhibit 44)

124.   Wachovia refused to accept Mr. Conrad's appeal and also refused to accept the additional information as ongoing documentation of his disability on an intermittent chronic successive disability basis, even though it was submitted within a 6 month time period as proof of an ongoing chronic disability.  (Exhibit 45)

125.    At no point in the entire administrative process did either Liberty Mutual, or Wachovia, speak to Stan Hadam, Mr. Conrad's immediate supervisor in order to confirm the physical manifestations of Mr. Conrad's illness and the effect of the illness on Mr. Conrad's ability to work full-time.  (Certification of Plaintiff)

126.    At no point in the entire administrative process did either Liberty Mutual, or Wachovia make a determination that Mr. Conrad was capable of full-time work in his own occupation.

127.    Not one of the approximate two dozen letters sent by Liberty Mutual to Mr. Conrad between January 2005 and July 2007 contests that Mr. Conrad's initial December 2003 STD claim received only a telephone call response.  (Exhibits 5, 6, 9, 17, 18, 19, 20, 23, 25, 27, 32; Certification of Plaintiff)

## SUMMARY

128.    Mr. Conrad's right to participate in the Wachovia Long Term Disability Plan exists not just for the benefit of Mr. Conrad, but for the benefit of Wachovia itself.   Mr. Conrad's supervisor, Stan Hadam, asked Mr. Conrad to try to work part-time as best as he could so that Wachovia could retain the benefit of Mr. Conrad's clientele.   In fact, at one point Mr. Hadam specifically told Mr. Conrad that he wanted him to come back to work so that the commissions which Mr. Conrad would earn, albeit only part of what he had been earning, would be credited to his performance/unit.  (Certification of Client)

**HAGNER & ZOHLMAN,  LLC**
Attorneys for Plaintiff

BY:_____
        Thomas J. Hagner

Dated:    January 13, 2010

| 09/2002 | 10/2002 | 11/2002 | 12/2002 | 01/2003 | 02/2003 | 03/2003 | 04/2003 | 05/2003 | 06/2003 | 07/2003 | 08/2003 | TOTAL* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14,977.26 | 5,870.89 | 18,217.38 | 7,554.92 | 12,239.31 | 23,309.58 | 15,835.43 | 17,782.36 | 15,099.61 | 6,435.45 | 4,935.62 | 9,036.58 | 151,294.39 |

*"*eligible functional incentive pay*" $151,294.39 times (0.70 =70%) = (BEC) $105,906.07 which also as defined above as my "*Pre-Disability Earnings*".

*My Short term Disability amount based on the table on page 79 "STD Benefits at a Glance" (03), working at least five days a week with over ten years of service 100% of my (BEC) for 26 weeks $2,036.88 or a total of $52,953.04.*

*$8,826.48 is STD Benefit.*

*20% = $1,765.29*                    *$7,061.18 = 80% "Pre-disability Earnings"*

| Sept. 03 | Oct. 03 | Nov. 03 | Dec. 03 | Jan. 04 | Feb. 04 | TOTAL |
|---|---|---|---|---|---|---|
| 5,842.59 | 7,585.71 | 8,730.38 | 877.88 | 9,513.70 | 12,468.95 | 88,803.31 |
| | | | | | | 0.00 |
| 8,826.48 | | | 8,826.48 | | | |
| 2,983.89 | 0.00 | 0.00 | 8,826.48 | .00 | 0.00 | <11,819.37> |

| Mar. 04 | Apr. 04 | May 04 | June 04 | July 04 | Aug. 04 | Sept. 04 | Oct. 04 | Nov. 04 | Dec. 04 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 7,262.45 | 2,336.27 | 11,139.85 | 11,416.41 | 3,756.63 | 7,872.49 | 0.0 | 0.0 | 0.0 | 0.0 | |
| | | | | | 5,327.66 | 5,327.66 | 5,327.66 | 5,327.66 | 5,327.66 | 26,638.30 |
| | 8,826.48 | | | 8,826.48 | | 8,826.48 | 8,826.48 | 8,826.48 | 5,883.66 | |
| 0.00 | 8,255.50 | 0.00 | 0.00 | 6,835.14 | 0.00 | 3,498.82 | 3,498.82 | 3,498.82 | 556.00 | <26,143.10> |

