G

# LTD: 2004 Plan Year:
## Wachovia Corporations Long Term Disability Plan (As Amended and Restated Effective January 1, 2004)

Wachovia/Conrad 97

**2004 LTD Plan**
**12/17/03 Memorandum re: Changes**

## December 17, 2003 Memorandum

### Long Term Disability:

- **Article 3, Benefits Eligible Compensation or (BEC)**
Special transition rules were added as it relates to PSI Transferred Employees for their calculation of BEC.

Article 3.7(d)(1), (2), and (3), the words "or equal to " in front of references 80% of Pre-Disability Earnings.

### Short Term Disability:

- **Article 3, Benefits Eligible Compensation or (BEC)**
Special transition rules were added as it relates to PSI Transferred Employees for their calculation of BEC.

- **Appendix A:**
This Appendix will apply to any Employee for whom Wachovia is required by state law to provide state-mandated coverage.

Generally, such an employee, who satisfied the STD Plan eligibility requirements will receive Disability Benefits as described in STD Plan, but such a benefit will be offset by any disability benefits provided under the State Plan. Further, we are requiring that the employee file with the state agency, if applicable, and we further provide that until such an employee provides satisfactory evidence that he or she is not entitled to a disability benefit under the applicable State Plan, the presumed disability benefit under the State Plan will be offset against his or her Disability Benefits.

- **Appendix D:**
This Appendix contains a specific plan document (containing provisions as required under NJ state law), for our New Jersey Private Plan under New Jersey Temporary Disability Benefits Law. Wachovia (and previously First Union) had a Private Plan for Disability Benefits in New Jersey, however the State of New Jersey did not have a Private Plan document for Wachovia on file. This document contained in this Appendix D serves to address this issue.

# WACHOVIA CORPORATION
# LONG TERM DISABILITY PLAN

(As Amended and Restated Effective January 1, 2004)

ATL01/11561949v1

Wachovia/Conrad 99

# WACHOVIA CORPORATION
## LONG TERM DISABILITY PLAN

Wachovia Corporation (the "Employer") has established a plan to provide long term disability income benefits for its eligible employees and eligible employees of its participating affiliates. This instrument sets forth provisions which constitute the plan as amended and restated effective January 1, 2004.

Wachovia/Conrad 100

# ARTICLE 1

## DEFINITIONS AND CONSTRUCTION

1.1    <u>Definitions</u>.  Whenever used in this Plan:

"<u>Active Employment</u>" means the Employee must be actively at work for the Participating Employer on a full-time or a part-time regularly scheduled basis and paid regular earnings and perform such work either (i) at the Participating Employer's usual place of business, or (ii) at a location to which the Participating Employer's business requires the Employee to travel.  An Employee will be considered actively at work if he or she was physically at work on the day immediately preceding (i) a weekend (except where one or both of these days are scheduled days of work), (ii) holidays (except when such holiday is a scheduled work day), (iii) paid approved leave, (iv) any non-scheduled work day, and (v) leave required under applicable law.

In cases where notice is provided to an Employee under the Worker Adjustment and Retraining Notification Act and the Employee remains on-call and available for work, such Employee will be deemed to be in Active Employment for purposes of the Plan.

For purposes of the definition of "Partial Disability" and the work incentive benefits described in Section 3.6, the term "Active Employment" will include employment with other employers that has been approved by the Claims Administrator.

"<u>Benefits Eligible Compensation</u>" or "<u>BEC</u>" has the same meaning as "Pre-Disability Earnings", as defined in Section 3.1 of the Plan.

"<u>Benefits from Other Income</u>" means those benefits shown below:

(a)    The amount for which the Participant is eligible under:

   (1)    any Workers' or Workmen's Compensation Law;

   (2)    any occupational disease law;

   (3)    any compulsory benefit act or law; or

   (4)    any other act or law of like intent.

(b)    The amount for which the Participant is eligible under The Jones Act (Title 46 appendix, United States Code Section 688).

(c)    The amount of any disability benefits which the Participant is eligible to receive under:

   (1)    any other group plan of the Participating Employer;

Wachovia/Conrad 101

(2)    any governmental retirement or disability system.

(d)    The amount of benefits the Participant receives under the Employer's Retirement Plan as follows:

(1)    The amount of any Disability Benefits, or Retirement Benefits the Participant voluntarily elects to receive as retirement payment under the Employer's Retirement Plan; and

(2)    the amount the Participant is eligible to receive as retirement payments when he or she reaches the later of age 62, or normal retirement age as defined in the Employer's Retirement Plan.

(e)    The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, for which:

(1)    the Participant receives or is eligible for; and

(2)    his or her spouse, child or children receives or are eligible for because of his or her Disability; or

(3)    his or her spouse, child or children receives or are eligible for because of his or her eligibility for Retirement Benefits.

(f)    The amount of earnings the Participant earns or receives from any form of employment, other than an Employer-approved "book buyout" or similar arrangement (as determined by the Employer).

(g)    The amount a Participant or his or her family receives from any group or franchise insurance or similar plan for persons in a group, excluding the following programs:

(1)    the Employer's Supplemental Executive Long Term Disability Plan;

(2)    the Employer's Long Term Disability Restoration Plan; or

(3)    the Employer's Supplemental Disability Benefit Plan.

(4)    the Employer's Supplemental Disability Income Protection Plan, or

(5)    the Employer's Executive Disability Income Plan.

Benefits from Other Income, other than Retirement Benefits, must be payable as a result of the same Disability for which the Plan pays a Disability Benefit.

Wachovia/Conrad 102

"Benefit Trust" means any trust maintained under Code section 501(c)(9) from which the Employer makes benefit payments hereunder.

"Chemical Dependency" means a condition of psychological and/or physical dependence or addiction to alcohol or psychoactive drugs or medications, which results in functional (physical, cognitive, mental, affective, social or behavioral) impairment.

"Claims Administrator" means any third party with which the Employer has entered into an agreement relating to the provision of third party administrative services under the Plan.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Disability" or "Disabled" means:

(a)     during the Elimination Period and the next 24 months, the Participant's inability to perform all of the material and substantial duties of his or her own occupation on an Active Employment basis because of an Injury or Sickness; and

(b)     after the period described in paragraph (a) above, the Participant's inability to perform all of the material and substantial duties of his or her own or any other occupation for which he or she is or becomes reasonably fitted by training, education, and experience because of an Injury or Sickness.

The loss of a license for any reason does not, in itself, constitute Disability.

A Participant will not be Disabled unless (i) he or she received disability benefits under the Wachovia Corporation Short Term Disability Plan (or exhausted benefits under such plan) which are related or due to the same cause(s) or (ii) he or she received disability benefits under any workers' compensation act or law or any other act or law of like intent or application which are related or due to the same cause(s).

"Disability Benefits" means the amount payable by the Plan to the Disabled or Partially Disabled Participant. Benefits for Long Term Disability coverage are determined on a monthly basis. When used with the term Retirement Plan, the term "Disability Benefits" means money which:

(a)     is payable under a Retirement Plan due to Disability as defined in that plan; and

(b)     does not reduce the amount of money which would have been paid as Retirement Benefits at the normal retirement age under the plan if the Disability had not occurred. (If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined in this Plan.)

Wachovia/Conrad 103

"Effective Date" means January 1, 2004, the effective date of this amendment and restatement.

"Eligible Employee" means any Employee who is regularly scheduled to work at least 20 hours per week. Whether an Employee is "regularly scheduled" will be determined by the Employer, in its sole discretion, in accordance with the personnel policies and practices of the Participating Employer.

"Elimination Period" means a period of consecutive calendar days of Disability for which no benefit is payable. The Elimination Period is 26 weeks and begins on the first day of Disability. If the Participant returns to work for any period of 30 or less days during the Elimination Period and cannot continue due to the same or related Disability, only those days the Participant is Disabled will be counted for purposes of satisfying the Elimination Period.

For purposes of Intermittent Chronic Disability, the term "Elimination Period" means a period of calendar days of Disability equal to 26 weeks accumulated within a calendar year due to the same or related condition for which no benefit is payable.

"Employee" means any individual employed by a Participating Employer, who is classified as an employee by the Participating Employer, and who is on the payroll of the Participating Employer. An Employee will cease to be such on his or her retirement, resignation, discharge, or death. An individual who is on leave of absence from a Participating Employer or who is receiving severance payments from a Participating Employer will be considered an Employee during such period to the extent provided in the personnel policies and practices of the Participating Employer.

"Employer" means Wachovia Corporation, the sponsor and named fiduciary of the Plan, and any successor thereto that adopts the Plan.

"Hospital" or "Institution" means a facility licensed to provide care and treatment for the condition causing the Participant's Disability.

"Injury" means bodily impairment resulting directly from an accident and independently of all other causes.

"Intermittent Chronic Disability" is a Disability of long duration which is characterized as a disease showing little change or of slow progression. It may be marked by intermissions in the course of such disease. It also includes an acute exacerbation of the same or related condition in the course of such disease. Acute has a sudden onset, severe symptoms, and a short course.

"Mental Illness" means mental, nervous or emotional diseases or disorders of any type.

"Monthly Earnings" means the Participant's earnings from all employment.

ATL01 11561949v1

Wachovia/Conrad 104

"Partial Disability" or "Partially Disabled" means as a result of the Injury or Sickness, the Participant is:

(a)     during the Elimination Period and the next 24 months, able to perform one or more, but not all, of the material and substantial duties of his or her own or any other occupation on an Active Employment or a part-time basis; or

(b)     after the period described in paragraph (a) above, able to perform all of the material and substantial duties of his or her own or any other occupation on a part-time basis.

Loss of a license for any reason does not, in itself, constitute a Partial Disability.

"Participant" means any Eligible Employee who has become a Participant as provided in Article II and who may be eligible to receive Disability Benefits under the Plan.

"Participating Employer" means the Employer and any company, corporation or firm that is subsidiary to, or affiliated with, the Employer that is designated by the Employer as a Participating Employer for purposes of this Plan. As they relate to this Plan, all actions, agreements, and notices between the Claims Administrator and the Employer will be binding on such related entities.  Unless otherwise provided by the Employer, Employees of any related entity that ceases to be a related entity for any reason, will be deemed to have transferred to a class of Employees not eligible for coverage under this Plan.

"Physician" means a person who:

(a)     is licensed and legally qualified to practice medicine and prescribe and administer drugs or to perform surgery; or

(b)     is a licensed and legally qualified practitioner of the healing arts in a category specifically favored under the health insurance laws of the State in which the policy was delivered and who is practicing within the terms of his or her license.

The term "Physician" will not include the Participant or his or her spouse, daughter, son, father, mother, sister, or brother.

"Plan" means the Wachovia Corporation Long Term Disability Plan set forth herein, and as amended from time to time.

"Plan Administrator" means the person or committee appointed by the Employer to administer the Plan, or in the absence of such appointment, the Employer.

"Plan Year" means a twelve consecutive month period that begins on any January 1 and ends on the next following December 31.

"Pre-Disability Earnings" will have the same meaning as "Benefits Eligible Compensation" or "BEC", as defined in Section 3.1 of the Plan.

ATL01/11561949v1

Wachovia/Conrad 105

"Retirement Benefit" when used with the term Retirement Plan, means money which:

(a)    is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

(b)    does not represent contributions made by an Employee (payments which represent Employee contributions are deemed to be received over the Employee's expected remaining life regardless of when such payments are actually received); and

(c)    is payable upon:

(1)    early or normal retirement; or

(2)    Disability, if the payment reduces the amount of money which would have been paid under the plan at the normal retirement age.

"Retirement Plan" means a plan which provides Retirement Benefits to Employees and which is not funded wholly by Employee contributions. The term will not include: a profit-sharing plan, informal salary continuation plan, registered retirement savings plan, 401(k) plan, stock ownership plan, or a nonqualified plan of deferred compensation. The term "Employer's Retirement Plan" is deemed to include any Retirement Plan:

(a)    which is part of any Federal, State, Municipal or Association retirement system; or

(b)    for which the Employee is eligible as a result of employment with the Participating Employer.

"Sickness" means illness, disease, pregnancy or complications of pregnancy.

"Termination for Cause" means activities that cause termination of the Participant's employment (or would have caused termination of employment if the activities were discovered while the Participant was an Employee) with the Participating Employer or an affiliated company as a result of:

(a)    any act or omission that constitutes a breach of the Participant's obligation to the Participating Employer or an affiliated company, or the failure or refusal of the Participant to perform satisfactorily any duties reasonably required of the Participant, after written notification by the Participating Employer of such breach, failure or refusal and the failure of the Participant within ten (10) business days of such notification to correct such breach, failure or refusal (other than failure by reason of incapacity due to physical or mental illness);

(b)    the commission of any fraud, misappropriation, embezzlement or other dishonest act that may reasonably be expected to have injurious effect on the Participating Employer or an affiliated company;

Wachovia/Conrad 106

(c)     reporting to work under the influence of alcohol, narcotics or unlawful controlled substances, or any other material violation of any Employer employment policy or procedure;

(d)     conviction of a felony or of a misdemeanor, or conduct in violation of state or federal law or that would constitute a basis for a criminal charge or indictment of a felony or of a misdemeanor involving moral turpitude;

(e)     violation of any securities or commodities laws, any rules or regulations pursuant to such laws, or the rules and regulations of any securities or commodities exchange or association of which the Participating Company is a member, or violation of any similar federal, state, or local law, regulation, ordinance, or licensing requirement applicable to employees of financial institutions; or

(f)     conduct that may reasonably be expected to have a material adverse effect on the financial interest or business reputation of the Participating Employer or an affiliated company.

1.2     <u>Gender and Number</u>.  The masculine pronoun will include the feminine; the singular will include the plural; and vice versa.

Wachovia/Conrad 107

# ARTICLE 2

# PARTICIPATION

2.1    <u>Commencement of Participation</u>.  Participation in the Plan will commence as follows:

(a)    Each Eligible Employee who was a Participant on the date immediately preceding the Effective Date will be eligible to continue as a Participant in the Plan as of the Effective Date.

(b)    Each other Eligible Employee will be eligible to become a Participant in the Plan on the first day he or she is physically at work on or after the date on which he or she completes three months of Active Employment.

Coverage for an Eligible Employee will commence on the date the Eligible Employee becomes a Participant; provided, however, that coverage will be delayed for an Eligible Employee if he or she is not in Active Employment because of Injury or Sickness.  Such coverage will commence on the date the individual returns to Active Employment. Notwithstanding the foregoing, coverage for an individual who was a Participant on December 31, 2003 or who was employed by an acquired company on the day immediately preceding the date on which employees of the acquired company became eligible for coverage under this Plan, but who was not in Active Employment because of an Injury or Sickness on January 1, 2004 or the day on which employees of the acquired company became eligible for coverage under this Plan, will not be delayed under the preceding sentence if such individual was an Eligible Employee in Active Employment immediately prior to the Injury or Sickness. Whether an Eligible Employee becomes a Participant (and when coverage commences) will be determined by the Plan Administrator in its sole discretion.