| Jan 05 | Feb 05 | Mar 05 | Apr 05 | May 05 | Jun 05 | Jul 05 | Aug 05 | Sep 05 | Oct 05 | Nov 05 | Dec 05 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,163.76 | 1,609.00 | 235.45 | 448.73 | 1,646.55 | 280.76 | 557.08 | 1,428.47 | 313.29 | 643.76 | 1,697.47 | 1,064.62 | |
| 5,327.66 | 2,952.06 | | | | 867.56 | 3,196.60 | 2,994.87 | 3,238.66 | 872.45 | 2,344.17 | 5,051.40 | |
| 5,883.66 | 5,883.66 | 5,883.66 | 5,883.66 | 5,883.66 | 5,883.66 | 5,883.66 | 5,883.66 | 5,883.66 | 5,883.66 | 5,883.66 | 5,883.66 | 70,603.92 |
| 556.00 | 2,931.60 | 5,883.66 | 2,687.06 | 2,780.44 | 5,016.16 | 2,687.06 | 2,888.79 | 2,645.00 | 5,011.27 | 3,539.49 | 832.26 | <37,458.79> |

| Jan 06 | Feb 06 | Mar 06 | Apr 06 | May 06 | Jun 06 | Jul 06 | Aug 06 | Sep 06 | Oct 06 | Nov 06 | Dec 06 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 766.64 | 2,675.09 | 3,493.26 | 7,263.43 | 2,965.84 | 2,979.40 | 961.66 | 2,734.68 | 3,406.88 | 5,285.91 | 1,942.22 | 16234.47 | |
| 5,683.93 | 5,981.91 | | | | | 6,393.20 | | 1,920.78 | 3,196.60 | 100.00 | 1,960.47 | |
| 5,883.66 | 4,973.86 | 4,155.69 | | 4,683.11 | 4,669.55 | 5,883.66 | 4,914.27 | 4,242.07 | 2,363.04 | 5,706.73 | 0.00 | |
| 199.73 | 1,008.05 | 4,155.69 | 0.00 | 4,683.11 | 4,669.55 | *509.54 | 4,914.27 | 2,321.29 | *833.56 | 5,606.73 | 1,960.47 | <22.238.75> |

| Jan 07 | Feb 07 | Mar 07 | Apr 07 | May 07 | Jun 07 | Jul 07 | Aug 07 | Sep 07 | Oct 07 | Nov 07 | Dec 07 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 500.25 | 3,663.57 | 862.86 | -160.00 | 5295.60 | 20,369.31 | 5,106.18 | 6,588.33 | 1,604.62 | 5295.60 | 28,278.24 | 4,652.12 | |
| | 2,765.17 | 3,196.60 | | | | | | | | | | |
| 5,883.66 | | 5,883.66 | 5,883.66 | 5,883.66 | | | | 5,883.66 | 5,883.66 | | | |
| 5,883.66 | 1,220.21 | 2,687.66 | 5,883.66 | 5295.60 | 0.00 | 2,542.77 | 1,060.62 | 5,883.66 | 5,883.66 | 0.00 | 2,996.83 | <39,926.39> |

| Jan. 08 | Feb. 08 | Mar 08 | Apr 08 | May 08 | Jun 08 | Jul 08 | Aug 08 | Sept 08 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| 1,672.39 | 5,559.21 | 10,503.56 | 5,295.60 | 523.80 | 9,520.37 | 5,295.60 | 19,909.90 | 0.00 | |
| | | | | | | | | | |
| 5,883.66 | | | 5,883.66 | 5,883.66 | | 5,883.66 | | 5,883.66 | |
| 5,883.66 | 2,089.74 | 0.00 | 5,883.66 | 5,883.66 | 0.00 | 5,883.66 | 0.00 | 5,883.66 | <31,508.04> |

**Total Shortage        $169,085.42**

**Key:**

Line 1.   Regular Earnings/Draw/ Commission Earnings
Line 2.   Disability Paid
Line 3.   Disability Due
Line 4.   Difference = column 4-column 3