2.2    <u>Agreement to Participate</u>.  By becoming a Participant, each Eligible Employee will for all purposes be deemed conclusively to have assented to the provisions of the Plan and all amendments thereto.

2.3    <u>Cessation of Participation</u>.  Coverage for a Participant will cease on the earliest of the following dates:

(a)    the date this Plan terminates, but without prejudice to any claim originating prior to the time of termination;

(b)    the date the Participant is no longer an Eligible Employee;

(c)    the last day the Participant is in Active Employment.  Cessation of Active Employment will be deemed termination of employment even if the Participant continues to receive pay following his or her termination date.  However, the Participant's coverage will be continued if he or she is absent due to Disability during the Elimination Period; and

Wachovia/Conrad 108

(d)   the date of the Participant's written resignation or the date of the Participating Employer's receipt of the Participant's written resignation, whichever is earlier.

Notwithstanding paragraph (c), a Participant who was displaced in connection with the 1999 Restructuring Initiative authorized by the Employer's Board of Directors will be deemed to be in Active Employment throughout the notice period specified in the Worker Adjustment and Retraining Notification Act or such longer period as may be agreed to in writing by the Employer.

2.4   Rehire Terms.  If a former Employee, who was displaced (involuntarily terminated), as determined by the Employer under the Wachovia Corporation Severance Pay Plan, due to layoff, merger, or consolidation, is re-hired by a Participating Employer within 12 months of his or her termination date, all past periods of Active Employment with the Participating Employer will be counted for purposes of the service requirement under Section 2.1.

If a former Employee, who was displaced (involuntarily terminated), as determined by the Employer under the Wachovia Corporation Severance Pay Plan, due to layoff, merger, or consolidation, is re-hired by a Participating Employer more than 12 months after his or her termination date, he or she is considered to be a new Employee for purposes of Section 2.1.

2.5   Family/Medical Leave.  A Participant's coverage may be continued under this Plan during any period that he or she is not in Active Employment because he or she is absent due to an approved  leave of absence under the Family and Medical Leave Act of 1993. Coverage will be provided at the same benefit levels in effect on the day immediately prior to the day the leave begins. Any change in the Plan's benefit levels that may occur while the Employee is on Family/Medical Leave will apply to such Participant.

Wachovia/Conrad 109

## ARTICLE 3

## BENEFITS

3.1     Benefits Eligible Compensation or BEC.

(a)     Overview.  Benefits under the Plan are determined using a concept of Benefits Eligible Compensation or BEC.  In this Plan, the terms "BEC" and "Pre-Disability Earnings" are equivalent.

(b)     Definitions for BEC.

(1)     "Grandfathered Annual Benefits Base Rate" or "Grandfathered ABBR" means the amount of earnings on which pay-related employee benefits were formerly calculated for certain grandfathered Participants, as specified in the Frozen ABBR field of the Participating Employer's payroll records.

(2)     "Business Unit Default Amount" or "BUDA" means the Participant's Earnings (expressed in an annual amount) as determined by the Participant's Business Unit when a Participant has less than one (1) Month of Participation.  See definition of "Rolling Twelve Month Amount."

(3)     "Comp Rate" means (i) for a salaried Participant, the Participant's base salary, as specified in the Comp Rate field of the Participating Employer's payroll records for such Participant or (ii) for a Participant paid an hourly wage, the Participant's "hourly rate" multiplied by the Participant's "scheduled number of hours," as such amounts are set forth in the Participating Employer's payroll records for such Participant.

(4)     "Compensation" means the sum of a Participant's

(i)     base salary;

(ii)    hourly wages;

(iii)   seventy percent (70%) of "eligible functional incentive pay" (as set forth in Appendix B); and

(iv)    contributions on behalf of the Participant determined on a salary-reduction basis to the Participating Employer's 401(k) savings plan, or the Participating Employer's flexible benefit program and, effective January 1, 2002, the Participating Employer's qualified transportation fringe benefit plan.

An element of Compensation set forth above will only be counted once in the definition of Compensation (i.e., double counting is prohibited).

A Participant's Compensation expressly *excludes*

Wachovia/Conrad 110

(i)    overtime and shift differential pay

(ii)   salary deferrals under a non-qualified deferred compensation plan

(iii)  severance pay

(iv)   Participating Employer contributions to benefit plans; and

(v)    all other forms of remuneration which are not expressly listed above as being included in the definition of Compensation.

For purposes of this definition, "Compensation" includes only amounts actually paid to the Participant or amounts that should have been paid but for a payroll processing delay; it does not include earned but unpaid amounts.

(5)    "Months of Participation" means any calendar month in which the Participant is eligible to participate in either the flexible benefit plan or the short term disability plan of the Participating Employer.

(6)    "Pre-Disability Earnings" or "BEC" means the greatest of the following three figures divided by 12 (i.e., the number of months in a calendar year):

(i)    the Participant's Grandfathered ABBR;

(ii)   the Participant's Comp Rate; and

(iii)  the Participant's Rolling Twelve Month Amount.

A Participant's Pre-Disability Earnings or BEC is determined as of the business day immediately preceding the date the Participant incurs a Disability.  Note, however, that the Rolling Twelve Month Amount is actually calculated once each month as set forth in Section 3.1(b)(7) below.

Notwithstanding the general definition of a Participant's Pre-Disability Earnings or BEC, such amount may not exceed one-twelfth (1/12th) of the dollar limit in effect under Code Section 505(b)(7).

(7)    "Rolling Twelve Month Amount":

(i)    General Definition.  The following is determined as of the last business day of each month for each Participant who is eligible to participate in this Plan on such date.  For example, if one becomes Disabled during April, the Rolling Twelve Month Amount is calculated for the twelve (12) months ending March 31.

1.    Twelve Months of Participation.  If a Participant has twelve (12) Months of Participation during the most recent twelve (12) consecutive calendar months, the

Wachovia/Conrad 111

Participant's Rolling Twelve Month Amount is the sum of the Participant's Earnings (as defined below) for such twelve (12) consecutive calendar months.

2.      Less than Twelve but more than One Month of Participation.  If a Participant has less than twelve (12) Months of Participation during the most recent twelve (12) consecutive calendar months but at least one (1) Month of Participation during such twelve (12) consecutive month period, the Participant's Rolling Twelve Month Amount is determined as follows:

A.      Step One.  Determine the number of Months of Participation earned by the Participant during the most recent twelve (12) consecutive calendar month period.

B.      Step Two.  Compute the sum of the Participant's Earnings (as defined below) for each of the months identified in Step One above.

C.      Step Three.  Determine the monthly average of the Participant's Earnings identified in Step Two above.

D.      Step Four.  Multiple the average Earnings determined in Step Three above by the number of calendar months out of the most recent twelve (12) consecutive calendar months for which the Participant did not earn a Month of Participation (e.g., 12 months minus the number of months identified in Step One above).

E.      Step Five.  Add the amount in Step Four to the amount in Step Two.  The resulting sum is the Participant's Rolling Twelve Month Amount.

F.      Special Rule for New Hires and Rehires.

(I)      If a Participant is hired or rehired within the most recent twelve (12) consecutive calendar months, the Participant's Earnings for his or her first Month of Participation following his or her date of hire or rehire will be one-twelfth (1/12th) of the Participant's Comp Rate, if the Participant has a Comp Rate or one-twelfth (1/12th) of the Participant's BUDA, if the Participant does not have a Comp Rate.

(II)      After the Participant's initial Month of Participation following his date of hire or rehire, the Participant's Earnings for such initial month will be the greater of (x) the Earnings described in subparagraph F.(I) above or (y) the Participant's actual Compensation for such initial month.

Wachovia/Conrad 112

G.    Example.  Assume a Participant received Earnings as follows:

| | |
|---|---|
| October 2004 | $4,000 |
| November 2004 | $4,000 |
| December 2004 | $4,000 |
| January 2005 | $4,000 |
| February 2005 | $4,000 |

The Participant terminated employment in February 2005.  The Participant is then rehired on August 25, 2005 with a Comp Rate of $60,000 ($5,000/month).  The Participant receives the following Earnings:

| | |
|---|---|
| August 2005 | $5,000* |
| September 2005 | $5,000 |

\*    The Participant actually received only five days of pay (Participant was hired on 8/25.)  However, the entire $5,000 is counted – See subparagraph F above for special rule.

The Participant's Rolling Twelve Month Amount is computed as follows:

Step One – The Participant has seven Months of Participation in the most recent twelve (12) consecutive months (October 2004 through February 2005 and August 2005 through September 2005).

Step Two – The Participant's aggregate Earnings during the seven month period is $30,000 ($4,000 x 5 months plus $5,000 x 2 months).

Step Three – The monthly average Earnings during this period is $4,285.72 ($30,000 divided by seven months).

Step Four – The Participant did not have Months of Participation during five of the most recent twelve (12) consecutive months  (March 2005 through July 2005).  The product of $4,285.72 and five months is $21,428.60 ($4,285.72 x 5).

Step Five – The sum of $30,000 (Step Two) and $21,428.60 (Step Four) is $51,428.60.

Accordingly, the Participant's Rolling Twelve Month Amount is $51,428.60.

3.    Less than One Month of Participation.  If a Participant has less than one (1) Month of Participation, the Participant's Rolling Twelve Month Amount is either (1) the Participant's Comp Rate, when the Participant has a Comp Rate; or (2) the Participant's Business Unit Default Amount, when the Participant has no Comp Rate.

Wachovia/Conrad 113

4.     Definition of Earnings. A Participant's "Earnings" (as defined below) is determined each month during which the Participant has earned a Month of Participation. A Participant's "history" of Earnings is then used in computing the Participant's Rolling Twelve Month Amount. A Participant's Earnings for a particular month is equal to the greatest of (i) the Participant's Compensation for that month, (ii) one-twelfth (1/12th) of the Participant's Grandfathered ABBR for that month or (iii) one-twelfth (1/12th) of the Participant's Comp Rate for that month.

(ii)    Special Transition Rule for Rolling Twelve Month Amounts in 2001.

1.     Background. Prior to 2001, the Plan utilized a different definition of Compensation. The current Plan utilizes a Rolling Twelve Month Amount in determining a Participant's Pre-Disability Earnings. For a Participant who becomes disabled at any time in 2001 this requires the Plan to look back to 2000 to determine the Rolling Twelve Month Amount.

2.     2001 Transition Rule. For a Participant who becomes disabled between February 1, 2001 and December 31, 2001, his or her Rolling Twelve Month Amount is the sum of the following two components:

A.     The Participant's Earnings received during any full Month(s) of Participation in 2001; and

B.     The Participant's "401 Accumulator" minus overtime and shift differential for each month in 2000 for which the Participant does not have a corresponding full Month of Participation in 2001 (i.e., if Participant has January, February, and March as full Months of Participation in 2001, then April through December of 2000 would be used in determining the Rolling Twelve Month Amount).

3.     January 2001 Transition Rule. If a Participant becomes Disabled during January 2001 and becomes entitled to benefits under this Plan, the Participant's Rolling Twelve Month Amount will equal the amount set forth in the Participant's "Life Annual Amount" (as set forth in the Participating Employer's January 2001 payroll records for such Participant).

(iii)    Special Transition Rule for Rolling Twelve Month Amounts in 2002.

1.     Background. Wachovia Corporation (previously unrelated to First Union Corporation) ("Pre-Merger Wachovia") merged into First Union Corporation on September 1, 2001. Immediately thereafter First Union changed its name to Wachovia Corporation ("Post-Merger Wachovia"). From September 1, 2001 until December 31, 2001, employees of Pre-Merger Wachovia as well as new hires or other employees who were put on the Pre-Merger Wachovia payroll ("Legacy Wachovia Employees"), participated in the long term disability plan maintained by Pre-Merger Wachovia. Effective January 1, 2002, Legacy Wachovia Employees who are otherwise eligible to participate under this Plan will begin participation in this Plan. However, the Legacy Wachovia Employees do not have a Rolling Twelve Month Amount. Accordingly, the following special rules will be used during 2002 to

Wachovia/Conrad 114

determine the Rolling Twelve Month Amount for a Legacy Wachovia Employee who is eligible to participate in this Plan.

     2.     2002 Transition Rule. For a Participant described in the preceding paragraph, his or her Rolling Twelve Month Amount for the 2002 calendar year will be the sum of the following two components:

     A.     The Participant's Earnings received during any full Month(s) of Participation in 2002 and

     B.     A portion of the Participant's "2001 Benefits Pay" (as defined in subparagraph C below) based on the number of months in 2001 for which the Participant does not have a corresponding full Month of Participation in 2002. For example, if the Participant has January, February and March as full Months of Participation in 2002, then nine-twelfths of the Participant's 2001 Benefits Pay (representing nine months of 2001 or April through December of 2001) would be used in determining the Rolling Twelve Month Amount.

     C.     A Participant's 2001 Benefits Pay will be the greater of (I) or (II) below:

     (I)     The Participant's annualized production income plus nonforgiveable draw for January 2001 through June 2001; or

     (II)     the Participant's actual 2000 production income.

     The terms "production income" and "nonforgiveable draw" will be determined by the Plan Administrator in its sole discretion. In making its determination, the Plan Administrator may consider the Participant's payroll records and the terms as used by the severance plan maintained by Pre-Merger Wachovia Corporation in effect prior to the Effective Date.

     D.     Notwithstanding the general definition of a Participant's Benefits Pay, during 2002, the monthly Benefits Pay for Participants described in paragraph E(I) below is limited to $200,000 divided by twelve (12). Notwithstanding the general definition of a Participant's Benefits Pay, during 2002, the monthly Benefits Pay for Participants described in paragraph E(II) below is limited to $80,000 divided by twelve (12).

     E.     The following Participants are identified for purposes of the limitation on benefits Pay (see subsection D above).

     (I)     The following positions are the only positions for which commissions and other production-related earnings paid to a Participant are included in the computation of the Participant's Benefits Pay and for which the Participant's Benefits Pay is limited during 2002.

Wachovia/Conrad 115

| Investment Consultant Associate | Investment Consultant I |
|---|---|
| Investment Consultant Senior | BEJS Managing Director, Sales |
| Branch Manager | Sales Manager |
| Financial Consultant | Financial Associate |
| Financial Consultant/Trainee | Consulting Director/CT |
| Consulting Manager/CT | Consulting Associate/CT |
| CT Analyst Associate | Producer Insurance Services |
| Trader | Trader Equity |
| Salesperson III | Senior Trader Equity |
| Senior Trader Equity $5mm+ | Salesperson II Equity |
| Salesperson III Equity | IJL Capital Market (Exempt/Temp.) |

(II)    The following positions are the only Mortgage jobs in which the Participants working in such Mortgage jobs are subject to the limitations on Benefits Pay during 2002.

| Mortgage Loan Originator | Mortgage Loan Sales |
|---|---|
| Mortgage Sales Manager | Affordable Housing, MLO |
| Mortgage Sales-Team Leader | |

(iv)   Special Rule for Rolling Twelve Month Amounts for PSI Transferred Employees.

1.      Background.  On July 1, 2003, Wachovia Corporation and Prudential Financial, Inc. entered into a joint venture to form a new limited liability corporation known as Wachovia Prudential Financial Advisors ("WPFA"). WPFA has a wholly owned subsidiary known as Wachovia Securities, LLC ("Wachovia Securities"). As a result of forming WPFA and Wachovia Securities, substantially all the former employees of Prudential Securities, Inc. ("PSI") and certain employees of entities related to PSI transferred employment to Wachovia Corporation or to Wachovia Securities ("PSI Transferred Employees"). From July 1, 2003 to December 31, 2003, the PSI Transferred Employees remained participants in the ~~short~~long-term disability plan maintained by PSI. Accordingly, prior to January 1, 2004, PSI Transferred Employees were not eligible under this Plan. Effective January 1, 2004, PSI Transferred Employees who are otherwise eligible to participate under this Plan will begin participation in this Plan. However, the PSI Transferred Employees do not have a Rolling Twelve Month Amount. Accordingly, the following special rules will be used during 2004 to determine the Rolling Twelve Month Amount for a PSI Transferred Employee who is eligible to participate in this Plan.

Since Wachovia Corporation does not have independent information to recompute a PSI Transferred Employee's 2004 Rolling Twelve Month Amount, the information provided by PSI to Wachovia Corporation will be deemed conclusive and determinative and cannot be challenged by a PSI Transferred Employee.

Wachovia/Conrad 116

2.      2004 Transition Rule. For a Participant described in the preceding paragraph, his or her Rolling Twelve Month Amount for the 2004 calendar year shall be the sum of the following two components:

A.      The Participant's Earnings during any full Month(s) of Participation in 2004 and

B.      A portion of the Participant's "PTE 2003 Benefits Earnings (as defined in paragraph C below) based on the number of months in 2004 for which the Participant does not have a corresponding full Month of Participation in 2004. For example, if the Participant has January, February and March as full Months of Participation in 2004, then nine-twelfths of the Participant's PTE 2003 Benefits Earnings (representing nine months of 2003 or April through December 2003) would be used in determining the Rolling Twelve Month Amount.

C.      A Participant's PTE 2003 Benefit Earnings depends upon the Participant's job title at PSI as of July 1, 2003 (or the Participant's most recent job at PSI if the Participant left PSI earlier than July 1, 2003 and was hired by Wachovia.)

(I)      If the Participant last held the job title of Financial Advisor, Financial Advisor in Training, or Branch Manager (as such job titles were determined by PSI), the Participant's PTE 2003 Benefits Earnings is the sum of the Participant's "monthly earnings" for the twelve months of employment with PSI ending on June 30, 2003 (i.e., the period beginning July 1, 2002 and ending June 30, 2003). If the Participant did not receive "monthly earnings" from PSI for the entire twelve-month period ending on June 30, 2003, the actual "monthly earnings" that the Participant did receive during such twelve month period will be annualized. "Monthly earnings" has the same definition as defined in the Participant's PSI LTD Group Policy Number DG-16171-NY for employees of Prudential Securities, Incorporated underwritten by Prudential Insurance Company of America in effect as of July 31, 2003 (the "PSI LTD Group Policy"). In general, "monthly earnings" means base pay, commissions, overtime, deferred compensation when earned (not paid), bonuses, and other forms of compensation paid by PSI during a calendar month.

(II)      If the Participant's last job title was anything other than Financial Advisor, Financial Advisor in Training, or Branch Manager, the Participant's PTE 2003 Benefit Earnings is the greater of the following two amounts:

1.   The amount of the Participant's "benefit earnings" (as defined in the PSI LTD Group Policy) for the 2002 calendar year. In general, "benefit earnings" means income from commissions, bonuses and overtime.

2.   The amount of the Participant's gross monthly base pay from PSI for the month of July 2003.

(v)      Example of Rolling Twelve Month Amount. Assume a Participant becomes disabled on October 15, 2001. The Participant had Earnings of $4,000 per month for all

-18-

Wachovia/Conrad 117

of 2001 up until the date of her Disability. The Participant had Earnings of $3,000 per month for all of 2000. The Participant's Rolling Twelve Month Amount is $45,000 calculated as follows:

              1.      Participant's actual Earnings for 2001 equals $36,000 ($4,000 for each of the nine full months from January through September; because Participant did not earn Compensation for the full month of October, any actual Compensation from October is not counted in computing this number); and

              2.      Participant's actual Earnings for 2000 equals $9,000 ($3,000 for each of the three months of October, November and December.)

              3.      The sum of $36,000 and $9,000 is $45,000.

    (c)   Special Rules.

        (1)   Severance Pay. Note, a Participant who is receiving severance pay is not eligible to receive benefits under this Plan. However, in certain circumstances (as described below), severance pay may be taken into account in computing a Participant's BEC.

            (i)   Eligible for Flexible Benefit Plan. If a Participant is eligible to participate in the flexible benefit plan while receiving severance pay, severance benefits paid to the Participant while eligible for such plan will (on an annualized basis) be substituted for the Participant's Comp Rate and used in determining the Participant's BEC or Pre-Disability Earnings under this Plan. Thus, for example, if a Participant who received severance pay while eligible for the flexible benefit plan was later rehired, the individual's BEC would reflect severance pay.

            (ii)   Not Eligible for Flexible Benefit Plan. If a Participant is not eligible to participate in the flexible benefit plan, any severance paid to the Participant during such period of ineligibility will not be used in determining BEC under this Plan.

        (2)   Change in Eligibility Status. This paragraph addresses how BEC is computed for a Participant who moves from an ineligible status to an eligible status (e.g., from authorized leave of absence to an active/benefits eligible position).

            (i)   If a Participant moves from an ineligible status to an eligible status under this Plan and is eligible for the first time to participate in the Plan or if during the most recent twelve (12) consecutive calendar months the Participant was ineligible to participate in the Plan, the Participant's BEC will be determined as if the Participant were a new hire.

            (ii)   If a Participant moves from an ineligible status to an eligible status under this Plan, but such Participant had within the most recent twelve (12) consecutive calendar months been eligible to participate in this Plan, the Participant will be treated as a rehire; however, the special rule described in Section 3.1(b)(7)(i)(2)(F)(I) will not apply.

Wachovia/Conrad 118

3.2    Payment of Disability Benefits.

(a)    When the Plan receives proof that a Participant is Disabled and requires the regular attendance of a Physician, the Plan will pay the Participant a Disability Benefit after the end of the Elimination Period. Subject to the provisions of this Article III, the Disability Benefit will be paid for the period of Disability if the Participant provides proof of continued (i) Disability, and (ii) regular attendance of a legally qualified Physician and compliance with the recommended course of treatment for the disabling condition.  Such proof must be given upon the request of the Plan Administrator or the Claims Administrator and at the Participant's expense.

(b)    For the purpose of determining Disability, the Injury must occur and Disability must begin while the Employee is a Participant.

(c)    Notwithstanding anything in this Plan to the contrary, Disability Benefits payable under the plan of any acquired entity that has been merged into this Plan (as identified in Appendix A) will continue to be paid pursuant to the terms of such plans which are incorporated herein and made a part hereof, with the exception of the rules related to the denial of claims contained in Section 4.7 which will supercede any similar provision in any predecessor plan.

3.3    Amount and Duration of Benefits.

(a)    The amount of Disability Benefits will be the lesser of:

(1)    60% of the Participant's Pre-Disability Earnings; or

(2)    66-2/3% of the Participant's Pre-Disability Earnings less the Benefits from Other Income;

provided, however, that in no event will the Disability Benefit be less than $100 per month.

Notwithstanding the foregoing, in no event will the minimum benefit be paid to a Participant to the extent that such Participant has been overpaid benefits under the Wachovia Corporation Short Term Disability Plan.

(b)    In no event will the Disability Benefit be paid for a period longer than the maximum benefit period shown in the following table:

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | To age 65 |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |

Wachovia/Conrad 119

| 65          | 24 months |
|-------------|-----------|
| 66          | 21 months |
| 67          | 18 months |
| 68          | 15 months |
| 69 and over | 12 months |

(c)    Notwithstanding the foregoing, the Disability Benefit of a Participant who was receiving benefits on December 31, 1997, under the terms of the Plan in effect on such date will continue to be paid in the accordance with the terms of the Plan in effect on such date.

(d)    Notwithstanding the foregoing, the Disability Benefit of a Participant who was receiving benefits under a disability plan sponsored by a Participating Employer immediately preceding the date on which such entity became a Participating Employer will continue to be paid in the accordance with the terms of the disability plan in effect on such date. If such prior disability plan contains a provision regarding successive periods of disability, such rules will continue to apply (and benefits will be paid under the prior plan) even if the Participant engages in Active Employment under this Plan.

3.4    Discontinuation of Benefits. The Disability Benefit will cease on the earliest of:

(a)    the date the Participant is no longer Disabled;

(b)    the end of the maximum benefit period in Section 3.3(b) or the date the Participant is able to work in his or her own occupation on a part-time basis (with or without reasonable accommodation or modification), and is offered such a position by the Employer, but chooses not to;

(c)    the date the Participant's Monthly Earnings exceed 80% of his or her Pre-Disability Earnings;

(d)    except as prohibited by applicable law, the Employer determines that the Participant is engaging or has engaged in conduct that would result in Termination for Cause;

(e)    the date the Participant is no longer under the regular attendance of a legally qualified Physician;

(f)    the date the Participant ceases to comply with the course of treatment recommended by his or her Physician for the disabling condition;

(g)    the date the Participant refuses to be examined or evaluated for purposes of determining the continuing nature of the Disability; or

(h)    the date the Participant dies.

ATL01/11561949v1

Wachovia/Conrad 120

3.5     Successive Periods of Disability.  With respect to this Section, "Successive Periods of Disability" means a Disability which is related or due to the same cause(s) as a prior Disability for which a Disability Benefit was payable.

(a)      A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability Benefits under this Plan, a Participant:

(1)      returns to his or her own occupation on an Active Employment basis for less than six (6) continuous months; and

(2)      performs all the material and substantial duties of his or her own occupation.

(b)      To qualify for a Successive Period of Disability Benefit, the Participant must experience more than a 20% loss of Pre-Disability Earnings.

(c)      Benefit payments will be subject to the terms of this coverage for the prior Disability.

(d)      If a Participant returns to his or her own occupation on an Active Employment basis for six (6) continuous months or more, the Successive Period of Disability will be treated as a new period of Disability and the Participant must complete another Elimination Period.

(e)      If a Participant becomes eligible for coverage under any other group long-term disability plan, this Successive Period of Disability provision will cease to apply to that Participant.

3.6     Mental Illness or Chemical Dependency Limitation.  The benefit for Disability due to Mental Illness or Chemical Dependency will not exceed 24 months of Disability Benefit payments unless the Participant meets one of the following requirements.

(a)      The Participant is in a Hospital or Institution for the treatment of Mental Illness or Chemical Dependency at the end of the 24 month period. The Disability Benefit will be paid during the confinement. If the Participant is still Disabled when he or she is discharged, the Disability Benefit will be paid for a recovery period up to 90 days. If the Participant becomes reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.

(b)      The Participant continues to be Disabled and becomes confined for Mental Illness or Chemical Dependency:

(1)      after the 24 month period; and

(2)      for at least 14 days in a row.

**Wachovia/Conrad 121**

The Disability Benefit will be payable during the confinement for the Mental Illness or Chemical Dependency.

The Disability Benefit will not be payable beyond the maximum benefit period described in Section 3.2(b).

3.7    <u>Work Incentive Benefits</u>.  To encourage Participants to return to work, a Participant who has satisfied the Elimination Period may be eligible to continue to receive a Disability Benefit while engaging in Active Employment in accordance with the provisions of this Section 3.7.

(a)    For the purposes of this provision, the Participant may satisfy the Elimination Period if he or she is Disabled or Partially Disabled, or a combination of Disabled and Partially Disabled, during such time.

(b)    A Disability Benefit will be paid for the period of Partial Disability if proof is provided upon request of the Plan Administrator or the Claims Administrator and at the Participant's expense of continued:

(1)    Partial Disability; and

(2)    regular attendance of a legally qualified Physician and compliance with the recommended course of treatment for the disabling condition.

(c)    For the purpose of determining Partial Disability, the Injury or Sickness must occur and Partial Disability must begin while the Employee is a Participant.

(d)    If the Participant is eligible for benefits described in this Section 3.6, the Plan will pay Disability Benefits as follows:

(1)    If, at any time while Disability Benefits are payable under Section 3.2, the Participant's Monthly Earnings are less than 20% of his Pre-Disability Earnings, a Disability Benefit determined under Section 3.2(b) will continue to be paid, and all other benefit provisions and terms applicable to Disability will apply as stated in this Plan.

(2)    If, during the first 12 months of a Participant's return to employment of any kind, the Participant's Monthly Earnings are greater than or equal to 20% of his Pre-Disability Earnings, but less than or equal to 80% of his or her Pre-Disability Earnings, a Disability Benefit determined under Section 3.2(b) will continue to be paid, and all other benefit provisions and terms applicable to Disability will apply as stated in this Plan. However, if the Disability Benefit plus the Participant's Monthly Earnings would exceed 100% of the Participant's Pre-Disability Earnings, the Disability Benefit will be reduced so that the Disability Benefit plus the Participant's Monthly Earnings does not exceed 100% of the Participant's Pre-Disability Earnings.

(3)    If, after the first 12 months of a Participant's return to employment of any kind, the Participant's Monthly Earnings are greater than or equal to 20% of his Pre-

Wachovia/Conrad 122

Disability Earnings, but less than or equal to 80% of his Pre-Disability Earnings, the Disability Benefit otherwise payable will be further reduced by 50% of the Participant's Monthly Earnings. All other benefit provisions and terms applicable to Disability will apply as stated in this Plan.

         (4)    If the Participant's Monthly Earnings exceed 80% of his Pre-Disability Earnings, Disability Benefits will cease.

    3.8    Cost of Living Freeze. After the first deduction for each of the Benefits from Other Income, the Disability Benefit will not be further reduced due to any cost of living increases payable under the Benefits from Other Income provision of this Plan. This provision does not apply to increases received from any form of employment.

    3.9    Lump Sum Payments. Benefits from Other Income which are paid in a lump sum will be prorated on a monthly basis over the time period to which the lump sum relates or the maximum benefit period described in Section 3.2(b), whichever is less. If the lump sum does not relate to a specific time period, the lump sum will be prorated over the expected benefit payment period.

    3.10    Estimated Benefits. The Plan Administrator, or the Claims Administrator acting as agent of the Plan Administrator, may estimate and include in the computation of benefits the amount the Participant is eligible to receive under any of the plans referred to Benefits from Other Income.

    With respect to benefits payable under the Social Security Act, the Participant must make application with the Social Security Administration for benefit payments under that plan, when the Claims Administrator determines that the Disability will extend beyond a 12 month period. If he or she does not make application for Social Security disability benefits when the Claims Administrator requires, the Claims Administrator will begin to reduce the Participant's benefit by an estimated Social Security disability benefit amount. If the application is denied by the Social Security Administration, and the Claims Administrator is not in agreement with that agency's decision, the Participant is obligated to make timely appeals of the denial through all administrative appeal processes including the Administrative Law Judge level. If the Participant does not appeal the denial, the Claims Administrator will begin to reduce the Participant's benefit by an estimated Social Security disability benefit amount.

    Benefit payments from any other source, referred to in the Benefits from Other Income provision of the Plan, will reduce the benefits payable under the Plan if the Claims Administrator makes a reasonable determination that the Participant:

    (a)    will be paid upon completion of the claim made under such plan; orb)
would have been paid if the Participant pursued the claim under such plan within the required time.

    In the event that the Claims Administrator overestimates an amount the Participant would have received from any plans referred to in the Benefits from Other Income provision of the Plan, the Claims Administrator will reimburse the Participant for such amount.

ATL01/11561949v1

Wachovia/Conrad 123

3.11   Prorated Benefits. For any period which a Disability Benefit is payable that does not extend through a full month, the benefit will be paid on a prorated basis. The rate will be 1/30th per day for such period of Disability.

3.12   Exclusions. This Plan will not pay benefits in connection with any Disability due to:

(a)   war, declared or undeclared or any act of war;.

(b)   intentionally self-inflicted injuries, while sane or insane;

(c)   active Participation in a Riot; or

(d)   the Participant's committing of or the attempting to commit an indictable offense, or criminal act whether or not the Participant knows the actions they have taken constitute an indictable offense or criminal act.

For purposes of paragraph (c):

"Participation" will include promoting, inciting conspiring to promote or incite, aiding abetting and all forms of taking part in, but will not include actions taken in defense of public or private property, or actions taken in defense of the person of the Participant, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and firemen.

"Riot" will include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together, whether or not acting with a common intent and whether or not damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

3.13   Notice and Proof of Claim.

(a)   *Notice*

(1)   Notice of claim must be given to the Plan Administrator, or the Claims Administrator acting as agent of the Plan Administrator, within 60 calendar days of the date of the loss on which the claim is based, or as soon thereafter as it is reasonably possible to do so. Such notice of claim must be received in a form or format satisfactory to the Claims Administrator.

(2)   If applicable, when the Claims Administrator has received the written notice of claim, the Claims Administrator will send the Participant claim forms. If the forms are not received within 15 days after written notice of claim is sent, the Participant may send to the Claims Administrator written proof of claim without waiting for the form.

Wachovia/Conrad 124

(3)      If the Participant is not able to submit notice of claim, notice may be submitted by a representative of the Participant (including a member of the Participant's family), the Employer or the Participant's Physician.

(b)      *Proof*

(1)      Proof of claim must be given to the Plan Administrator, or the Claims Administrator acting as agent of the Plan Administrator, no later than 60 calendar days after the end of the Elimination Period.  For this purpose, "proof" means (a) the evidence in support of a claim for benefits in a form or format satisfactory to the Claims Administrator, (b) an attending Physician's statement in a form or format satisfactory to the Claims Administrator, completed and verified by the Participant's attending Physician, and (c) provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence that may be required by the Claims Administrator in support of a claim for benefits.  Notwithstanding the foregoing, the Plan Administrator, or the Claims Administrator acting as agent of the Plan Administrator, may also consider other evidence of a claimed Disability, including, but not limited to evidence discovered or otherwise developed by the Plan Administrator or the Claims Administrator.

(2)      Failure to furnish such proof within such time will not invalidate nor reduce any claim if it was not reasonably possible to furnish such proof within such time.  Such proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required, and the Claims Administrator is able to certify the period of Disability.

(3)      Proof of continued Disability and regular attendance of a Physician must be given to the Plan Administrator, or the Claims Administrator acting as agent of the Plan Administrator, within 60 calendar days of the request for the proof.

3.14    Source of Payments.  All Disability Benefits and associated expenses (unless paid by the Employer) under the Plan will be paid exclusively by a Participating Employer out of its general assets (including payments made by a Claims Administrator as agent for the Participating Employer) or from the Benefit Trust, as determined by the Employer.

3.15    Examination.  The Plan Administrator, at its own expense, will have the right and opportunity to have a Participant, whose Injury or Sickness is the basis of a claim, examined by a Physician or vocational expert of its choice.  This right may be used as often as reasonably required.

3.16    Right of Recovery.  If a benefit overpayment on any claim occurs, including overpayment resulting from fraudulent claims or claims paid in error, reimbursement must be made by the Participant to the Plan within 60 days of such overpayment, or the Plan has the right to reduce future benefit payments until such reimbursement is received.  The Plan, or the Claims Administrator acting as agent for the Plan, has the right to recover such overpayments from the Participant or the Participant's estate.

Wachovia/Conrad 125

### 3.17    Reimbursement Agreement, Subrogation.

(a)    If a Participant receives or becomes eligible to receive any benefit (a "Reimbursable Benefit") arising from an accident, injury, or illness for which the Participant has, may have, or has asserted any claim or rights to recovery against a third party or parties, then any payments by this Plan with respect to such Reimbursable Benefit will be made on the condition that this Plan will be reimbursed by the Participant or the Participant's estate, to the extent of any amount or amounts received or receivable from or with respect to the third party or parties, whether by way of suit, judgment, settlement, compromise, or otherwise and without regard to how the amount received from the third party or parties is characterized. Any monies recovered by the Participant or the Participant's estate must be held in constructive trust for the benefit of the Plan until such time that the Plan is reimbursed.

(b)    The "make whole doctrine" arising under federal common law and under state law does not apply to the Plan's reimbursement or subrogation rights. The Plan has the right to first reimbursement out of any recovery and retains its subrogation rights described herein regardless of whether the Participant's receipt of payment from other sources fully reimburses the Participant or whether the Participant has been "made whole." The Plan's reimbursement and subrogation rights apply to the full amount the Participant receives without regard to the nature or characterization of the proceeds whether by judgment, settlement, arbitration award, or otherwise (unreduced by attorney's fees and other expenses of recovery). The Plan does not share in the cost of the Participant's recovery.

(c)    To the extent set forth in the summary plan descriptions and any subsequently issued summary of material modifications, the Participant may be obligated to sign a reimbursement agreement, as prescribed by the Plan Administrator, before any Reimbursable Benefits are paid from this Plan. If Reimbursable Benefits are to be paid with respect to a dependent who is a minor, the Plan Administrator may require the Participant to execute a reimbursement agreement on the minor's behalf. All Participants will be obligated to cooperate with this Plan in its efforts to enforce its reimbursement rights and to refrain from any actions that interfere with those rights. The Plan will have the right to take all appropriate actions necessary to enforce its reimbursement rights in the event that a Participant refuses to sign a reimbursement agreement, refuses to reimburse this Plan in accordance with the Plan's reimbursement rights, or takes any other action inconsistent with the Plan's reimbursement rights. In such situations, the Plan's options will include, without limitation, the right in appropriate cases to deny benefits to an individual who refuses to sign a reimbursement agreement; to institute legal actions to recover sums wrongfully withheld or to obtain other relief; and/or to offset wrongfully withheld sums against future benefit payments otherwise owed the Participant.

(d)    The Plan will be subrogated to all claims, demands, actions, and rights of recovery of the Participant against a third party or parties to the extent of any and all payments made by the Plan with respect to Reimbursable Benefits, and the reimbursement agreement will so provide. The Plan will have a lien against the proceeds of any recovery by the Participant and against future benefits due under the Plan in the amount of any claims paid. This lien will attach as soon as any person or entity agrees to pay any money to or on behalf of any covered individual

Wachovia/Conrad 126

that would be subject to the Plan's right of recovery if and when received by the Participant. If the Participant fails to repay the Plan from the proceeds of any recovery, the Plan Administrator may satisfy the lien by deducting the amount from future claims otherwise payable under the Plan.

(e)     If the Participant fails to take action against a responsible third party to recover damages within one year or within 30 days of a request by the Plan Administrator, the Plan will be deemed to have acquired, by assignment or subrogation, a portion of the Participant's claim equal to the Plan's prior payments of Reimbursable Benefits. The Plan may thereafter start proceedings directly against any responsible third party. The Plan will not be deemed to waive its rights to begin action against a third party if it fails to act after expiration of one year, nor will the Plan's failure to act be deemed a waiver or discharge of the lien described in (d) above. The Participant must cooperate fully with the Plan in asserting claims against a responsible third party, and such cooperation will include, where requested, the filing of suit by the Participant against a responsible third party and the giving of testimony in any action filed by the Plan. If the Participant fails or refuses to cooperate in connection with the assertion of claims against a responsible third party, the Plan Administrator may deny future Disability Benefits.

3.18   Workers' Compensation.  Disability Benefits under the Plan are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

Wachovia/Conrad 127

# ARTICLE 4

# ADMINISTRATION

4.1     Plan Administrator.  The Employer is the administrator of the Plan for purposes of the Employee Retirement Income Security Act of 1974.  The Employer may appoint one or more Employees to conduct the general administration of the Plan, and to have the responsibility for carrying out its provisions.

4.2     Named Fiduciary.  The Employer will be the named fiduciary responsible for administration of the Plan.  The Employer may, however, delegate to any person or entity any powers or duties of the Employer under the Plan, and to the extent of any such delegation, the delegate will become a named fiduciary (if the delegate is a fiduciary by reason of the delegation); and references herein to the Employer will apply instead to its delegate.  Any action by the Employer assigning any of its responsibilities to specific persons who are all Employees of the Employer will not constitute delegation of the Employer's responsibility but rather will be treated as the manner in which the Employer has determined internally to discharge such responsibility.

4.3     Rules of Administration.  The Employer will adopt such rules for administration of the Plan as it considers desirable, provided they do not conflict with the Plan or applicable law.  The Plan Administrator will have the exclusive right and the sole discretionary authority to interpret the terms and provisions of the Plan and to resolve all questions arising thereunder, including, without limitation, the authority to determine eligibility for Benefits and the right to resolve and remedy ambiguities, inconsistencies or omissions in the Plan, and, subject to Section 4.7, such action will be conclusive.  Records of administration of the Plan will be kept, and Participants may examine records pertaining directly to them.

4.4     Services to the Plan.  The Employer may contract for legal, actuarial, investment advisory, medical, accounting, clerical and other services to carry out the Plan.  The costs of such services and other administrative expenses will be paid by the Employer.

4.5     Funding Policy.  The Plan's funding policy and method are to provide benefits through the general assets of Participating Employers or the Benefit Trust, as determined by the Employer.

4.6     Claims Procedure.  Claims are to be submitted to the Claims Administrator in accordance with procedures approved by the Plan Administrator.

4.7     Denial of Claim.

(a)     The Claims Administrator will review claims for benefits, including claims resulting after the termination of the Participant's benefits, and respond thereto within a reasonable time after receiving the claim but under no circumstances later than 45 days after receipt of the claim by the Claims Administrator, unless the Claims Administrator determines that an extension of time is necessary for reasons beyond the Claims Administrator's control.  If

-29-

Wachovia/Conrad 128

an extension is deemed necessary, the Claims Administrator will notify the claimant prior to the end of the 45-day period of the reason for the extension and indicate the date the Claims Administrator expects to make a decision, which will be as soon as reasonably possible but no later than 30 days after the end of the initial 45-day period. If an additional extension is necessary for reasons beyond the control of the Claims Administrator, the Claims Administrator will notify the Claimant of the reason for the extension and the date the Claims Administrator expects to make a decision, which will be as soon as reasonably possible but no later than 30 days after the end of the first 30-day extension. If the extension is necessary because the claimant has failed to provide information necessary to decide the claim, the claimant will have 45 days from the date of the notice of extension to provide the information requested in the notice and the time period during which the Claims Administrator must make a determination is tolled until the earlier of the date the information is provided or 45 days from the date of the notice. The Claims Administrator will provide to every claimant who is denied a claim for benefits written notice setting forth, in a manner calculated to be understood by the claimant, the following:

(1)    The specific reason or reasons for the denial;

(2)    References to the specific Plan provisions upon which the denial is based;

(3)    A description of any additional material or information necessary for the claimant to perfect the claim and an explanation as to why such information is necessary;

(4)    An explanation of the Plan's claim review procedures and the time limits applicable to such procedures, including a statement that the Participant has a right to bring a civil action under Section 502(a) of ERISA following an adverse benefits determination on review by the Claims Appeal Reviewer;

(5)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either a description of the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request;

(6)    If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request; or

(7)    A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document or record is "relevant" will be determined in accordance with Labor Reg. 2560.503-1(m)(8).

Wachovia/Conrad 129

(b)     Within 180 days of receipt by a claimant of a notice from the Claims Administrator denying a claim under paragraph (a), the claimant or his or her duly authorized representative may request in writing a full and fair review of the claim by the Claims Administrator. The claimant will have the right to submit documents, records or other information related to the claim without regard to whether such information was submitted or considered during the review referenced in paragraph (a) above and the Claims Administrator must take into account such information. The Claims Administrator will make a determination within a reasonable time but under no circumstances later than 45 days after the Claims Administrator's receipt of a request for review, unless the Claims Administrator determines that an extension of time for processing is required for reasons beyond the control of the Claims Administrator. If an extension is deemed necessary, the Claims Administrator will notify the claimant prior to the end of the 45-day period of the reasons for the extension and indicate the date the Claims Administrator expects to make a decision, which will be as soon as reasonably possible but no later than 45 days after the end of the initial 45-day period. If the extension is necessary because the claimant has failed to provide information necessary to decide the claim, the claimant will have 45 days from the date of the notice of extension to provide the information requested in the notice and the time period during which the Claims Administrator must make a determination is tolled until the earlier of the date the information is provided or 45 days from the date of the notice. The decision on review will be in writing or by means of an electronic medium that satisfies the requirements of 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv), and will include, in a manner calculated to be understood by the claimant, the following:

(1)     the specific reason or reasons for the denial;

(2)     specific references to pertinent Plan provisions upon which the denial is based;

(3)     a description of any additional material or information necessary for the claimant to perfect the claim;

(4)     an explanation of the Plan's claim review procedures and the time limits applicable to such procedures, including a statement that the Participant has a right to bring a civil action under Section 502(a) of ERISA following an adverse benefits determination on review by the Claims Appeal Reviewer;

(5)     if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either a description of the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request;

(6)     if the claim involves medical judgment, either an explanation of the scientific or clinical judgment, applying the terms of the Plan to the claimant's specific

Wachovia/Conrad 130

circumstances or a statement that such explanation will be provided upon request and free of charge; or

(7)   a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document or record is "relevant" will be determined in accordance with Labor Reg. 2560.503-1(m)(8).

The determination made by the Claims Administrator under this paragraph (b) will be:

(1)   made without deference to the adverse determination referenced in paragraph (a);

(2)   conducted by individual(s) who were neither involved in the determination described in paragraph (a) nor a subordinate of such individual(s);

(3)   if the claim involves medical judgment, the Claims Administrator must consult with a health care professional who has appropriate training and experience in the field of medicine involved in the judgment and will provide upon request and free of charge the identity of any medical or vocational experts whose advice was obtained on behalf of the Plan in accordance with this subparagraph (b).

(c)   Within 60 days of receipt by a claimant of a notice from the Claims Administrator denying a claim under paragraph (b), the claimant or his or her duly authorized representative may request in writing a further review of the claim by the Plan Administrator or such person or persons designated by the Plan Administrator (the "Claims Appeal Reviewer"). The Claims Appeal Reviewer may extend the sixty-day period where the nature of the benefit involved or other attendant circumstances make such extension appropriate. The claimant will have the right to submit documents, records, or other information related to the claim without to whether such information was submitted or considered during the review referenced in paragraph (a) and (b) above and the Claims Appeal Reviewer must take into account such information. The Claims Appeal Reviewer will make a decision within a reasonable period of time but in no event later than 45 days after the Claims Appeal Reviewer's receipt of a request for review, unless the Claims Appeal Reviewer determines that an extension of time for processing is necessary for reasons beyond the control of the Claims Appeal Reviewer. If an extension is deemed necessary, the Claims Appeal Reviewer will notify the claimant prior to the end of the 45-day period of the reasons for the extension and indicate the date the Claims Appeal Reviewer expects to make a decision, but under no circumstance will the decision be made later than 45 days after the end of the initial 45-day period. If the extension is necessary because the claimant has failed to provide information necessary to decide the claim, the claimant will have 45 days from the date of the notice of extension to provide the information requested in the notice and the time period during which the Claims Appeal Reviewer must make a determination is tolled until the earlier of the date the information is provided or 45 days from the date of the notice. The decision on review will be in writing or by means of an electronic medium that satisfies the requirements of 29 CFR

Wachovia/Conrad 131

2520.104b-1(c)(1)(i), (iii), and (iv), and will include, in a manner calculated to be understood by the claimant, the following:

   (1) the specific reason or reasons for the adverse determination;

   (2) specific reference to the pertinent Plan provisions upon which the benefit determination is based;

   (3) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document or record is "relevant" will be determined in accordance with Labor Reg. 2560.503-1(m)(8);

   (4) a statement informing the claimant of his right to bring suit in federal under Section 502(a) of the ERISA;

   (5) if an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either a description of the specific rule, guideline, protocol, or other similar criterion; or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided free of charge to the claimant upon request;

   (6) if the claim involves medical judgment, either an explanation of the scientific or clinical judgment, applying the terms of the Plan to the claimant's specific circumstances or a statement that such explanation will be provided upon request and free of charge;

The determination made by the Claims Appeal Reviewer under this paragraph (c) will be:

   (1) made without deference to the adverse determination in paragraph (a) or (b);

   (2) conducted by individual(s) who were not involved in the determination described in paragraph (a) or (b) nor a subordinate of such individual(s);

   (3) if the claim involves medical judgment, the Claims Appeal Reviewer must consult with a health care professional who has appropriate training and experience in the field of medicine involved in the judgment and will provide upon request and free of charge the identity of any medical or vocational experts whose advice was obtained on behalf of the Plan in accordance with this subparagraph (c).

  4.8 <u>Legal Proceedings</u>.  A claimant or the claimant's authorized representative cannot start any legal action:

Wachovia/Conrad 132

        (a)     until after the exhaustion of the administrative remedies under Section 4.7; nor

        (b)     more than one (1) year after the time proof of claim is required under the claim procedures approved by the Plan Administrator.

    4.9     <u>Operation</u>. All interpretations, decisions, and designations by the Employer under the Plan will be made in a manner in which persons similarly situated are treated alike.

    4.10   <u>Responsibility for Administration</u>. Neither the Employer, nor any of its directors, officers, employees or agents will be liable for any loss due to error or omission in administration of the Plan unless the loss is due to the gross negligence or willful misconduct of the party to be charged or is due to the failure of the party to be charged to exercise a fiduciary responsibility with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

    4.11   <u>Indemnification of Administrative Personnel</u>. The Employer will indemnify each officer or employee of the Employer for all expenses (other than amounts paid in settlement to which the Employer does not consent) reasonably incurred by him or her in connection with any action to which he or she may be a party by reason of his or her performance of administrative functions and duties under the Plan, except in relation to matters as to which he or she will be adjudged in such action to be personally guilty of gross negligence or willful misconduct in the performance of his or her duties. The foregoing rights to indemnification will be in addition to such other rights as the individual may enjoy as a matter of law or by reason of insurance coverage of any kind. Rights granted hereunder will be in addition to and not in lieu of any rights to indemnification to which the individual may be entitled pursuant to the Employer's by-laws or applicable law.

ATL01:11561949v1

Wachovia/Conrad 133

## ARTICLE 5

## AMENDMENT AND TERMINATION

5.1     Amendment.  The Employer will have the right at any time, by or pursuant to action of its Board of Directors or the Human Resources Committee of the Board, to amend the Plan.  In addition, the Human Resources Division may amend the Plan, at any time, to the extent it deems necessary in order to accomplish the following:

(a)     To comply with the requirements of the Code and any amendment thereto, any other law, or any rule or regulation issued in interpretation of the Code or any applicable law;

(b)     To make all technical, administrative, regulatory, and compliance amendments;

(c)     To make all amendments that it deems appropriate in connection with an acquisition by the Employer or its subsidiaries or affiliates of a corporation or other legal entity; and

(d)     To make any other amendment or election that will not significantly increase the cost of the Plan to the Employer.

Any action to amend the Plan taken by the Human Resources Division may be taken by any appropriate human resources officer of the Employer.  An amendment will become effective as provided therein.

5.2     Termination.  Although the Employer intends to maintain the Plan for an indefinite period, the Employer reserves the absolute right to terminate or partially terminate the Plan at any time, for any reason, by or pursuant to action of its Board of Directors.  Furthermore, each Participating Employer may terminate its participation in the Plan at any time.  Any termination or partial termination of the Plan will not adversely affect the payment of Benefits to which to which a covered individual was entitled under the terms of the Plan prior to the date of termination or partial termination.  Thereafter, no covered individual nor any Participating Employer will have any liability or obligation to make any further contributions under the Plan.

Wachovia/Conrad 134

## ARTICLE 6

## MISCELLANEOUS

6.1     Effect on Employment.  This Plan will not confer upon a person any right to be continued in the employment of a Participating Employer.

6.2     Alienation of Benefits.  Except as otherwise provided by law and by contract governing any Benefit of under this Plan, no Benefit under this Plan may be voluntarily or involuntarily assigned or alienated.

6.3     Facility of Payment.  If a benefit is payable to a Participant's estate, a Participant who is a minor, or who is not competent, the Plan Administrator may direct the Claims Administrator to pay up to $2,000 to any of the Participant's relatives or any other person whom the Plan Administrator considers entitled thereto by reason of having incurred expense for the maintenance, medical attendance or burial of the Participant. If the Plan in good faith, pays the benefit in such a manner, the Plan will not have to pay such benefit again.

6.4     Lost Distributees.  Any benefit payable hereunder will be deemed forfeited if the Employer or Claims Administrator is unable to locate the Participant to whom payment is due; provided, however, that such benefit be reinstated if a claim is made by such person for the forfeited benefit within one year of the date of loss.

6.5     Severability.  If any provision of this Plan will be held invalid or unenforceable, such invalidity or unenforceability will not affect any other provision, and this Plan will be construed and enforced as if such provision had not been included.

6.6     Applicable Law.  Except as may otherwise be required by the controlling law of the United States, the Plan will be construed, administered, and enforced in accordance with the laws of the State of North Carolina.

IN WITNESS of its adoption of this amended and restated Plan, the Employer has caused this instrument to be executed by its duly authorized officer this __17th__ day of __December__ 2003.

WACHOVIA CORPORATION

By:___Benjamin J. Jolley___
~~Executive~~ Vice President
Senior

-36-

Wachovia/Conrad 135

# LIBERTY MUTUAL

Liberty Mutual Group

## ANNEX A-1

## DISABILITY RISK MANAGEMENT AGREEMENT

Effective January 1, 1998 between Liberty Life Assurance Company of Boston (*hereinafter referred to as Liberty*) and Wachovia Corporation (*hereinafter referred to as the Sponsor*). This Plan's anniversary date will occur each succeeding January 1st.

The Sponsor agrees to pay the benefits provided by the Plan in accordance with its provisions and Liberty agrees to provide the administrative and other services described in this Agreement.

### Participating Employers

As they relate to this Plan, all actions, agreements and notices between Liberty and the Sponsor will be binding on the Participating Employers (as defined in the Plan).

### Plan Changes

The Plan may be terminated or changed in whole or in part by the Employer. The change must be in writing and endorsed on or attached to the Plan.

No other person, including an agent, may change this Plan or waive any part of it.

### Time of Payment of Claims

When Liberty, on behalf of the Sponsor, receives satisfactory proof of claim, the benefit payable under this Plan will be paid at least monthly depending on the coverage for which claim is made, during any period for which the Sponsor is liable.

### Subrogation

Liberty will gather information as a part of its normal procedures to determine the existence of possible subrogation claims. Liberty will identify possible subrogation claims in accordance with guidelines established by Liberty and Sponsor. Liberty will, at the Sponsor's request and in accordance with plan provisions, cooperate fully in the facilitation of recoveries.

Wachovia/Conrad 136

## APPENDIX A

## PLANS OF ACQUIRED ENTITIES

Disability Benefits payable under a plan that was sponsored by one of the following entities will continue to be paid pursuant to the terms of such plan. Notwithstanding the foregoing, the provisions of Section 4.7 of the Plan relating to the denial of claims will supercede any similar provision in a plan that was sponsored by one of the entities listed below.

- First American

- Dominion Bank

- First Fidelity

- CoreStates

- Meridian

- Central Fidelity

- Jefferson National Bank

- Legacy Wachovia Corporation

A-1

Wachovia/Conrad 137

# APPENDIX B
## ELIGIBLE FUNCTIONAL INCENTIVE PAY

| Earnings Code | | Start Date |
|---|---|---|
| A4 | CBG FUMC Com Mort Sales Inct | 01-Jan-01 |
| AC3 | CMKG Equity Commissions Supp | 01-Jan-01 |
| AC4 | CMKG Equity Commissions Supp | 01-Jan-01 |
| AS | CMG FUBS Reg Reps Sales Inct | 01-Jan-01 |
| BA | CMG Personal Inv Couns Inct | 01-Jan-01 |
| BA7 | Key Contributor (FUBS accrual account) | 01-Jan-01 |
| BA8 | Key Contributor (FUBS accrual account) | 01-Jan-01 |
| BA9 | Key Contributor (FUBS expense account) | 01-Jan-01 |
| BE2 | Everen Commissions Plan | 01-Jan-01 |
| BE3 | Everen Guarantee | 01-Jan-01 |
| BE5 | Everen Trainee Pay | 01-Jan-01 |
| BE6 | Everen Enhanced Payout | 01-Jan-01 |
| BE7 | Everen Giveaway | 01-Jan-01 |
| BE8 | Everen IC Electv LKBK | 01-Jan-01 |
| BEC | Everen Recruiting Bonus | 01-Jan-01 |
| BED | Everen Scorecard Bonus | 01-Jan-01 |
| BEE | Everen Profitability Bonus | 01-Jan-01 |
| DF | Wholesale/Correspondent Acct Exec Plan | 01-Jan-01 |
| DRW | Draw Earnings | 01-Jan-01 |
| K4 | WIS Producer Commission | 01-Jan-01 |
| KAB | FinConsult | 01-Jan-01 |
| KCJ | GBG FC Premium | 01-Jan-01 |
| KCR | Direct Roll-over from Key Contributor | 01-Jan-01 |
| KK | CMG Insurance Spec Incentive | 01-Jan-01 |
| KZB | FinConsult | 01-Jan-01 |
| SIE | Deferral of Monthly/Qtrly Incentives | 01-Jan-01 |
| SSE | Deferral of Monthly/Qtrly Incentives | 01-Jan-01 |
| UA1 | CMG Wheat Spy Bonus | 01-Jan-01 |
| UA2 | CMG Wheat Spy Bonus | 01-Jan-01 |
| UC1 | Profit Formula Earnings | 01-Jan-01 |
| UC2 | Profit Formula Earnings | 01-Jan-01 |
| UL1 | Comm/Pretax Earnings | 01-Jan-01 |
| UL2 | CMG Wheat Commission S/Rate | 01-Jan-01 |
| UN1 | Retail Recruiting Bonus A/Rate | 01-Jan-01 |
| UN2 | Retail Recruiting Bonus S/Rate | 01-Jan-01 |
| UR1 | Finders Fees/Spec Bonus Pmts | 01-Jan-01 |
| UR2 | Finders Fee/Spec Bonus Pmt | 01-Jan-01 |
| UT1 | CMG Wheat Mgr Ovr A/Rate | 01-Jan-01 |

B-1

Wachovia/Conrad 138

| | | |
|---|---|---|
| UT2 | CMG Wheat Mgr Ovr S/Rate | 01-Jan-01 |
| UXR | Direct Roll-over from Key Contributor | 01-Jan-01 |
| UX3 | Key Contributor (Securities expense acct) | 01-Jan-01 |
| UX4 | Key Contributor (Securities expense acct) | 01-Jan-01 |
| ET | WM FSO Commission | 01-June-01 |
| GH5 | CMG - Worksite Comml IS | 01-June-01 |
| UAI | Deferral – Broker Vol. Plan ISG | 31-July-01 |
| USI | Deferral – Broker Vol. Plan ISG | 31-July-01 |
| UCC | Defpayout - Broker Vol. Plan ISG | 31-July-01 |
| UCA | DefRoll - Broker Vol. Plan ISG | 31-July-01 |
| UAV | Deferral  - Broker Vol. Plan PCG | 31-July-01 |
| USV | Deferral  - Broker Vol. Plan PCG | 31-July-01 |
| UBV | Defpayout - Broker Vol. Plan PCG | 31-July-01 |
| URB | DefRoll - Broker Vol. Plan PCG | 31-July-01 |
| BBF | CMG Corp/Inst Tr Sales ITS | 01-Nov-01 |
| BBH | CMG Corp/Inst Tr Sls Del Trust | 01-Nov-01 |
| ASC | Atlantic Savings Comm | 01-Jan-02 |
| BMT | Brnch Man Profit Bon 401k Elig | 01-Jan-02 |
| HCO | Commission 401k Elig | 01-Jan-02 |
| MCM | Mortgage Commission | 01-Jan-02 |
| BBG | CMG Corp/Inst Tr Sales Corp Tr | 01-Jan-03 |
| CMW | WM Insurance Advisor Commission - A | 01-July-02 |
| FN1 | Commissions BEC Annualized | 15-Nov-02 |
| FN2 | Commissions BEC Supplemental | 15-Nov-02 |
| CMV | WM Comm Plan Insur Advisor – S | 20-Mar-03 |
| WCM | WIS Commission – Monthly Pay | 10-Dec-03 |
| WDS | WIS Draw – Semi-monthly Pay | 10-Dec-03 |
| WCS | WIS Commission – Semi-monthly Pay | 10-Dec-03 |
| WDM | WIS Draw – Monthly Pay | 10-Dec-03 |
| 031 | Style of Business P/O (FAIT) | 01- Jan-04 |
| 032 | Commissions | 01-Jan-04 |
| 034 | Managers Forgivable Adj. | 01-Jan-04 |
| RSB | Managers Step Down Forgivable Draw | 01-Jan-04 |
| 039 | Referral Back End Bonus – Non AL | 01-Jan-04 |
| 041 | FAIT Training Gty (Type - L) | 01-Jan-04 |
| 042 | FAIT Training GTY (Type – N) | 01-Jan-04 |
| 050 | FAIT Guarantee (Pay Adj. – K) | 01-Jan-04 |
| 051 | Managers Forgivable Draw | 01-Jan-04 |
| 052 | Asst Mgrs Forgivable Draw | 01-Jan-04 |
| 053 | AE – FA Guarantee | 01-Jan-04 |
| 068 | FAIT Bonus | 01-Jan-04 |
| 06W | FACDP 2001 Cash Bonus Award | 01-Jan-04 |
| 092 | Draw | 01-Jan-04 |
| 093 | Guarantee Draw | 01-Jan-04 |
| 094 | Commissions ADJ | 01-Jan-04 |

B-2

Wachovia/Conrad 139

| | | |
|---|---|---|
| 095 | FACDP Draw | 01-Jan-04 |
| OPC | Pre-Paid Commissions | 01-Jan-04 |
| OSB | Back End Bonus | 01-Jan-04 |
| 127 | BIA-MA | 01-Jan-04 |
| 176 | BIN-NV | 01-Jan-04 |
| 182 | BIO-OK | 01-Jan-04 |
| 185 | BIAL-AL | 01-Jan-04 |
| 399 | Deficit Recoup | 01-Jan-04 |
| 459 | Referral Reward | 01-Jan-04 |
| 469 | FAIT Referral Reward | 01-Jan-04 |
| B23 | 2003 Location Profit Bonus | 01-Jan-04 |
| BM3 | 2003 Branch Manager Cash | 01-Jan-04 |
| BMF | BM Front-End Bonus 99+ | 01-Jan-04 |
| FSB | FA Backend Bonus 99+ | 01-Jan-04 |

B-3

Wachovia/Conrad 140

## APPENDIX C

## WACHOVIA SHORT-TERM MEDICAL LEAVE BENEFIT

This Appendix C will apply to any Employee who had at least 10 years of service with the Corporation as of December 31, 1998 and who was eligible for grandfathered Extended Sick Leave benefits under the Wachovia Short-Term Medical Leave Plan (hereinafter referred to as a "Legacy Wachovia Employee").

Benefits. The first ten weeks of Disability Benefits for a Legacy Wachovia Employee who has 10-14 years of service with the Corporation as of December 31, 1998 will be increased to 100% of Pre-Disability Earnings less the Benefits from Other Income in accordance with the terms of the Wachovia Short-Term Medical Leave Plan (the "Legacy Plan"). After the first ten weeks of Disability Benefits for these Legacy Wachovia Employees, the Disability Benefits for which the Legacy Wachovia Employee is entitled will be determined in accordance with the terms of the Plan without regard to this Appendix C.

The first twenty-six weeks of Disability Benefits for a Legacy Wachovia Employee who has 15 or more years of service with the Corporation as of December 31, 1998 will be increased to 100% of Pre-Disability Earnings less the Benefits from Other Income in accordance with the terms of the Legacy Plan. After the first twenty-six weeks of Disability Benefits for these Legacy Wachovia Employees, the Disability Benefits for which the Legacy Wachovia Employee is entitled will be determined in accordance with the terms of the Plan without regard to this Appendix C.

Effective for any Disability which occurs on or after January 1, 2004, Disability Benefits for all Legacy Wachovia Employees will be determined in accordance with the terms of the Plan without regard to this Appendix C.

Notwithstanding the foregoing, the provisions of Section 4.7 of the Plan relating to the denial of claims will supercede any similar provision in the Legacy Plan.

C-1

Wachovia/Conrad 141

# TABLE OF CONTENTS

Page

ARTICLE 1   DEFINITIONS AND CONSTRUCTION ........................................................ 2
   1.1   Definitions ........................................................................................... 2
   1.2   Gender and Number ............................................................................. 8
ARTICLE 2   PARTICIPATION ............................................................................... 9
   2.1   Commencement of Participation .......................................................... 9
   2.2   Agreement to Participate ...................................................................... 9
   2.3   Cessation of Participation .................................................................... 9
   2.4   Rehire Terms ...................................................................................... 10
   2.5   Family/Medical Leave ....................................................................... 10
ARTICLE 3   BENEFITS ...................................................................................... 11
   3.1   Benefits Eligible Compensation or BEC ........................................... 11
   3.2   Payment of Disability Benefits ......................................................... 20
   3.3   Amount and Duration of Benefits ...................................................... 20
   3.4   Discontinuation of Benefits ............................................................... 21
   3.5   Successive Periods of Disability ........................................................ 22
   3.6   Mental Illness or Chemical Dependency Limitation .......................... 22
   3.7   Work Incentive Benefits .................................................................... 23
   3.8   Cost of Living Freeze ........................................................................ 24
   3.9   Lump Sum Payments ......................................................................... 24
   3.10   Estimated Benefits ............................................................................ 24
   3.11   Prorated Benefits ............................................................................... 25
   3.12   Exclusions ......................................................................................... 25
   3.13   Notice and Proof of Claim ................................................................. 25
   3.14   Source of Payments ........................................................................... 26
   3.15   Examination ....................................................................................... 26
   3.16   Right of Recovery .............................................................................. 26
   3.17   Reimbursement Agreement, Subrogation .......................................... 27
   3.18   Workers' Compensation ..................................................................... 28
ARTICLE 4   ADMINISTRATION ......................................................................... 29

Wachovia/Conrad 142

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 4.1 | Plan Administrator | 29 |
| 4.2 | Named Fiduciary | 29 |
| 4.3 | Rules of Administration | 29 |
| 4.4 | Services to the Plan | 29 |
| 4.5 | Funding Policy | 29 |
| 4.6 | Claims Procedure | 29 |
| 4.7 | Denial of Claim | 29 |
| 4.8 | Legal Proceedings | 33 |
| 4.9 | Operation | 34 |
| 4.10 | Responsibility for Administration | 34 |
| 4.11 | Indemnification of Administrative Personnel | 34 |
| ARTICLE 5 | AMENDMENT AND TERMINATION | 35 |
| 5.1 | Amendment | 35 |
| 5.2 | Termination | 35 |
| ARTICLE 6 | MISCELLANEOUS | 36 |
| 6.1 | Effect on Employment | 36 |
| 6.2 | Alienation of Benefits | 36 |
| 6.3 | Facility of Payment | 36 |
| 6.4 | Lost Distributees | 36 |
| 6.5 | Severability | 36 |
| 6.6 | Applicable Law | 36 |
| ANNEX A-1 | | Annex A-1 |
| APPENDIX A | | A-1 |
| APPENDIX B | | B-1 |
| APPENDIX C | | C-1 |

ATL01/11561949v1

Wachovia/Conrad 143

## MEMORANDUM

| To: Ben Jolley | Date: December 17, 2003 |
|---|---|
| From: Larry Brundick | Re: Substantive Changes to LTD Plan Document and STD Plan Document |

The following summarizes the substantive changes made to the Wachovia Corporation Long Term Disability Plan Document and Short Term Disability Plan Document for 2004. Please note for 2004, there were relatively few substantive changes to either Plan.

**Long Term Disability:**

**Article 3, Benefits Eligible Compensation or (BEC)**
Special transition rules were added as it relates to PSI Transferred Employees for their calculation of BEC.

Article 3.7(d)(1), (2), and (3), the words "or equal to" in front of references 80% of Pre-Disability Earnings.

**Short Term Disability:**

**Article 3, Benefits Eligible Compensation or (BEC)**
Special transition rules were added as it relates to PSI Transferred Employees for their calculation of BEC.

**Appendix A:**
This Appendix will apply to any Employee for whom Wachovia is required by state law to provide state-mandated coverage.

Generally, such an employee, who satisfies the STD Plan eligibility requirements will receive Disability Benefits as described in STD Plan, but such a benefit will be offset by any disability benefits provided under the State Plan. Further, we are requiring that the employee file with the state agency, if applicable, and we further provide that until such an employee provides satisfactory evidence that he or she is not entitled to a disability benefit under the applicable State Plan, the presumed disability benefit under the State Plan will be offset against his or her Disability Benefits.

Wachovia/Conrad 144

**Appendix D:**
This Appendix contains a specific plan document (containing provisions as required under NJ state law), for our New Jersey Private Plan under New Jersey Temporary Disability Benefits Law.   Wachovia (and previously First Union) had a Private Plan for Disability Benefits in New Jersey, however the State of New Jersey did not have a Private Plan document for Wachovia on file.  This document contained in this Appendix D serves to address this issue.


If you have any questions, please let me know.  Thank you.

H

**Conrad**
**630720**

| | DRW - Draw Earnings | UL1 - Commission A/Rate | BE8 - Elective LookBack Bonus | | Monthly BEC |
|---|---|---|---|---|---|
| Jul-04 | $1,734.00 | $2,022.63 | | | $2,629.64 |
| Jun-04 | $1,734.00 | $9,682.41 | | | $7,991.49 |
| May-04 | $1,734.00 | $9,405.85 | | | $7,797.90 |
| Apr-04 | $1,734.00 | $602.27 | | | $1,635.39 |
| Mar-04 | $1,734.00 | $5,528.45 | | | $5,083.72 |
| Feb-04 | $1,734.00 | $10,734.95 | | | $8,728.27 |
| Jan-04 | $1,734.00 | $7,779.70 | | | $6,659.59 |
| Dec-03 | | $877.88 | $1,363.79 | | $1,569.17 |
| Nov-03 | | $8,730.38 | | | $6,111.27 |
| Oct-03 | | $7,585.71 | | | $5,310.00 |
| Sep-03 | | $5,842.59 | | | $4,089.81 |
| Aug-03 | | $9,036.58 | | | $6,325.61 |

$63,931.83 **Rolling 12**

**Wachovia/Conrad 316**



Liberty Life Assurance Company of Boston
Disability Claims
P.O. Box 242484
Charlotte, NC 28224-2484
Phone No.: (800) 853-7108  Ext. 328
Secure Fax No.: (888) 443-4212

February 1, 2005

Robert Conrad
44 Longwood Drive
Sicklerville, NJ 08081-0000

RE:   Long Term Disability Benefits
      Wachovia Corporation
      Claim #: 2021495

Dear Mr. Conrad:

We are writing in regard to your claim for Long Term Disability (LTD) benefits under the Wachovia Corporation's Group LTD Plan and are pleased to advise you that a decision has been made to approve your claim. Our determination is based on your inability to perform the duties of your occupation as defined below. According to the terms of the LTD Plan for Wachovia Corporation:

"Disability or Disabled" means:

(a)    *during the Elimination Period and the next 24 months, the Participant's inability to perform all of the material and substantial duties of his or her own occupation on an Active Employment basis because of an Injury or Sickness; and*

(b)    *after the period described in paragraph (a) above, the Participant's inability to perform all of the material and substantial duties of his or her own or any other occupation for which he or she is or becomes reasonably fitted by training, education or experience because of the Injury or Sickness.*

Your LTD Plan provides benefits at the lesser of: (1) 60% of your Pre-Disability Earnings; or (2) 66 2/3% of your Pre-Disability Earnings less the Benefits from Other Income. In no event shall the Disability Benefit be less than $100.00 per month. Benefits from Other Income means:

(a)    *The amount for which the Participant is eligible under:*
       *(1)   any Worker's or Workmen's Compensation Law;*
       *(2)   any occupational disease law;*
       *(3)   any compulsory benefit act or law; or*
       *(4)   any other act or law of like intent.*

(b)   The amount for which the Participant is eligible under The Jones Act (Title 46 appendix, United States Code Section 688).

(c)   The amount of any disability benefits which the Participant is eligible to receive under:

   (1)   any other group plan of the Participating Employer;
   (2)   any governmental retirement or disability system.

(d)   The amount of benefits the Participant receives under the Employer's Retirement Plan as follows:

   (1)   The amount of any Disability Benefits, or Retirement benefits the Participant voluntarily elects to receive as retirement payment under the Employer's Retirement Plan; and
   (2)   the amount the Participant is eligible to receive as retirement payments when he or she reaches the later of age 62, or normal retirement age as defined in the Employer's Retirement Plan.

(e)   The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan or any similar plan or act, for which:

   (1)   the participant receives or is eligible for; and
   (2)   his or her spouse, child or children receives or are eligible for because of his or her Disability; or
   (3)   his or her spouse, child or children receives or are eligible for because of his or her eligibility for Retirement Benefits.

(f)   The amount of earnings the participant earns or receives from any form of employment.

(g)   The amount a Participant or his or her family receives from any group or franchise insurance or similar plan for persons in a group, excluding the following programs:

   (1)   the Employer's Supplemental Executive Long Term Disability Plan;
   (2)   the Employer's Long Term Disability Restoration Plan; or
   (3)   the Employer's Supplemental Disability benefit Plan.

*Benefits from Other Income, other than Retirement Benefits, must be payable as a result of the same Disability for which the Plan pays a Disability Benefit.*

You must satisfy an Elimination Period of 26 weeks which begins on the first day of Disability. Your date of Disability was August 03, 2004. Therefore, your LTD benefit effective date is February 01, 2005.

Your first check in the amount of $2,472.57 represents LTD benefits due for the period of February 1, 2005 through February 28, 2005, and will be sent under separate cover. Your gross monthly benefit is equal to $3,196.59 until you return to work or are awarded Other Income Benefits as defined above. In addition, if you are released to return to work full time or part-time, please advise us of this change as it will impact your benefits.   **Liberty/Conrad 1134**

Considering the medical and vocational information in your file, it appears you may be eligible to receive Social Security Disability Benefits. Social Security is an insurance program that you

pay for by working and paying FICA taxes. In essence your FICA taxes are the insurance premiums. Social Security covers individuals in the form of retirement, life, and disability insurance.

There are a number of advantages for you if you are approved for Social Security. These advantages are outlined in the attached pamphlet, and include:

> *Higher retirement benefits from Social Security
> *Medicare eligibility after 24 months
> *Annual Cost of Living increase to the Social Security Benefit

If you are approved for Social Security Disability Benefits, the disability benefits you receive from Liberty will be reduced by the amount you and any dependents receive under Social Security. (An exception is Social Security Cost of Living increases, which are yours to keep.) In other words, you will continue to receive the same amount of monthly benefits, but the money will come from two sources.

You have advised us that you have applied for Social Security Disability benefits and have provided us with a copy of the Receipt of Application letter Social Security sent to you. Please notify me immediately when you are awarded Social Security Disability Benefits. Typically you will receive a significant retroactive payment from Social Security shortly thereafter. Much of this money is essentially money that Liberty advanced to you while you were waiting for Social Security's decision, and you must repay it immediately.

We will continue to review your claim and request medical documentation to support your continued disability. We ask that you assist us with your claim to obtain the necessary information to continue benefits. Please notify our office immediately with any changes in your treatment.

Should you have any questions regarding your claim, please contact our office.


Sincerely,

Denise S. Welsh
Sr. Disability Case Manager
Phone No.: (800) 853-7108  Ext. 328
Secure Fax No.: (888) 443-4212

Liberty/Conrad 1135

J



# HAGNER & ZOHLMAN, LLC

### ATTORNEYS AT LAW

JOHN A. ZOHLMAN III ◊ *
THOMAS J. HAGNER ◊

———————

◊  CERTIFIED BY THE SUPREME COURT
    OF NEW JERSEY AS A CIVIL TRIAL
    ATTORNEY
*  ALSO MEMBER OF PA. BAR

COMMERCE CENTER
1820 CHAPEL AVENUE WEST
SUITE 160
CHERRY HILL, NJ 08002
PHONE 856.663.9090
FAX 856.663.9199

JZOHLMAN@HZLAWPARTNERS.COM
THAGNER@HZLAWPARTNERS.COM

June 26, 2008

Wachovia Corporation
Safety & Disability Benefits Committee
Attn: Jim Beaver
Two Wachovia Center, T4
301 South Tryon Street
Charlotte, NC   28288-0960

Re:  **Robert Conrad**
      **Claim No.  2021495**

Dear Mr. Beaver:

Kindly consider this letter as a request for a reconsideration of the denial of benefits set forth in your letter of January 18, 2008.  I am enclosing herewith the following:

(1)  Report of Pravin B. Vasoya, M.D. dated February 1, 2008;

(2)  Report of Jason Cerutti, D.C. dated May 1, 2008;

(3)  Fibromyalgia Residual Functional Capacity Questionnaire completed by Dr. Petruncio;

(4)  Sleep Study conducted by Sleep Care Center of Washington Township on February 6, 2008.

With respect to the sleep study, it confirms that, even with use of the C-PAP, slow wave sleep was absent; Stage III sleep was absent; and Stage IV was absent.  Most significantly, REM sleep was decreased at 7.1%.   20-25% is normal.  It is apparent that even when using C-PAP therapy, Mr. Conrad is lacking REM sleep which is a major reason for his daytime fatigue.

**Wachovia/Conrad 216**

Page Two
January 26, 2008

_____

Additionally, by comparing the February, 2008 sleep study to the 2004 sleep studies, you will see that Mr. Conrad's condition has actually decreased.

Please note that we take issue with the basis for the January 11, 2008 denial in that it incorporates by reference an earlier medical review by a Dr. Howard.  Pursuant to the ERISA regulations, the healthcare professional engaged for purposes of an appellate consultation "shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual."  Therefore your incorporation of the earlier Howard report was improper.

Finally, I should note that Mr. Conrad remains employed by Wachovia and therefore remains eligible to be covered by, and in fact continues to be covered by the LTD plan.  Therefore if this letter is not accepted as a reconsideration of the January 11, 2008, it should be considered as a continuation and/or reapplication of Mr. Conrad's claim for LTD benefits.  Kindly advise us of your position as soon as possible.  Please note that pursuant to the ERISA regulations, specifically § 2560.503-1(3)(i)(4) claimants are entitled to at least 180 days following receipt of a notification of an adverse benefit determination within which to appeal that determination.

Very truly yours,

THOMAS J. HAGNER

TJH/bg
Enclosures
cc:   Robert Conrad



SleepCare Center at Washington Twp.
400 Medical Center Drive  Suite D
Sewell, NJ  08080

Morley, Thomas DO
570 Egg Harbor Road  Harbor Pavilions Suite C-2
Washington Township, NJ  08080
Fax: (856) 582-7872

Petruncio, George MD
188 Fries Mill Rd  Ste E-1
Turnersville, NJ  08012
Fax: (856) 262-0428

**RE: Robert Conrad**
**Sex:** Male
**Date of Birth:** 02/26/1955
**Age:** 52
**Height:** 5-11
**Weight:** 295
**B.M.I.:** 41.1
**Admitting Diagnosis:** Obstructive Sleep Apnea Syndrome (OSAS) 327.23

**Past Sleep History:** Non-Restorative Sleep and Snoring.

**Medical History:**

Thank you for the opportunity to study Robert Conrad. I wanted to give you the results of the split study that was performed at SleepCare Center at Washington Twp. on 02/06/2008. This study was performed to treat the patient's sleep related complaints.

The patient was studied using the Sandman System. Electroencephalogram (EEG), electro-oculogram (EOG), and electromyogram (EMG), were monitored for sleep staging. Nasal pressure monitoring, chest wall movement, abdominal movement, snoring and oxygen saturation were monitored for respiratory assessment. Electrocardiogram (EKG) and tibial EMG were monitored for cardiac arrhythmias and nocturnal limb movements respectively.

In the diagnostic portion of the study, Mr. Conrad slept 120.0 minutes out of 188.4 minutes in bed for a sleep efficiency of 63.7%. The sleep latency was decreased at 52.0 minutes. of the total sleep time was spent in the supine position. Stage I sleep was increased at 8.8%. Stage II sleep was increased at 91.3%. Slow wave sleep total was absent at 0.0%, with Stage III sleep absent at 0.0% and Stage IV sleep absent at 0.0%. There were 0 REM sleep period(s).

The overall apnea hypopnea index was severe at 68.0 events/hr. The supine index was 94.7 events/hr. The obtructive apnea index was 40.5 events/hr. There were 81 obstructive apneas with a mean duration of 15.8 seconds. There were 55 obstructive hypopneas. with a mean duration of 19.8 seconds. Mean saturation was 92.0 with a nadir saturation in non-REM sleep of 72.0% . 79.2% of the study time was spent with a saturation in the 90-100% range. 20.8% of the study time was spent with a saturation below 90%. There were 105 arousals related to respiratory events with an index of 52.5 arousals/hour. There were 64 spontaneous arousals with an index of 32.0 arousals/hour. The etiology of some of these was unclear. Snoring was moderate.

Mean heart rate was 69.8 bpm. Heart rate ranged from 60.0 bpm to 91.0 bpm.

Wachovia/Conrad 218


**KENNEDY**
HEALTH SYSTEM

SleepCare Center at Washington Twp. ,
400 Medical Center Drive  Suite D
Sewell, NJ  08080

**RE: Robert Conrad**

In the treatment portion of the study, due to the obstructive sleep apnea noted, nasal CPAP was titrated from a pressure of 5 CmH2O to 8 CmH2O. On 8 CmH2O, the respiratory disturbance index was reduced to 0 events/hr. The time at the effective pressure was 210.8 minutes including 14.0 minutes in REM sleep. 0 obstructive apneas were seen at the effective pressure. 0 hypopneas were seen at the effective pressure. Mean saturation was 94.8% with a nadir saturation of 86.0%. Robert slept 197.0 minutes out of 275.4 minutes in bed for a sleep efficiency of 71.5%. The sleep latency was decreased at 3.2 minutes. of the total sleep time was spent in the supine position. Stage I sleep was normal at 4.1%. Stage II sleep was increased at 88.8%. Slow wave sleep total was absent at 0.0%, with Stage III sleep absent at 0.0% and Stage IV sleep absent at 0.0%. REM sleep was decreased at 7.1%. REM onset occurred 128.0 minutes into the study.

The overall apnea hypopnea index was normal at 1.2 events/hr. The REM specific index was 0.0 events/hr. The supine index was 1.0 events/hr. There were 4 obstructive hypopneas. with a mean duration of 17.5 seconds. There were 4 arousals related to respiratory events with an index of 1.2 arousals/hour. There were 77 spontaneous arousals with an index of 23.5 arousals/hour. The etiology of some of these was unclear.

Mean saturation was 94.5 with a nadir saturation in non-REM sleep of 86.0% and in REM sleep of 91.0%. 99.0% of the study time was spent with a saturation in the 90-100% range. 0.8% of the study time was spent with a saturation below 90%.

The titration time was adequate. Snoring was eliminated.
Mean heart rate was 60.9 bpm. Heart rate ranged from 52.0 bpm to 82.0 bpm.
The patient did display a normal sinus rhythm.
**SLEEP DISORDER:**

Obstructive Sleep Apnea Syndrome (OSAS). An apnea is a pause in breathing lasting at least 10 seconds. Apneas during wake are a normal phenomenon and not normally associated with any pathology. Sleep apnea is an apnea that occurs during sleep or during the transition from wake to sleep. Obstructive sleep apnea is an apnea during sleep that occurs with continued respiratory effort (as evidenced by thoracic and/or abdominal expansion, intercostals muscle activation, intrathoracic pressure variation, etc.). Obstructive Sleep Apnea Syndrome is a complex syndrome involving excessive apneas, repeated awakenings or arousals from sleep, loud snoring or gasping, excessive daytime sleepiness, and often cardiovascular and neurological complications from blood oxygen plunges and blood pressure swings.

The cause of Obstructive Sleep Apnea Syndrome is a transient lack of upper airway patency during relaxed sleep resulting in a partial or complete collapse of the upper airway blocking inspiration. Excessive intrathoracic pressure eventually opens the airway and often wakens the subject, causing the transient and cyclic phenomena observed in the syndrome.

**IMPRESSIONS**

Severe Obstructive Sleep Apnea Syndrome (OSAS) 327.23

Wachovia/Conrad 219

 **KENNEDY**
HEALTH SYSTEM

**SleepCare Center at Washington Twp.**
**400 Medical Center Drive  Suite D**
**Sewell, NJ  08080**

RE: Robert Conrad

## RECOMMENDATIONS

CPAP at pressure 8 cm/H2O with a ramp of 15 minutes using a Respironics Comfort Gel Sm mask with a heated humidifier .

- Review of the patient's sleep logs
- Avoid driving while sleepy
- Recommend weight loss
- Results should be reviewed in person with the patient

- Evaluation of thyroid function

Obstructive Sleep Apnea could cause hypertension and has been associated with an increased risk of cardiovascular disease, stroke, and insulin resistance. It can disrupt sleep and cause daytime hypersomnolence.

As with all patients who are overweight and have obstructive sleep apnea, a weight loss program is likely to be of benefit.

The patient should be counseled to avoid activity that requires heightened concentration such as driving or operating equipment until these matters can be resolved.

Thank you for the opportunity to study Robert Conrad.

This document was digitally signed originally by Vasoya, Amita DO on 02/14/2008 at 11:09:43 PM

Wachovia/Conrad 220

*PAX   856- 663- 9199*

*To. Tom Hagner*



**Washington Township Neurological Associates. P.C.**

Pravin B. Vasoya, M.D.

General & Sub-Specialty Neurology

EMG/NCV, EEG, Nerve Block, Epidural Block, Facet Block, Pain Management

438 Gunitown Rode, Suite B-3, Sewell NJ 08080 Phone: (856) 256-2600 Fax: (856) 256-2616

**Pt. Name:  Robert Conrad      DOB: 02/26/1955**
Office visit Dt. Feb 01, 2008

Primary Physician: Dr. George , Petruncio
188 Fries Mill Road  - Suite B-1
Turnersville, NJ 08012

**HPI:** I had the privilege of seeing your patient in office consultation. As you know, Robert is a 52 year 11 month old right handed patient with a primary complaint of he has side effect with lyrica specifically visual change water retention and swelling in legs has myelgic pain and sleep deprivation and problem with memory and hyper hydrosis his muscle pain makes him tired easily and not able to finish shoping.

**ROS:** persistent myelgic pain. Patient denies neck pain and Patient denies chest pain, dizziness, orthopnea, palpitations, pedal edema. Patient denies cough, dyspnea, hemoptysis, pleuritic pain, wheezing.

Review of Data: Need sleep study

**Allergy:** ,      Current Medication: (1) **Verapamil Hcl   240 Mg  Cap  SIG:** ONCE A DAY **(2) Hydrochlorothiazide 12.5 Mg  Cap  SIG:** ONCE A DAY **(3) Lexapro   40 Mg  Tab .   Tab  SIG:** ONCE A DAY **(4) Avandia  4 Mg  Tab  SIG:** ONCE A DAY **(5) Zocor   40 Mg  Tab  SIG:** ONCE A DAY **(6) Adderall Xr   20 Mg  Cap  SIG:** 1 every morning **(7) Lyrica 150 Mg  1 Tab Po Qhs  SIG:** AT BED TIME

**EXAMINATION:** Vital Sign:BP 136/88

**HEENT:** Neck was supple without JVD, lymphadenopathy, thyromegaly, or carotid bruit. No scalp tenderness. No tenderness over Para nasal sinuses or TMJ's. No tenderness in neck, range of neck rotation was adequate. Heart: Regular without murmur; Lungs: CTA (no rales, wheeze, or rhonchi), Abdomen: Soft, nontender/nondistended, no hepatosplenomegaly. Patient exhausted, and difficulty staying awake. Extremities: without clubbing, cyanosis, or edema; pulses palpable bilaterally.

**Neuro:** AAOX3 in no acute distress. Has Cooperative affect. Patient is in moderate pain and depressed but not suicidal. Short term and long term recall was adequate with intact visual praxis and comprehension. Serial 7 subtractions from 100 were adequate but slow. Follows 3/4 step command and comprehension was adequate. Mild dysphasia and dysarthria noted. There were no stigmata of neurocutaneous disorder. Head was normocephalic, atraumatic. Pupils were equal and reactive bilaterally. Extra ocular movement was full without nystagmus or gaze paresis. Optic disks were clear without drusion or papilledema. Venous pulsations were adequate. No evidence of conjunctival or subhyloid hemorrhage. Holpike's maneuver was positive revealing end gaze reproducible nystagmus. Face was symmetrical and tongue protrusion was midline with normal facial sensation. Cranial nerve examination was within normal limits. Shoulder shrug

Wachovia/Conrad 221

was adequate. Fine and gross motor movement of hands were reduced. Myelgic tenderness present and there is generalised weakness. No fasciculation or myotonia noted. Proximal and distal motor strength in the upper extremities was --4/5 and lower extremity motor strength was +4/5. Neck flexion weakness is noted. Pt can't walk on tips of toes and on heels. Gait was wide based and waddling. Romberg was normal. Finger to nose showed no dysmetria or dysdiadokokinesis. Deep tendon reflexes were symmetrical +2/4 upper and lower extremities. Babinski was negative. Sensory exam was normal to cold, pinprick, vibration and position. There was no dystonia, tremor, rigidity, or joint deformity. subnectively patient has peroxysmal numbness but objective exam sensory point of vew normal. hyperpathia at B/L occipital area noted.

IMPRESSION: 742.51   FIBROMYELGIA
OSA
Obesity
Neuropathy

CARE PLAN: consider Provigil 200 mg po Q AM  need sleep study **(1) Verapamil Hcl   240 Mg   Cap** SIG: ONCE A DAY **(2) Hydrochlorothiazide   12.5 Mg   Cap** SIG: ONCE A DAY **(3) Lexapro   40 Mg   Tab Tab** SIG: ONCE A DAY **(4) Avandia   4 Mg   Tab** SIG: ONCE A DAY **(5) Zocor   40 Mg   Tab** SIG: ONCE A DAY **(6) Adderall Xr   20 Mg   Cap** SIG: 1 every morning **(7) Lyrica 150 Mg   1 Tab Po Qhs** SIG: AT BED TIME  I thank you for the opportunity to evaluate your patient. Please call 856-256-2600 with any questions.With Regards,

Dr. Pravin B. Vasoya
Department of Neurology JFK

Wachovia/Conrad 222

MAY-1-2008  02:33P FROM:DYNAMIC CHIROPRACTIC 856 782 2078          TO:8756287          P.2



**Dynamic Chiropractic Center**

817 Erial-New Brooklyn Road
Sicklerville, NJ 08081
Telephone: (856) 782-2077
Fax: (856) 782-2078

Dr. Jason Cerutti

www.drjason.net

May 1, 2008

RE: Robert Conrad

To Whom It May Concern:

Robert Conrad was first examined in my office on January 4, 2006. The patient complained of severe pain in multiple areas of his spine as well as multiple body parts. Mr. Conrad indicated he suffered from fibromyalgia, which caused a variety of pain syndromes. The patient indicated he suffered with severe lower back pain, which radiated into his lower extremities. He described the pain as a constant, dull ache that worsened with activity. He also complained of a constant, intense neck and upper back pain, which radiated into his upper extremities. The patient also complains of shoulder joint and muscle pain as well as joint pain in both hands.

Upon examination, Mr. Conrad had limited mobility and range of motion in his neck, upper and lower back with pain upon movement. Palpation revealed multiple spinal levels of muscle spasms and decreased segmental range motion throughout his spine. A surface EMG revealed multiple levels of abnormal muscle contraction and muscle imbalance. It was also noticed that the patient experiences severe bouts of sweating brought on by no specific action or activity. Mr. Conrad suffers from fatigue and his demeanor is calm and sluggish.

I have been providing treatment for Mr. Conrad and he is still currently being seen in my office for regular chiropractic care. The patient has followed my recommendations to date, has been consistent with his care and is truly working to improve his health. I have been utilizing specific chiropractic adjustments to eliminate nerve interference in his spine as well as trigger point therapy and deep tissue massage to eliminate the intense muscle spasms causing him severe pain.

It is my recommendation that Mr. Conrad continue his chiropractic care in order to continue to manage his pain and discomfort as well as to prevent a worsening in his spinal column and limit the possibility of future degenerative changes.

Should you have any questions or concerns or require additional information, please do not hesitate to contact me at your convenience.

Yours in Health,

Jason Cerutti, D.C.

Wachovia/Conrad 224

# FIBROMYALGIA RESIDUAL FUNCTIONAL CAPACITY QUESTIONNAIRE

Doctor:     George Petruncio, M.D.

Patient:    Robert Conrad

DOB:        02/26/1955

Please answer the following questions concerning your patient's impairments.

1.  Frequency and length of contact: _a and onga Sept 8, 200 J_

2.  Does your patient meet the American College of Rheumatology criteria for fibromyalgia?
    _✓_ Yes        ___ No

3.  List any other diagnosed impairments: _Sleep Apnea , Depression_
    _Fibromyalgia , Gout, Hypertin , periphal neuropthy_

4.  Prognosis: _Poor_

5.  Have your patient's impairments lasted or can they be expected to last at least twelve months? _✓_ Yes        ___ No

6.  Identify the *clinical findings*, laboratory and test results that show your patient's medical impairments: _____

7.  Identify all of your patient's symptoms:

    _✓_ Multiple tender points
    _✓_ Nonrestorative sleep   _Sleep Apnea_
    _✓_ Chronic fatigue
    _✓_ Morning stiffness
    _✓_ Muscle weakness
    ___ Subjective swelling
    ___ Irritable Bowel Syndrome
    ___ Frequent, severe headaches
    ___ Female Urethral Syndrome
    ___ Premenstrual Syndrome (PMS)
    ___ Vestibular dysfunction
    ___ Temporomandibular Joint Dysfunction (TMJ)

    _✓_ Numbness and tingling
    ___ Sicca symptoms
    ___ Raynaud's Phenomenon
    ___ Dysmenorrhea
    ___ Breathlessness
    _✓_ Anxiety
    ___ Panic attacks
    _✓_ Depression
    ___ Mitral Valve Prolapse
    ___ Hypothyroidism
    ___ Carpal Tunnel Syndrome
    _✓_ Chronic Fatigue Syndrome

8.  Is your patient a malingerer? ___ Yes            ___ No

9.  Do emotional factors contribute to the severity of your patient's symptoms and functional limitations? _✓_ Yes        ___ No

10. If your patient has pain:

a. Identify the location of pain including, where appropriate, an indication of right or left side or bilateral areas affected:

|  | RIGHT | LEFT | BILATERAL |
|---|---|---|---|
| ___ Lumbosacral spine | ___ | ___ | ✓ |
| ___ Cervical spine | ___ | ___ | ✓ |
| ___ Thoracic spine | ___ | ___ | ✓ |
| ___ Chest | ___ | ___ | ___ |
| ___ Shoulders | ___ | ___ | ✓ |
| ___ Arms | ___ | ___ | ✓ |
| ___ Hands/fingers | ___ | ___ | ✓ |
| ___ Hips | ___ | ___ | ✓ |
| ___ Legs | ___ | ___ | ___ |
| ___ Knees/ankles/feet | ___ | ___ | ✓ |

b. Describe the nature, frequency, and severity of your patient's pain:

_____Constant_____

c. Identify any factors that precipitate pain:

_✓_Changing weather  _✓_Fatigue  ___Movement/Overuse  ___Cold
_✓_Stress  ___Hormonal Changes  ___Static Position

11. Are your patient's impairments (physical impairments plus any emotional impairments) *reasonably consistent* with the symptoms and functional limitations described in this evaluation?  _✓_Yes  ___No

If no, please explain: _____

12. How often during a typical workday is your patient's experience of pain or other symptoms severe enough to interfere with **attention and concentration** needed to perform even simple work tasks?

___Never  ___Occasionally  _✓_Frequently  ___Constantly

*For this and other questions on this form, "occasionally" means 1% to 5% of an 8-hour working day; " frequently " means 6% to 33% of an 8-hour working day; "constantly" means 34% to 66% of an 8-hour working day.*

13. To what degree can your patient tolerate work stress?

___ Incapable of even "low stress" jobs    _✓_ Capable of low stress jobs
___ Moderate stress is okay    ___ Capable of high stress work

14. Identify the side effects of any medication that may have implications for working, e.g., dizziness, drowsiness, stomach upset, etc.:

_____Lyrica_____

15.  As a result of your patient's impairments, estimate your patient's functional limitations
     if your patient were placed in a *competitive work situation*.

     a.   How many city blocks can your patient walk without rest or severe pain? ___½___

     b.   Please circle the hours and/or minutes that your patient can sit *at one time*, e.g., before
          needing to get up, etc.

          **Sit:**         0  5  10  15  (20) 30  45              1   2   More than 2
                              Minutes                                          Hours

     c.   Please circle the hours and/or minutes that your patient can stand *at one time*, e.g.,
          before needing to sit down, walk around, etc.

          **Stand:**       0  5  (10) 15  20  30  45              1   2   More than 2
                              Minutes                                          Hours

     d.   Please indicate how long your patient can sit and stand/walk *total in an 8-hour working
          day* (with normal breaks):

          | Sit | Stand/walk | |
          |-----|-----------|-----|
          | ✓ | ✓ | less than 2 hours |
          | — | — | about 2 hours |
          | — | — | about 4 hours |
          | — | — | at least 6 hours |

     e.   Does your patient need to include periods of walking around during an 8-hour working
          day? _✓_ Yes ___ No

          1.   If yes, approximately how *often* must your patient walk?

               1  (5) 10  15  20  30  45  60  (90)
                         Minutes

          2.   How *long* must your patient walk each time?

               1  2  3  4  (5) 6  7  8  9  10  11  12  13  14  15
                              Minutes

     f.   Does your patient need a job that permits shifting positions *at will* from sitting, standing
          or walking?                          _✓_ Yes        ___ No

     g.   While engaging in occasional standing/walking, must your patient use a cane or
          other assistive device?              ___ Yes       _✓_ No

     h.   Will your patient sometimes need to take unscheduled breaks during an 8-hour working
          day?                                 _✓_ Yes        ___ No

          If yes,  1) how *often* do you think this will happen?       3c month
                   2) how *long* (on average) will your patient
                      have to rest before returning to work?       _____
                   3) on such a break, will your patient need to ___ lie down or _✓_ sit quietly?

     i.   With prolonged sitting, should your patient's leg(s) be elevated?   ___ Yes  _✓_ No

          If yes,  1) how *high* should the leg(s) be elevated?       _____
                   2) if your patient had a sedentary job, *what percentage of time* during an 8-hour
                      working day should the leg(s) be elevated?       _____ %

Wachovia/Conrad 227

3

j.    How many pounds can your patient lift and carry in a competitive work situation?

|  | Never | Occasionally | Frequently | Constantly |
|---|---|---|---|---|
| Less than 10 lbs. | — | — | — | — |
| 10 lbs. | — | ✓ | — | — |
| 20 lbs. | — | ✓ | — | — |
| 50 lbs. | — | — | ✓ | — |

k.    How often can your patient perform the following activities?

|  | Never | Occasionally | Frequently | Constantly |
|---|---|---|---|---|
| Twist | — | ✓ | — | — |
| Stoop (bend) | — | ✓ | — | — |
| Crouch/ squat | — | ✓ | — | — |
| Climb ladders | — | ✓ | — | — |
| Climb stairs | — | ✓ | — | — |

l.    How often can your patient perform the following activities?

|  | Never | Occasionally | Frequently | Constantly |
|---|---|---|---|---|
| Look down (sustained flexion of neck) | — | ✓ | — | — |
| Turn head right or left | — | ✓ | — | — |
| Look up | — | — | — | — |
| Hold head in static position | — | ✓ | — | — |

m.    Does your patient have significant limitations with reaching, handling or fingering?
___ Yes    ✓ No

If yes, please indicate the percentage of time during an 8-hour working day that your patient can use hands/fingers/arms for the following activities:

|  | HANDS: Grasp, Turn Twist Objects | FINGERS: Fine Manipulations | ARMS: Reaching (incl. Overhead) |
|---|---|---|---|
| Right | 100 % | 100 % | 100 % |
| Left: | 100 % | 100 % | 100 % |

n.    Are your patient's impairments likely to produce "good days" and "bad days"?
✓ Yes    ___ No

If yes, please estimate, on the average, how many days per month your patient is likely to be absent from work as a result of the impairments or treatment:

___ Never
___ About one day per month
___ About two days per month
___ About three days per month
___ About four days per month
✓ More than four days per month

Wachovia/Conrad 228

16. Please explain or describe any other limitations that would affect your patient's ability to work at a regular job on a sustained basis.

_____ _Decreased Alertness, impaired_ _____
_____ _Decreased Alertness,_ _____

17. What is the earliest date the description of *symptoms and limitations* on this questionnaire applies?_____ _Sept 03_     _Sept 03_ _____

18. Please provide any additional information that may assist in more fully understanding your patient's impairments.

_____ _Chronic fatigue syndrome_ _____
_____ _fibromyalgia_ _____
_____ _____
_____ _____

_10-24-06_
Date

Signature _____

Print/Type Name: _____

Address: _____

_____

Telephone: _____

Please return to: Bassett, Nelson & Associates, PO Box 1226, Columbia, MO 65205; or fax to (815)927-0278. Please call (800)331-1127 with questions. Thank you for your cooperation.

Wachovia/Conrad 229

### GENERAL MEDICAL OPINION RE: PHYSICAL CAPACITY TO DO WORK

Doctor:      George Petruncio, M.D.

Patient:     Robert Conrad

DOB:        02/26/1955

**Definitions:**

**Occasionally** means an activity or condition exists up to 1/3 of the time.
**Frequently** means an activity or condition exists from 1/3 to 2/3 of the time.
**Constantly** means an activity or condition exists 2/3 or more of the time.
**Regular and Continuing Basis** means 8 hours a day, for 5 days a week, or an equivalent work schedule.

YES NO
☐ ☑    Is your patient capable of performing sustained work activities in an ordinary work setting on a regular and continuing basis (eight hours a day, five days a week)?

**If Yes above:**

Based on medical findings it is my opinion that this patient is capable of performing the following level of work on a regular and continuing basis considering all factors including the effects of pain, fatigue, medical treatment and side-effects from medications:

YES NO
☑ ☐   **Sedentary Work.** Exerting up to 10 pounds of force *occasionally* and/or a negligible amount of force *frequently* to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only *occasionally* and all other sedentary criteria are met.

☐ ☑   **Light Work.** *Exerting up to 20 pounds of force occasionally,* and/or up to 10 pounds of force frequently, and/or a negligible amount of force *constantly* to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.
*NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.*

☐ ☑   **Medium Work.** Exerting 20 to 50 pounds of force *occasionally,* and/or 10 to 25 pounds of force *frequently,* and/or greater than negligible up to 10 pounds of force *constantly* to move objects. Physical demand requirements are in excess of those for Light Work.

The following medical findings support this opinion:



Signature _____          Date  10-24-02
              George Petruncio, M.D.

Please return to: Bassett, Nelson & Associates, LLP, PO Box 1226, Columbia, MO 65205; Watchnota/Conrad 230
        (815)927-0278. Thank you.