**FISHER & PHILLIPS LLP**
430 Mountain Avenue
Murray Hill, New Jersey 07974
(908) 516-1050
Attorneys for Defendant
Attorney of Record: Kathleen McLeod Caminiti

| | |
|---|---|
| ROBERT S. CONRAD, SR.,<br><br>        Plaintiff,<br><br>        vs.<br><br>THE WACHOVIA GROUP LONG-<br>TERM DISABILITY PLAN,<br><br>        Defendant. | UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY<br><br>Civil Action No. 1:08-cv-05416-RMB-AMD<br><br>**Defendant's Responses and Objections to<br>Plaintiff's Statement of Uncontested<br>Material Facts and Other Unsubstantiated<br>Assertions of Fact in Support of Plaintiff's<br>Motion for Summary Judgment** |

Defendant Wachovia Corporation ("Wachovia"), Plan Administrator for the Wachovia Corporation Long-Term Disability Plan (the "LTD Plan"), incorrectly denominated in the caption as the Wachovia Group Long-Term Disability Plan, by and through its attorneys Fisher & Phillips LLP, hereby responds and objects to Plaintiff's Statement of Uncontested Material Facts and Other Unsubstantiated Assertions of Fact in Support of Plaintiff's Motion for Summary Judgment.

FISHER & PHILLIPS LLP
Attorneys for Defendant
Wachovia Corporation Long-Term Disability
Plan

By:     /s/Kathleen McLeod Caminiti
          KATHLEEN McLEOD CAMINITI
          For FISHER & PHILLIPS LLP

Dated: February 15, 2010

**Defendant's Response to Plaintiff's Statement of Uncontested Material Facts**

1.      Plaintiff, Robert S. Conrad, Sr. ("Mr. Conrad") resides in Sicklerville, New Jersey. Mr. Conrad is a participant in the Health and Welfare Plans offered by Wachovia Corporation, which includes the Wachovia Group Long-Term Disability Plan ("LTD Plan"). He was employed as a commissioned securities broker. (Certif. of Plaintiff.)

**Response:**
        Admitted, for purposes of this motion, that Mr. Conrad resides in Sicklerville, New Jersey and was employed by Wachovia as a commissioned securities broker. Wachovia offers its employees a variety of Health and Welfare Plans, including a Long-Term Disability Plan ("LTD Plan"), but the employees must meet the Plans' eligibility requirements before they can be considered "participants" of those plans.

2.      Liberty Mutual Life Insurance Company of Boston ("Liberty Mutual") was engaged to provide administrative services including claims administration, with respect to the LTD plan. (Exhibit 5).

**Response:**
        Admitted that Liberty Mutual was and is the Claims Administrator for the Wachovia Corporation Long-Term Disability Plan (the "LTD Plan").

3.      Commencing September, 2003, Conrad began suffering with various chronic ailments, the symptoms of which included unexplained sweating, fatigue, diarrhea, sudden weight loss, lack of appetite and short term memory loss. (Certif. of Plaintiff.)

**Response:**
        Denied. The Court should disregard these assertions because they are not supported by specific citations to the administrative record compiled in connection with plaintiff's benefit claim. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

4.      In November, 2003, while in the office, Mr. Conrad needed to suddenly excuse himself from an extremely important meeting with two of his wealthiest clients and rushed to the hospital. He was admitted for a five-day admission undergoing numerous tests to determine the cause of his symptoms, which included abdominal pains and chest discomfort. (Certif. of Plaintiff).

**Response:**
        Admitted, for purposes of this motion, that Mr. Conrad was admitted to the hospital on November 24, 2003 and was discharged on November 28, 2003.

5.      Thereafter, Mr. Conrad's symptoms worsened and, as a result, he was unable to perform most of his major work tasks.  He was only able to answer phone calls and to minimally service existing clients.  He was virtually unable to produce new business which had a devastating effect on his commission income. (Certif. of Plaintiff)

**Response:**

Denied.  Furthermore, the Court should disregard these assertions because they are not supported by specific citations to the administrative record compiled in connection with plaintiff's benefit claim. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

6.      Commencing in September, 2003, Mr. Conrad missed the following days from work due to his illness:

a.      In September, 2003, Mr. Conrad was out on the 8th in order to see a physician with respect to his symptoms and then remained out of work for the rest of the week; he had a follow up visit with his doctor on the 15th; he required another doctor visit on the 19th missing a half of day; he was out of work on the 23rd; a half day on the 24th; the entire day of the 25th and the entire day of the 30th.

b.      In October, 2003 Mr. Conrad was out of work on the 2nd, 7th, 9th, 10th, 13th, 15th, 16th, 17th, 20th, 22nd, 24th and 28th.

c.      In November, 2003, Mr. Conrad was out for a half day on the 6th and then completely [out] on the 10th, 12th, 13th, 17th, 19th, 20th and 21st.  On the 24th, Mr. Conrad reported for work but it was on that date that he needed to rush to the hospital where he remained hospitalized through Friday the 28th.

d.      In December, 2003, Mr. Conrad was out the 1st, 2nd, 3rd, 5th, 8th, 12th, 16th, 18th and 22nd. (Exhibit 41).

**Response:**

Denied.  The Court should disregard these assertions because they are not supported by specific citations to the administrative record compiled in connection with plaintiff's benefit claim. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

7.      Mr. Conrad continued to be absent either for full days or partial days throughout the period of January, 2004 through August, 2004 at the same rate i.e., approximately 10 days per month. (Exhibit 41)

**Response:**

Denied.  The Court should disregard these assertions because they are not supported by specific citations to the administrative record compiled in connection with plaintiff's benefit claim. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

8.    As of August, 2004, Mr. Conrad was totally absent from the office through November, 2005, at which time he began working again pursuant to the "Return to Work" program. (Exhibit 41).

**Response:**

Denied that Mr. Conrad was "totally absent from the office through November 2005, at which time he began working again pursuant to the 'Return to Work' program." Admitted that Mr. Conrad was out of work on an approved Short-Term Disability Leave from August 3, 2004 to January 31, 2005. Mr. Conrad was then approved for Long-Term Disability benefits on a full-time basis from February 1, 2005 to October 9, 2005. He returned to work on a part-time basis on October 10, 2005 and thereafter received a reduced amount of LTD benefits in accordance with the terms of the LTD Plan until May 23, 2007, at which time continuation of LTD benefits was denied.

9.    As of December, 2003, the then Office Manager of the office in which Plaintiff worked, was fully aware of Plaintiff's symptoms and had discussions with Plaintiff concerning his health and the impact on his ability to work. Rather than advise Plaintiff concerning the Short Term Disability Plan's features and benefits, the Office Manager recommended that Plaintiff exercise a "look back" option to supplement his income. (Certif. of Plaintiff).

**Response:**

Denied.  The Court should disregard these assertions because they are not supported by specific citations to the administrative record compiled in connection with plaintiff's benefit claim. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

10.   Mr. Conrad continuously inquired to his Wachovia Office Manager about disability benefits through the fall of 2003, but was told initially that no such benefit plan existed. (Certif. of Plaintiff)

**Response:**

Denied.  The Court should disregard these assertions because they are not supported by specific citations to the administrative record compiled in connection with plaintiff's benefit claim. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

11.   After a substantial delay, Mr. Conrad determined that a disability benefits plan did exist and he submitted a claim for short-term disability benefits in December, 2003. (Certif. of Plaintiff)

**Response:**

Denied as to all assertions made by plaintiff in paragraph 11, except to admit that Mr. Conrad did, in fact, submit a claim for short-term disability benefits in December 2003 with a disability date of November 25, 2003.

12.     After filing the claim, Plaintiff was informed over the phone by Liberty Mutual that he was not covered, because he remained at work answering his incoming calls. (Certif. of Plaintiff)

**Response:**
    Denied. Plaintiff's December 2003 STD claim was denied by letter, dated January 19, 2004, due to a failure to provide proof of disability. *See Liberty/Conrad 1304-1305.*

13.     Although Plaintiff requested information concerning benefits, he was not given a copy of the Summary Plan Description until January, 2005. (Exhibit 5)

**Response:**
    Denied. All employees of Wachovia Securities, LLC are provided with a Summary Plan Description ("SPD") for both the Wachovia Corporation STD Plan and LTD Plan, respectively, through electronic access via the *My Wachovia Benefits* website which is accessible to all employees. The SPD posted on Wachovia's website advised employees (under the section entitled, "Your Rights Under ERISA") that they can also view the official plan documents which legally govern the operation of the STD and LTD Plans, by submitting a written request to the Plan Administrator. Each year all employees of Wachovia Securities, LLC are also given access to an Employee Handbook (via the company intranet) which summarizes the parameters of the current STD and LTD Plans, with electronic links to the actual SPD. (*See* Facts ¶ 4-6.)

14.     Pursuant to the applicable Employment Benefits Plan, STD benefits begin upon an absence as a result of an injury or sickness. In pertinent part, the STD Plan provides that "If your absence lasts for 8 or more consecutive calendar days, you may apply for STD benefits." (Exhibit 1, pg. 49)

**Response:**
    Admitted.

15.     Under the heading of "Intermittent Chronic Disability" the STD Plan provides for coverage of intermittent disabilities which are defined as a "disability of long duration characterized as a disease showing little change or slow progression." (Exhibit 1, pg. 52)

**Response:**
    Admitted.

16.   In pertinent part, the Employment Benefits Plan provides that "Employees who suffer from intermittent chronic disabilities may obtain STD benefits for days when they are out of work, even though the days are not consecutive." (Exhibit 1, pg. 52)

**Response:**
       Admitted.

17.   Also under the heading "Intermittent Chronic Disability," the Disability Plan provides that, "You and your manager will be responsible for tracking the days of absence from work as they occur." (Exhibit 1, pg. 52)

**Response:**
       Admitted.

18.   Under the heading of "Partial Disability", the Disability Plan provides that "In calculating the 8 days of absence from work (which are required to establish entitlement to STD benefits), you also may include absences of partial work days due to disability." (Exhibit 1, pg. 52)

**Response:**
       Admitted.

19.   The STD Plan includes a section entitled "Return to Work Program."  In pertinent part, the provision states that "This Program enables a partially disabled employee to rejoin the workforce sooner and be more productive while still receiving disability benefits.  If you are able to work and earn more than 80% of your Pre-Disability Earnings you are no longer considered disabled." (Exhibit 1)

**Response:**
       Admitted.

20.   After receiving STD benefits for a six month period of time, Mr. Conrad applied for long-term disability (LTD) benefits. (Certif. of Plaintiff)

**Response:**
       Denied.  Between August 3, 2004 and January 31, 2005 (*i.e.* the maximum 26 weeks of benefits provided under Wachovia's STD Plan), Plaintiff received full benefits pursuant to the terms of the STD Plan. Pursuant to the terms of Wachovia's 2004 LTD Plan, after satisfying the 26-week elimination period, an individual becomes eligible to receive LTD benefits. Approximately 17 weeks into the LTD elimination period, Liberty begins to review an STD recipient's file, and if appropriate, will automatically transition an STD claim to the LTD program, upon expiration of the full 26 week elimination period.  Pursuant to this process, Liberty approved LTD benefits for Plaintiff effective February 1, 2005. (See Defendant's Facts ¶ 27-31.)

21.    According to the LTD Plan as it pertains to Mr. Conrad, the amount of LTD benefits is based upon the benefits eligible compensation ("BEC") which has the same meaning as pre-disability earnings. (Exhibit 1, pg. 60-61)

**Response:**
 Denied. "As used in the plan, the **terms** BEC and 'Pre-Disability Earnings' have the same meaning." (Exhibit 1, pg. 60, emphasis added.)

22.    For purposes of calculation and entitlement to LTD benefits, BEC is determined on the business day immediately preceding the date a disability is incurred. (Exhibit 1, pg. 60-61)

**Response:**
 Denied. The Plan documents speak for themselves. (See Exhibit 1, pg. 60-61 for the complete explanation of BEC calculation.)

23.    According to the Plan, BEC means the greatest of the following amounts, divided by 52 weeks:
 (a) Your grandfathered annual benefits base rate;
 (b) Your comp rates;
 (c) Your rolling 12 month amount.
(Exhibit 1, pg. 60-61)

**Response:**
 Denied. The Plan documents speak for themselves. (See Exhibit 1, pg. 60 for the precise language.)

24.    For purposes of the LTD Plan, the BEC in this instance represents Mr. Conrad's "rolling 12 month amount." (Exhibit 1, pg. 60-61)

**Response:**
 Admitted.

25.    Pursuant to the LTD Plan, Mr. Conrad's rolling 12 month amount represents the sum of Mr. Conrad's earnings, as defined in the Plan, for the 12 consecutive months immediately preceding the onset of disability. (Exhibit 1, pg. 60-61)

**Response:**
 Denied. The Plan documents speak for themselves. (See Exhibit 1, pg. 60-61 for the precise language.)

26.     Pursuant to the terms of the LTD Plan, compensation is defined as 70% of Mr. Conrad's "Eligible Function Incentive Pay." (Exhibit 1, pg. 60-61)

**Response:**
        Denied. The Plan documents speak for themselves. (See Exhibit 1, pg. 60-61 for the precise language.)

27.     With respect to the calculation of Mr. Conrad's BEC, or pre-disability earnings, his eligible functional incentive pay for the months of September, 2002 through August, 2003 equaled $151,294.39. Accordingly, his BEC, calculated at 70% of that amount, equaled $105,906.07. Mr. Conrad's short term disability benefit equaled 100% of his BEC for 26 weeks, or $2,036.88 per week, totaling $52,953.04 for the 26 week period. According to the Long Term Disability Plan, the monthly benefit amount is equal to the lesser of 60% of your monthly BEC or 66 2/3% of your monthly BEC reduced by income received by other sources. Those sources include payments of any kind from Wachovia. (Certif of Plaintiff.)

**Response:**
        Denied. The Court should disregard these assertions because they are not supported by specific citations to the administrative record compiled in connection with plaintiff's benefit claim. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

28.     Attached hereto and made a part hereof is a schedule of monthly earnings on the part of Mr. Conrad from September, 2003 through September, 2008 when this suit was filed. The schedule reflects:
        Line 1:         The amount of Mr. Conrad's monthly earnings for the months of October 2003 through September 2008;
        Line 2:         The disability benefit due based upon a BEC of $105,906.07 calculated as 60% of BEC or 662/3% of BEC less monthly earnings;
        Line 3:         Disability benefit received;
        Line 4:         The difference, or underpayment of benefits.

**Response:**
        Admitted that the schedule attached to plaintiff's brief purportedly reflects Mr. Conrad's alleged earnings, disability benefits due, disability benefits received and benefits allegedly underpaid. Denied that the contents of this purported schedule are accurate.

29.     It should be noted that all months utilize the "66 2/3% less earnings received" except for the months of December 2005, May 2007, October 2007, April 2008 and July 2008 when there were no earnings.

**Response:**

Denied.  See Response to No. 28.

30.     Pursuant to the terms of the Plan, a participant is entitled to partial benefits in the event of a partial disability, which is defined in the Plan as the ability to perform one or more, but not all, of a participant's material and substantial duties. (Exhibit 1, pg. 66)

**Response:**

Denied.  The Plan specifically states, "In calculating the 26-week LTD elimination period before LTD benefits can begin, you may include periods during which you are partially disabled. You are partially disabled if you are able to perform one or more, but not all, of the material and substantial duties of your occupation or if you are able to perform one or more, but not all, of the material and substantial duties of your own or any other occupation on a full-time or part-time basis. After you have been receiving disability benefits for 24 months, you are partially disabled if you are able to perform all of the material and substantial duties of your own or any other occupation on a part-time basis."

31.     The LTD Plan provides for a "Return to Work Program" available to partially disabled participants. (Exhibit 1, pg. 66)

**Response:**

Denied.  Specifically, the LTD Plan states, "If you are partially disabled, you **may be eligible** to participate in Wachovia's Return to Work Program and collect disability benefits while you work."   (See Exhibit 1, p.66 for complete description; emphasis added.)

32.     Pursuant to the "Return to Work Program" a participant is entitled to full benefits if monthly earnings are less than 20% of pre-disability earnings.  During the first 12 months of a return to employment if earnings are greater than or equal to 20% of pre-disability earnings, but less than 80% of pre-disability earnings, the full LTD benefit will continue to be paid providing it does not exceed 100% of pre-disability earnings. (Exhibit 1, pg. 66)

**Response:**

Admitted.  Specifically, the LTD Plan states, "If your monthly earnings from all employment are less than 20% of your Pre-disability Earnings from Wachovia, the full LTD benefit will be paid to you.  If, during the first 12 months of your return to employment of any kind, your monthly earnings from all employment are greater than or equal to 20% of your Pre-disability Earnings from Wachovia, but less than 80% of your Pre-disability Earnings from Wachovia, the LTD benefit will continue to be paid. However, if the LTD benefit plus your monthly earnings from all employment would exceed 100% of your Pre-disability Earnings from Wachovia, the LTD benefit will be

reduced so that the LTD benefit plus your earnings from all employment does not exceed 100% of your Pre-disability Earnings from Wachovia." (Exhibit 1, pg.66.)

33.     After the first 12 months of a return to employment under the Return to Work Program, if monthly earnings are greater than or equal to 20% of pre-disability earnings, but less than 80% of pre-disability earnings, the LTD benefit otherwise payable will be reduced by 50% of monthly earnings from all employment, and, if monthly earnings are greater than or equal to 80% of pre-disability earnings, LTD benefits will end.  (Exhibit 1, pg. 66)

**Response:**
     Admitted.

34.     Under the Return to Work Program, Mr. Conrad was entitled to his full monthly disability payment of $5,883.66 during all months in which his monthly earnings did not exceed $1,765.29 and he was entitled to partial benefits during all months in which his monthly earnings did not exceed $7,061.18.  (Exhibit 1)

**Response:**
     Denied. While Mr. Conrad was completely out of work and ***approved for disability payments***, his monthly LTD benefit was properly calculated as $3,551.77. When he returned to work on a part-time basis, for the first 12 months, ***while still approved for disability payments***, he was entitled to $3,551.77 for those months in which he earned less than 20% of his Pre-Disability Earnings (i.e. less than 20% of $5,327.65). For those months in which he earned 20% or more than his Pre-Disability Earnings, but less than 80% of his Pre-disability Earnings, he was only entitled to that same amount if his LTD benefit plus his monthly earnings did not exceed 100% of his Pre-disability earnings (or $5,327.65).  If that were the case, then his LTD payment would be reduced so that his total earnings plus the LTD benefit did not exceed 100% of his Pre-disability Earnings (or $5,327.65).  After the first 12 months of Mr. Conrad's working part-time, ***if still approved for disability payments***, and if his monthly earnings were equal to or greater than 20% of his Pre-disability Earnings, but less than 80% of his Pre-disability Earnings, Mr. Conrad's LTD benefit would be further reduced by 50% of his monthly earnings. If his monthly earnings were equal to or greater than 80% of his Pre-disability Earnings, then Mr. Conrad's LTD benefits would end.

35.     Mr. Conrad's disability claim was initially approved based upon a disability date of August 3, 2004 and LTD benefits commenced as of February 1, 2005. (Exhibit 6)

**Response:**
     Admitted.  The document speaks for itself.

36.   On December 31, 2004, Mr. Conrad sent a letter to the Wachovia Benefits Committee objecting to the calculation of his BEC stating that it should be higher based upon a disability onset date of September 2003, rather than August, 2004. (Exhibit 4)

**Response:**
   Admitted. The document speaks for itself.

37.   In his December 31, 2004 letter, Mr. Conrad explained that he was initially hired by Wheat First Butcher & Singer in May, 1995, achieved the status of Senior VP in 1997 and had been a loyal Wheat First/First Union Securities/Wachovia Securities Broker since that time. (Exhibit 4)

**Response:**
   Admitted. The document speaks for itself.

38.   In his December 31, 2004 letter, Mr. Conrad explained that since September 15, 2003 he had been struggling with various chronic ailments and that his symptoms included spontaneous perspiring, fatigue, diarrhea, sudden weight loss, lack of appetite and short term memory loss, among other things.   Mr. Conrad explained that he attempted to continue to work his regular hours, but that his production gradually declined as his symptoms persisted.   In his December 31, 2004 letter, Mr. Conrad explained that "Then, in November, 2003, I was in the office and had to excuse myself from a very important meeting of two of my wealthiest clients.  I went to the hospital and was admitted with abdominal pains and chest discomfort.  I stayed in the hospital for 5 days undergoing numerous tests to determine the cause of these symptoms.  These tests included stress tests, EKG and heart catheterization." (Exhibit 4)

**Response:**
   Admitted. The document speaks for itself.

39.   Mr. Conrad explained that he was released from the hospital in November 2003 and submitted a claim for short term disability in December 2003.  He was contacted by a representative from Liberty Mutual in January 2004 advising him that he would "probably get turned down for benefits."  Nothing in writing was ever received from Liberty Mutual or Wachovia determining Mr. Conrad's initial STD claim. (Exhibit 4)

**Response:**
   Admitted that Mr. Conrad submitted a claim for STD benefits in December 2003 with a disability date of November 25, 2003.  The document speaks for itself.  Denied that anyone from Liberty advised that he would "probably get turned down for benefits."  Also denied that nothing in writing was ever received from Liberty or Wachovia determining Mr. Conrad's STD claim.  In fact, Liberty Mutual sent a letter to Mr. Conrad dated January 19, 2004, denying his claim and explaining that, "*We have not received medical information to support a condition of such severity as to preclude you from*

*performing your occupation as a Financial Advisor. To support your claim, on January 12, 2004, a request for medical information was faxed to the office of Dr. George Petruncio. To date, we have not received a response. Therefore, your claim for STD leave has been closed…You have the right to have your claim reopened by providing the documentation requested above within 60 days from the date of this letter.*" (*See* McGee Opp. Certif.[1], Exhibit E.) Furthermore, Liberty also sent letters, dated January 19, 2004, to plaintiff, plaintiff's manager and the New Jersey Department of Labor, advising of the denial of plaintiff's STD claim as well as his claim for New Jersey Temporary Disability Benefits. (*See* McGee Opp. Certif., Exhibits E,F,G and I.)  And finally, the Liberty Case Manager also telephoned both plaintiff and plaintiff's manager on that same date, leaving explanatory voice messages concerning the denial.  Mr. Conrad returned the phonecall the next day (January 20, 2004) and had a conversation with Ms. Darby which she documented in the claims file notes. (*See* McGee Opp. Certif., Exhibit E.)

40.    The LTD Plan also includes a section entitled "Intermittent Chronic Disability." That provision provides that "If you suffer from an intermittent chronic disability as defined on page 52 of the STD Summary, you may be entitled to receive LTD benefits after you have been absent from work due to your disability for a total of 26 weeks (130 work days) during any rolling 12-month period." (Exhibit 1, pg. 67)

**Response:**
    Admitted.

41.    On January 11, 2005, Mr. Conrad received a letter from Liberty Mutual indicating that his short term disability benefits ended on January 31, 2005 and if his disability extended beyond that period of time he may be eligible for long term disability (LTD) benefits. (Exhibit 5)

**Response:**
    Admitted.

42.    The January 11, 2005 letter from Liberty Mutual specifically referenced "Work Incentive Benefits", stating "To encourage Participants to return to work, a participant who has satisfied the Elimination Period may be eligible to continue to receive a Disability Benefit while engaging in Active Employment in accordance with the provisions of this Section 3.7." (Exhibit 5)

**Response:**
    Admitted.

---

[1] "McGee Opp. Certif." refers to the Certification of Paula McGee in support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment, dated February 12, 2010.

43.    The January 11, 2005 letter also indicated that the LTD Plan pays a benefit equal to 60% of base monthly salary "at the time your disability commenced." (Exhibit 5)

**Response:**
      Admitted.

44.    Liberty Mutual issued a letter to Mr. Conrad dated February 1, 2005 indicating that his LTD benefits were approved and that his first check in the sum of $2,472.57 representing LTD benefits due for the period of February 1, 2005 through February 28, 2005 was being sent. (Exhibit 6)

**Response:**
      Admitted.

45.    The February 1, 2005 letter from Liberty Mutual indicated that Mr. Conrad's gross monthly benefit was equal to $3,196.59. (Exhibit 6)

**Response:**
      Admitted.

46.    On June 23, 2005, Wachovia issued a letter to Mr. Conrad indicating that his date of disability had been determined to be August 3, 2004 and therefore his LTD commencement date was February 1, 2005. (Exhibit 8)

**Response:**
      Admitted.

47.    The June 23, 2005 letter from Wachovia acknowledged that Mr. Conrad had indicated that he had never received a Summary Plan Description, and did not contest that fact. (Exhibit 8)

**Response:**
      Denied.  The document speaks for itself.  The letter actually states, "We noted in your letter you contend that you did not receive instruction or assistance from anyone in the company with regard to disability benefits and the way they are calculated.  Please note that in the Summary Plan Description for the STD Plan (*which is provided to all participants, either with a hard copy, or through access on Exchange*) contains the information surrounding the STD Plan, which you contend not to have been provided." (See Exhibit 8, emphasis added.)

48.    The June 23, 2005 letter from Wachovia indicated that Wachovia believed that the benefit calculation, using a disability date of August, 2004 was correct and rejected Mr. Conrad's assertion that the calculation should have utilized the September, 2003 salary.

However, the letter did not explain its decision or give any reasons whatsoever for the decision. (Exhibit 8)

**Response:**
Admitted that the June 23, 2005 letter indicated that the BEC used, with a disability date of August, 2004 was correct. Denied that no explanation was given. The document speaks for itself.

49.    On May 11, 2006, Liberty Mutual issued a letter to Mr. Conrad terminating his benefits on the basis that his monthly earnings as of February, 2006 exceeded 80% of his Pre-Disability earnings which were calculated using the August 2004 date of disability. The letter states that "Since you exceeded 80% of your Pre-Disability Earnings, you are no longer eligible to receive Long Term Disability Benefits." (Exhibit 9)

**Response:**
Denied. The document speaks for itself. The letter precisely states, "Since your monthly earnings have exceeded 80% of your pre-disability earnings for three consecutive months, your disability benefits have ceased, and your claim is closed effective May 1, 2006."

50.    On May 24, 2006, Mr. Conrad issued a letter to Wachovia, Attn: Office Manager, Stan Hadam. In the letter, Mr. Conrad explained that an examination of his income during the period of September 2003 through August 2004 showed a marked decrease and that Mr. Conrad had documentation, "That this is the period of time when I first received doctor's care (Sept. 15, 2003)." (Exhibit 10)

**Response:**
Admitted that Mr. Conrad issued a letter dated May 24, 2006. (See Exhibit 10 for its precise language.) The document speaks for itself.

51.    In his letter of May 24, 2006, Mr. Conrad reiterated that in December, 2003, he initially filed his claim for STD benefits and received a call and was told that he would not likely be approved for an STD claim. ("In December 2003, I filed my initial claim with Liberty for STD benefits. I received a call at the office and was told I would not likely be approved for a STD claim.") Nothing in writing was received from either Liberty or Wachovia with respect to the December, 2003 STD claim which Mr. Conrad filed. (Exhibit 10)

**Response:**
Admitted that Mr. Conrad issued a letter dated May 24, 2006 and that these allegations were contained within that letter. Denied that nothing in writing was ever received from either Liberty or Wachovia with respect to the December, 2003 STD claim which Mr. Conrad filed. (*See* McGee Opp. Certif., Exhibits E,F,G and I.)

52.    In his letter of May 24, 2006, Mr. Conrad further questioned the fact that the amount of his life insurance, tied to his compensation, dropped from $300,000 in 2004 to $190,000 in 2006.  (Exhibit 10)

**Response:**
Admitted. The document speaks for itself.

53.    Mr. Conrad, whose compensation was totally commission-based, was accustomed to earning amounts approaching and in some cases exceeding $300,000 per annum.  His compensation for the years 1998 through 2002 was as follows:

| | |
|---|---|
| 1998 | $242,470.91 |
| 1999 | $286,541.32 |
| 2000 | $388,703.56 |
| 2001 | $261,446.66 |
| 2002 | $135,159.72  (The year of a significant stock market drop) |

(Certif of Plaintiff.)

**Response:**
Denied. The Court should disregard these assertions because these amounts are not supported by competent evidence.

54.    On June 1, 2006, Mr. Conrad issued a letter to Liberty Mutual reiterating most of the major points raised in his May 24, 2006 letter to Wachovia.  Mr. Conrad's letter of June 1, 2006 makes multiple references to his interaction with his Office Manager, Stan Hadam.   Among the points raised was the fact that his December 2003 claim was "evaluated over the phone by Tosha Darby from Liberty and she should have instructed me to proceed with the paperwork." (Exhibit 11)

**Response:**
Admitted. The letter, dated June 1, 2006, speaks for itself.

55.    In his letter of June 1, 2006, Mr. Conrad drew attention to the fact that he did not receive a copy of the Summary Plan Description until 2005 and that in fact it was only sent by the Wachovia Benefits Committee "after they received my written appeal." (Exhibit 11)

**Response:**
Admitted. The document speaks for itself.

56.    On June 29, 2006, Mr. Conrad issued another letter to Wachovia, attention Jim Beaver, Wachovia Corporation Safety Disability Benefits Committee, which opened with

the sentence, "I have been instructed by Liberty Life Assurance Company of Boston to send my appeal to you in regards to my BEC." (Exhibit 14)

**Response:**
    Admitted. The document speaks for itself.

57.    In his letter of June 29, 2006 to Mr. Beaver, Mr. Conrad again asserted that his benefits were improperly calculated and that, since he was first treated for the condition on September 15, 2003, that date should be used for the calculation of his benefit amount. Mr. Conrad further indicated that in an effort to resolve this matter he had submitted inquiries to no less than a dozen Wachovia representatives, the last being a Linda Hudson who finally gave Mr. Conrad the name and address of the Wachovia Corporation Safety & Disability Benefits Committee on December 30, 2004.  (Exhibit 14)

**Response:**
    Admitted. The document speaks for itself.

58.    On June 21, 2006, Mr. Conrad had also written to Liberty Mutual seeking to appeal the determination to cancel his LTD benefits.  (Exhibit 12)  Referring to the calculation of his benefit amount, and his part-time status, the letter states, in pertinent part, that "When I can generate more commissions than you have calculated were my pre-disability amount in 48 hours a month, you should realize something is wrong with your numbers."

**Response:**
    Admitted. The document speaks for itself.

59.    On August 9, 2006, Mr. Conrad submitted a letter to Liberty Mutual indicating that he had a chronic health condition that limited his ability to work full-time.  Mr. Conrad attached his July, 2006 paystub indicating that his gross commission income for July, 2006 was only $961.66. (Exhibit 15)

**Response:**
    Admitted. The document speaks for itself.

60.    On September 5, 2006, Mr. Conrad received a letter from Wachovia indicating that his claim had been reopened and that "Since this period fell within 6 months from the date your claim was closed, your claim has been reopened with Liberty Mutual for a successive period of disability." (Exhibit 16)

**Response:**
    Admitted. The document speaks for itself.

61.     On September 21, 2006, Mr. Conrad received correspondence from Liberty Mutual responding to his letters of June 1 and June 26, 2006 indicating that his claim had been reopened stating, in pertinent part that, "While continuing to meet all the terms and conditions of the disability contract, you will receive benefits under this 'Partial Disability' provision." The letter does not dispute Mr. Conrad's statement that his initial STD claim was responded to only by a phone call. (Exhibit 17)

**Response:**

Admitted that Liberty sent a letter to Mr. Conrad dated September 21, 2006 in which it is stated that, "While continuing to meet all the terms and conditions of the disability contract, you will receive benefits under this 'Partial Disability' provision." Denied that the letter "does not dispute" Mr. Conrad's statement that his initial STD claim of 2003 was responded to only by a phone call. That issue is not addressed at all in this letter, presumably because it has no bearing on this completely separate 2004 claim for disability benefits. Furthermore, the administrative record (i.e. Liberty's claim file) contains the January 19, 2004 letters that addressed the denial of Mr. Conrad's 2003 claim for STD benefits. (*See* McGee Opp. Certif., Exhibits E,F,G and I.)

62.     On December 7, 2006, Liberty Mutual issued a letter to Mr. Conrad indicating that it was Wachovia, not Liberty Mutual that needed to address the issue of the calculation of his benefits amount. (Exhibit 18)

**Response:**

Admitted. The letter specifically states: "As we have informed you in prior communications, your benefits amount is based on the Benefits Eligible Compensation (BEC) as determined by Wachovia.   While your file reflects that a Wachovia representative has addressed this matter with you previously, any ongoing concerns you have in this matter must be communicated in writing directly to Wachovia."

63.     On December 7, 2006 and December 8, 2006, Liberty Mutual issued letters to Mr. Conrad indicating that it needed medical reports from three physicians by January 8, 2006 (sic) just five business days after the holiday season. (Exhibits 18 and 19)

**Response:**

Admitted that Liberty sent letters to plaintiff dated 12/07/06 and 12/08/06, respectively. The December 7, 2006 letter requested the completed, enclosed Authorization to Obtain and Release Information, Claimant Supplementary Statement and Social Security Consent for Release of Information forms to be returned no later than January 8, 2007. The December 8, 2006 letter stated that "We are currently gathering information to assess your continued elibility for LTD benefits beyond this date. On December 8, 2006, we requested updated medical information from Dr. Petruncio. Please follow up with this provider to ensure that this information is submitted by January 8, 2006 (sic). In reviewing the Aetna Protected Health Information reports you

provided to us, we also note all of the following doctors providing services since July 1, 2006: Dr. Bruce D. Hopper; Dr. Thomas Morley; Dr. Raphael Dehoratuis."

64.    On December 17, 2006, Liberty Mutual issued a letter to Mr. Conrad stating that the Wachovia LTD Plan "does not provide intermittent chronic disability benefits." (Exhibit 20)

**Response:**
    Admitted. The document speaks for itself.

65.    On January 6, 2007, Mr. Conrad sent a letter to Liberty Mutual enclosing a copy of his December 15, 2006 timesheet and pay statement, signed by his supervisor, indicating that his gross monthly income was only $2,472.25. The timesheet indicating that Mr. Conrad was only working part time due to health reasons is signed by his supervisor, Stan Hadam. (Exhibit 21)

**Response:**
    Denied. The timesheet submitted was for hours worked during the month of December, but the pay statement submitted indicates that *for the time period of January 1, 2007 through January 15, 2007*, Mr. Conrad earned $2,472.25.

66.    On January 6, 2007, Mr. Conrad sent a letter to Liberty Mutual indicating, "I don't understand that you would wait until the last day to call and tell me you are going to have to stop my benefits because I did not comply with your request in Dec. I interpreted your letter in Dec. as though you had sent a request for information to my attending physicians, which you do have a list of their addresses." (Exhibit 22)

**Response:**
    Admitted. The document speaks for itself.

67.    OMITTED FROM PLAINTIFF'S STATEMENT.

68.    On January 10, 2007, Liberty Mutual issued a letter to Mr. Conrad indicating that since the medical information requested on December 8, 2006, was not received, his benefits were being suspended even though one medical provider, Dr. Petruncio, had indicated that a request for information purportedly by Liberty Mutual on December 8, 2006 had never been received. (Exhibit 23)

**Response:**
    Admitted that Liberty issued a letter dated January 10, 2007 to Mr. Conrad, which speaks for itself. The letter stated as follows:

Please refer to our prior letter dated December 8, 2006 which advised you benefits would be interrupted if we did not receive all requested information, as described in that letter, by January 8, 2007. This documentation was necessary to assess your continued eligibility for benefits…On January 9, 2007, we did receive the Medical Providers List you faxed on January 9, 2007. However, we have not received from you the forms we asked you to complete and return. These forms were the Authorization to Obtain and Release Information, Claimant Supplementary Statement, and Social Security Consent for Release of Information. In the event you have misplaced the set of forms we sent you on December 8, 2006, we are including another set at this time to give you one additional opportunity to complete and return these forms by end of business day on February 8, 2007. We also have not received the information we requested from Dr. Petruncio on December 8, 2006 as well. A copy of that request was mailed to you along with our letter to you dated December 8, 2006. We received a call from Barbara at Dr. Petruncio's office on the afternoon of January 9, 2007 stating that they had not received our original request. At 17:39 on January 9, 2007, we re-faxed the original request to Dr. Petruncio, attention Barbara, along with the report showing prior successful fax transmission to his office on December 8, 2006. Please encourage your physician to submit the information we previously requested as we will not be contacting Dr. Petruncio with any additional requests.

69. On January 11, 2007, Mr. Conrad sent a further letter to Liberty Mutual enclosing a copy of his health history for the year 2006 stating, "If you need additional information on any of my providers, please give me a call and I will do my utmost to get the information you request." (Exhibit 24)

**Response:**

Admitted that Mr. Conrad sent Liberty a letter dated 1/11/07, enclosing his self-authored "health history" and containing the quoted statement above. The document speaks for itself. However, Mr. Conrad never submitted the requested forms that were sent to him TWICE by Liberty. Nor did he ever make sure that Dr. Petruncio (or any of his other doctors) submitted any test results or office notes to Liberty by the deadline as requested.

70. On February 15, 2007, Liberty Mutual issued a letter to Mr. Conrad indicating that his benefits were terminated as of January 10, 2007, "since we did not receive the necessary proof to verify ongoing disability…" The letter indicated that "80% of your Pre-Disability earnings is $4,262.13." (Exhibit 25)

**Response:**

Admitted. The document speaks for itself.

71. On February 20, 2007, Mr. Conrad forwarded correspondence with medical documentation to Liberty including Dr. Petruncio's file from July 5, 2006 through

February 16, 2007. Mr. Conrad indicated that "I regret that you could not have updated me on the missing information before the expiration of the extension. This is a busy time for doctors with the flu and all...I was not made aware of his oversight until you phoned me on February 15, 2007." (Exhibit 26)

**Response:**
Admitted. The documents speak for themselves.

72.   In his letter of February 20, 2007, Mr. Conrad further indicated that, "Lastly, I would like to appeal the figures you refer to in paragraph 8 of page 3 of your letter. As you know, I have contested this calculation since 2004 and I do not feel that I have been treated fairly in light of my diagnosis." (Exhibit 26)

**Response:**
Admitted. The document speaks for itself.

73.   On March 23, 2007, Liberty Mutual issued a letter to Mr. Conrad indicating that his claim had been reopened and that he would continue to receive LTD benefits during the review. (Exhibit 27)

**Response:**
Admitted that Liberty issued a letter to Mr. Conrad, dated March 23, 2007, which stated he would continue to receive LTD benefits during Liberty's continuing review of his LTD claim. However, the letter also specifically stated that, "...this payment, or any future payments, should not be interpreted as an admission of present or ongoing liability. We reserve the right to enforce any and all provisions of the plan at any time." The letter also stated, "As part of our continuing review, we are awaiting the results of an independent physician review of your claim, as we advised in our letter dated March 1, 2007." And, finally, Liberty's letter also explained as follows:

> You have been receiving LTD benefits based on your inability to perform the duties of your own occupation as a Financial Advisor. The [Wachovia LTD] Plan contains a change in the definition of disability which states the following:

> "Disability" or "Disabled" means:
> (a) during the Elimination period and the next 24 months, the Participant's inability to perform all of the material and substantial duties of his or her own occupation on an Active Employment basis because of an Injury or Sickness; and
> (b) after the period described in paragraph (a) above, the Participant's inability to perform all of the material and substantial duties of his or her own or any other occupation for which he or she is or becomes reasonably fitted by training, education, or experience because of an Injury or Sickness.

On December 8, 2006, we advised you that to remain eligible for LTD benefits beyond the 24th month, you must be disabled from any occupation as stated above. Since your LTD benefits began on February 1, 2005, the change in definition occurred on February 1, 2007.

74.    On April 24, 2007, a letter on behalf of Mr. Conrad was directed to Wachovia Corporation requesting Mr. Conrad's attendance records during the months of September, October, November and December 2003. The purpose of the request was to determine when Mr. Conrad satisfied the 8 day elimination period for STD eligibility. (Exhibit 28)

**Response:**
Admitted that on April 24, 2007, a letter on behalf of Mr. Conrad was directed to Wachovia Corporation. The document speaks for itself.

75.    By letter dated May 8, 2007, Wachovia refused the request for the information stating that it would not do so "without a subpoena." (Exhibit 30)

**Response:**
Denied. By letter dated May 8, 2007, Wachovia wrote to Mr. Conrad's attorney, stating: "Pursuant to the request issued to Wachovia Corporation, it is not our practice to provide employment/payroll records of employees without a subpoena. Please forward the appropriate documentation and I will respond upon receipt. If you should have any questions, please feel free to contact me."

76.    By letter dated April 25, 2007 to Liberty Mutual, Mr. Conrad sent multiple medical reports including the notes of the treatment rendered by Dr. Petruncio between September 2003 and December 2003, establishing the commencement of Mr. Conrad's disability in December, 2003. (Exhibit 29)

**Response:**
Admitted that Mr. Conrad's attorney sent correspondence to Liberty dated April 25, 2007, along with medical documentation enclosed. The documents speak for themselves.

77.    The April 25, 2007 letter to Liberty Mutual pointed out that its letter of December 17, 2006 stating that the Wachovia LTD Plan did not provide intermittent chronic disability benefits was erroneous. (Exhibit 29)

**Response:**
Admitted that plaintiff's counsel's letter to Liberty dated April 25, 2007 attempts to make that argument. Denied that the statement made on December 17, 2006 was erroneous. The SPD clearly states that, "If you suffer from an intermittent chronic disability as defined on page 66 of the STD Summary, you may be entitled to receive

LTD benefits **after** you have been absent from work due to your disability for a total of 26 weeks (130 work days) during any rolling twelve month period." (See Exhibit 29, p. 2, emphasis added)  In other words, once the STD benefits have maxed out, then you may be eligible to receive LTD benefits.  **There is no intermittent chronic disability provision for non-consecutive days of absence under the LTD Plan.**  At the LTD stage, a participant is either fully disabled or partially disabled.  For both fully disabled and partially disabled participants, the continuation of benefits depends on the continued ability to meet the definition of disabled.

78.     The April 25, 2007 correspondence to Liberty Mutual also drew attention to Dr. Petruncio's medical records which stated in pertinent part that "In September, 2003, Mr. Conrad experienced the onset of symptoms of depression, fatigue and malaise…since the onset of symptoms in September, 2003, he has experienced spontaneous diaphoresis of unknown etiology, depression, myalgias, sleep apnea, etc.  His attempts to return to work only aggravated his condition with a result in total disability." (Exhibit 29)

**Response:**
        Denied.  The letter dated April 25, 2007 simply states that it is enclosing a copy of Dr. Petruncio's report.  That report is not included in Exhibit 29.

79.     The April 25, 2007 letter referenced the terms of the STD/LTD Plans that related to the Return to Work Program, Partial Disability and Intermittent Chronic Illnesses. (Exhibit 29)

**Response:**
        Denied.  The letter dated 4/25/07 referenced only some of the terms of the STD/LTD Plans that related to the Return to Work Program, Partial Disability and Intermittent Chronic Disability.  The document speaks for itself.

80.     Included with the April 25, 2007 correspondence were Mr. Conrad's paystubs commencing September 15, 2002 through March 15, 2007 which, among other things, established Mr. Conrad's "rolling 12 month" compensation for the time period of September 2002 through August 2003.  The April 24, 2007 letter indicated that Mr. Conrad was entitled to receive 6 months of short term disability benefits representing 100% of the BEC of $9,290.00 equaling $55,740.00 followed by long term disability benefits thereafter. (Exhibit 29)

**Response:**
        Admitted that Mr. Conrad's attorney submitted paystubs to Liberty with his letter dated April 25, 2007.  Also admitted that Mr. Conrad's attorney argued in the letter that his client was entitled to six months of STD benefits representing 100% of the BEC of $9,290.00 which equals $55,740.00, followed by LTD benefits thereafter.  The documents speak for themselves.

81.   The April 25, 2007 letter further indicated that, in terms of the calculation of Mr. Conrad's BEC, the correct amount of earnings was $13,271.26 per month.  (Exhibit 29)

**Response:**
      Admitted that Mr. Conrad's attorney made this allegation in his letter to Liberty dated 4/25/07.  The document speaks for itself.

82.   By letter dated May 17, 2007, Liberty Mutual responded to Mr. Conrad's letter of April 24, 2007.  (Exhibit 31)

**Response:**
      Denied.  Liberty's letter dated May 17, 2007 was in response to the letter from Mr. Conrad's attorney dated April 25, 2007.

83.   Liberty Mutual's letter of May 17, 2007 acknowledged that Mr. Conrad received medical treatment for his condition dating back to September 2003, but without any reasoning or explanation of any kind, simply stated that, "However, our investigation on Mr. Conrad's claim has established that the date of disability applicable to his LTD claim was August 3, 2004."  (Exhibit 31)

**Response:**
      Denied.  Liberty's May 17, 2007 letter stated as follows:

      We are in receipt of the medical documentation you included with the above
      mentioned letter and we appreciate your assistance.  We understand Mr. Conrad
      received treatment for his condition during the time period covered by the medical
      documentation; however, our investigation on Mr. Conrad's claim has established
      that the date of disability applicable to his LTD claim is August 3, 2004 [ie. the
      start of his approved STD claim].

84.   With respect to the provisions concerning Intermittent Chronic Disability, Liberty Mutual's letter of May 17, 2007 attempted to explain away its earlier misstatement by explaining the purpose of the language.  (Earlier Liberty Mutual denied that any such provision existed in either the STD Plan or LTD Plan.)  (Exhibit 31)

**Response:**
      Denied.  The letters speak for themselves.  In its letter dated 5/17/07, Liberty quite clearly explained that the language concerning intermittent chronic disability referenced by Mr. Conrad defines the requirements for fulfilling the STD Elimination Period in

order to be eligible for LTD benefits.   The LTD Plan itself does not provide for intermittent chronic disabilities.  (See Wachovia's Response to Plaintiff's Fact No. 77.)

85.     In its letter of May 17, 2007, Liberty Mutual stated again without explanation that "Please note that we have previously established that Mr. Conrad did meet the Elimination Period defined in the LTD Plan.  As such, he began receiving LTD benefits effective February 1, 2005." (Exhibit 31)

**Response:**
        Admitted that Liberty's letter dated May 17, 2007 stated: "Please note that we have previously established that Mr. Conrad did meet the Elimination Period defined in the LTD plan.  As such, he began receiving LTD benefits effective February 1, 2005."

86.     Essentially, even after it was brought to Liberty Mutual's attention that the Plan contained an Intermittent Chronic Disability provision – which it previously denied – Liberty Mutual persisted in maintaining the August 2004 commencement date of Mr. Conrad's disability and, even after explaining the provision ("Please note the language that you are referencing defines the requirements for fulfilling the elimination period to be eligible for LTD benefits") Liberty Mutual persisted – without explanation – in its refusal to acknowledge September 2003 as the commencement date of Mr. Conrad's intermittent chronic disability.  (Exhibit 31)

**Response:**
        Admitted that Liberty maintained the August 2004 commencement date of Mr. Conrad's disability was correct, because that was the commencement date of his approved STD claim.   Liberty refused to acknowledge September 2003 as the commencement date of Mr. Conrad's intermittent chronic disability, because Mr. Conrad's 2003 STD claim was not approved.  It was denied by letter, dated January 19, 2004, and Mr. Conrad never appealed the denial.

87.     The average compensation of the proposed other occupations was less than a third of Mr. Conrad's lowest pre-disability compensation, and only about 15% of his average pre-disability compensation.  (Certif. of Plaintiff)

**Response:**
        Denied. The Court should disregard these assertions because they are not supported by specific citations to the administrative record compiled in connection with plaintiff's benefit claim. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

88.     Finally, in its letter of May 17, 2007, Liberty Mutual claimed that the calculation of Mr. Conrad's benefits eligible compensation (BEC) was not within its responsibilities

and wrote that "We must defer all comments and inquiries directly to the Wachovia Corporation as we are not able to comment on this." (Exhibit 31)

**Response:**
Denied that Liberty claimed the BEC calculation was "not within its responsibilities" in its letter to Mr. Conrad dated 3/17/07. The document speaks for itself. Admitted that Liberty did advise Mr. Conrad in its letter that: "With regard to the calculation of Mr. Conrad's Benefits Eligible Compensation (BEC), we must defer all comments and inquiries directly to the Wachovia Corporation, as we are not able to comment on this. The BEC for each employee who files a claim for disability benefits is calculated by the Wachovia Corporation and then provided to Liberty Mutual."

89.   Even though Liberty Mutual was performing the claims administration, it insisted that "The BEC for each employee who files a claim for disability benefits is calculated by the Wachovia Corporation and then provided to Liberty Mutual." The administrative record reflects that Liberty Mutual never contacted Wachovia about Mr. Conrad's BEC calculation. (Exhibit 31)

**Response:**
Admitted that in Liberty's letter to Mr. Conrad, dated 5/17/07, it advised: "The BEC for each employee who files a claim for disability benefits is calculated by the Wachovia Corporation and then provided to Liberty Mutual." The document speaks for itself.

90.   By letter dated May 23, 2007, Liberty Mutual terminated Mr. Conrad's benefits. (Exhibit 32)

**Response:**
Admitted. The document speaks for itself.

91.   The May 23, 2007 denial letter begins by misstating that, "a review of your file indicates that your last date worked was August 2, 2004…" In fact, Mr. Conrad continued to work part-time. (Exhibit 32)

**Response:**
Admitted that the May 23, 2007 denial letter states, "A review of your file indicates your date last worked was August 2, 2004 and your date of disability was August 3, 2004." Denied that this was a misstatement. Clearly, Liberty was referring to the last date worked by Mr. Conrad before going out on an approved short-term disability leave which lasted 26 weeks. Subsequently, Mr. Conrad collected LTD benefits. Mr. Conrad did not return to work on a part-time basis until October of 2005.

92.    Most importantly, the May 23, 2007 denial made no reference whatsoever to the Return to Work Program or the Partial Disability provisions in the LTD Plan and, instead, rested its denial on the results of a transferable skills analysis indicating that Mr. Conrad was capable of working **fulltime** employed in some **other occupation**.  (Exhibit 32)

**Response:**
       Denied that Liberty "rested its denial on the results of a transferable skills analysis." Liberty's letter to Mr. Conrad, dated May 23, 2007, described its reasons for the denial in great detail over the course of four (4) pages, devoting one entire page on the Physician's File Review by Dr. Paul F. Howard.  It was only after Dr. Howard concluded that Mr. Conrad could work a full-time schedule, that Liberty obtained the Transferable Skills Analysis.

93.    In essence, the May 23, 2007 denial letter was requiring Mr. Conrad, who continued to be semi-productive, albeit part-time, in his own occupation with Wachovia to resign and seek full-time employment elsewhere in another occupation essentially as a clerk, making **less** than he was earning **part-time** with Wachovia!  As such, Liberty Mutual completely ignored Mr. Conrad's rights to continued benefits as a part time employee pursuant to the Return to Work Program.  (Exhibit 32)

**Response:**
       Denied.  The document speaks for itself.  Liberty explained very clearly to Mr. Conrad that in order to receive LTD benefits, he must meet the following definition of disability.

       "Disability" is defined as:
       (a)     during the Elimination period and the next 24 months, the Participant's
               inability to perform all of the material and substantial duties of his or her
               **own** occupation on an Active Employment basis because of an Injury or
               Sickness; and
       (b)     after the period described in paragraph (a) above, the Participant's
               inability to perform all of the material and substantial duties of his or her
               own **or any other** occupation for which he or she is or becomes
               reasonably fitted by training, education, or experience because of an Injury
               or Sickness.
(emphasis added)

       Liberty never advised Mr. Conrad that he should resign, only that he was no longer eligible to continue to work part-time at Wachovia and collect LTD benefits, based upon the explicit terms of the LTD Plan.

94.    By letter dated June 6, 2007 a response to Wachovia's letter of April 24, 2007, refusing to release employment records without a Subpoena, was issued.  (Exhibit 34)

**Response:**

Admitted that Mr. Conrad's attorney issued a letter to Wachovia, dated June 6, 2007, which speaks for itself.

95.    The letter to Wachovia dated June 6, 2007 enclosed a copy of the letter to Liberty Mutual dated May 17, 2007 indicating that it was the position of Liberty Mutual that it was Wachovia's obligation to calculate the benefits eligible compensation.  The letter closed with "Therefore, I am requesting that you recalculate the BEC for an effective date of September, 2003." (Exhibit 34)

**Response:**

Admitted. The June 6, 2007 letter speaks for itself.

96.    By letter dated July 6, 2007, a further letter was issued to Wachovia indicating that a response to the June 6, 2007 letter had not been received.  (Exhibit 35)

**Response:**

Admitted that Mr. Conrad's attorney issued a letter to Wachovia, dated July 6, 2007, in which he advised that he had not yet received the requested documents, but acknowledged that he "did receive a call from a Mr. Sharpton on June 19, 2007, indicating that the documents would be forwarded promptly."  The document speaks for itself.

97.    On July 17, 2007, Mr. Conrad directed a letter to Liberty Mutual enclosing his timesheet for the pay period of June, 2007.  These timesheets were submitted by Mr. Conrad and Mr. Hadam every month. (Exhibit 36)

**Response:**

Admitted only that on July 17, 2007, Mr. Conrad submitted his timesheet for June 2007 to Liberty.

98.    The June, 2007 timesheet indicated that Mr. Conrad was working only part-time and had only worked 39 hours and 50 minutes during the entire month of June, 2007. (Exhibit 36)

**Response:**

The document speaks for itself.

99.    Significantly, the referenced timesheet indicated that the reason for the part time work was "disability" and the timesheet was signed not just by Mr. Conrad, but also by Mr. Conrad's supervisor, Stan Hadam. (Exhibit 36)

**Response:**

The document speaks for itself.

100.   Mr. Conrad's letter of July 17, 2007 was acknowledged by Liberty Mutual by letter dated July 20, 2007.  (Exhibit 37)

**Response:**
Admitted.  The document speaks for itself.

101.   The July 20, 2007 letter from Liberty Mutual including as an attachment further documentation from Mr. Hadam, verifying that due to a disability Mr. Conrad had no earnings for the month of March, 2007.  (Exhibit 37)

**Response:**
Admitted that the July 20, 2007 letter enclosed an attached document from Mr. Hadam.  Denied that Mr. Hadam verified anything was "due to a disability."  The documents speak for themselves.

102.   Liberty Mutual's letter of July 20, 2007 indicates that it never attempted to communicate with Mr. Hadam directly in order to verify either Mr. Conrad's lack of earnings, or the nature of his disability in spite of the fact that Mr. Hadam was Mr. Conrad's immediate supervisor and had the opportunity to observe him on a close and regular basis.  (Exhibit 37)

**Response:**
Denied.  Liberty's letter to Mr. Conrad dated July 20, 2007 makes no reference to Mr. Hadam.  Admitted, however, that Liberty did not attempt to communicate directly with Mr. Hadam to verify the nature of Mr. Conrad's disability.

103.   By letter dated August 7, 2007, a letter was issued to Wachovia acknowledging receipt of paystubs for the months of September, 2003 through December, 2003 but pointing out that a request had been made for paystubs back to September, 2002 so that the BEC for the time period of September, 2002 and ending September, 2003 could be calculated. (Exhibit 38)

**Response:**
Admitted that Mr. Conrad's attorney wrote a letter dated August 7, 2007, which speaks for itself.

104.   The letter of August 7, 2007 further pointed out that the earlier request for attendance records which had been made on April 24, 2007 had still not been met. (Exhibit 38)

**Response:**
    The document speaks for itself.

105.   By letter dated September 10, 2007, a further request was made to Wachovia for a response to the earlier requests for paystubs from September, 2002 through September, 2003 and attendance records.  (Exhibit 39)

**Response:**
    The document speaks for itself.

106.   By letter dated September 26, 2007, a letter was issued to Wachovia referencing the multiple requests for Mr. Conrad's attendance records and stating that, "Accordingly, we must conclude that no such attendance records exist."  (Exhibit 40)
**Response:**
    The document speaks for itself.

107.   The provision regarding "Intermittent Chronic Disability" in the STD Plan provides that "You and your manager will be responsible for tracking the days of absence from work as they occur."  (Exhibit 1)

**Response:**
    Admitted.

108.   By letter dated November 13, 2007, Mr. Conrad issued an appeal to the denial of long term disability benefits set forth in the letter of May 23, 2007.  (Exhibit 41)

**Response:**
    Admitted.

109.   The November 13, 2007 appeal provided medical documentation of the following absences due to Mr. Conrad's medical condition – the same medical condition for which disability benefits were approved commencing August, 2004:

    (a)    Out of work September 8, 2003/Dr. Visit;
    (b)    Out of work for remainder of the week;
    (c)    Follow up visit with Dr. Petruncio September 15, 2003/out of work;
    (d)    Work half a day on Friday, September 19th/further doctor visit;
(The disability plan provides that in calculating the 8 days of absence from work, partial work days due to disability may be included.)

(e)    Out of work September 23rd
(f)    Half day September 24th
(g)    Out of work September 25th
(h)    Out of work September 30th

(Exhibit 41)

**Response:**

The documents speak for themselves.  Denied that the attachments to the letter dated November 13, 2007 provided medical documentation of all the absences listed in the letter.  Also denied that all the alleged absences were due to the same medical condition for which disability benefits were approved commencing August, 2004. Wachovia states that these allegations are irrelevant because Conrad failed to pursue his 2003 STD claim or appeal its denial.

110.   The letter of November 13, 2007 further pointed out that Mr. Conrad was out of work on October 2nd, 7th, 9th, 10th, 13th, 15th, 16th, 17th, 20th, 22nd, 24th and 28th, 2003. (Exhibit 41)

**Response:**

The November 13, 2007 appeal letter speaks for itself. Wachovia states that these allegations are irrelevant because Conrad failed to pursue his 2003 STD claim or appeal its denial.

111.   The appeal of November 13, 2007 further established that Mr. Conrad was out of work partially on November 6th and then completely on November 10th, 12th, 13th, 17th, 19th, 20th and 21st.  (Exhibit 41)

**Response:**

The document speaks for itself.  Denied that the November 13, 2007 appeal letter "established" that Mr. Conrad was out of work on those dates.  Admitted that those are the dates Mr. Conrad alleged he was absent.  Wachovia states that these allegations are irrelevant because Conrad failed to pursue his 2003 STD claim or appeal its denial.

112.   The appeal of November 13, 2007 includes the following paragraph:   "On November 24th, he reported for work but in the middle of a meeting he began sweating uncontrollably and indicated that he had to leave the meeting and go to the hospital.  He was hospitalized through Friday, the 28th.  He was out again on December 1st (visit with Dr. Petruncio), and also the 2nd, 3rd, 5th, 8th 12th, 16th, 18th and 22nd."  (Exhibit 41)

**Response:**

The November 13, 2007 letter speaks for itself.   Wachovia states that these allegations are irrelevant because Conrad failed to pursue his 2003 STD claim or appeal its denial.

113.   The November 13, 2007 appeal explained that Mr. Conrad had been diagnosed as suffering from fibromyalgia by numerous doctors which included Dr. Petruncio, Dr. Dwyer as well as multiple other specialists at Jefferson Hospital and Cooper Hospital. (Exhibit 41)

**Response:**
The document speaks for itself.

114.   The November 13, 2007 appeal explained that "fibromyalgia is a complex, chronic condition which causes widespread pain and fatigue as well as a variety of other symptoms.  The fatigue of fibromyalgia varies from person to person and ranges from a mild tired feeling to the exhaustion of a severe flu-like illness."  (Exhibit 41)

**Response:**
Admitted that the November 13, 2007 appeal letter, which speaks for itself, contained this statement, albeit with absolutely no supporting medical reference.

115.   The November 13, 2007 appeal further explained that typical symptoms in addition to pain and fatigue are sleep disturbances, cognitive disorders, depression and anxiety, all of which symptoms were well reported by Mr. Conrad's multiple physicians. (Exhibit 41)

**Response:**
The document speaks for itself.

116.   The November 13, 2007 appeal includes the following request for an explanation: "If you contend that Mr. Conrad is not suffering from the fatigue, memory and other concentration problems which he has articulated, kindly indicate specifically and in detail why either you do not believe that Mr. Conrad is suffering from these symptoms, or why you believe that, in spite of the symptoms, Mr. Conrad is capable of working a full-time job on a regular and reliable basis."  (Exhibit 41)

**Response:**
Admitted.  The document speaks for itself.

117.   The November 13, 2007 [letter] included a report of July 19, 2007 from Dr. James P. Dwyer, D.O.  Dr. Dwyer is a fellow in the American College of Rheumatology and part of the practice known as Arthritis, Rheumatic and Back Disease Associates, P.A. (Exhibit 41)

**Response:**

Admitted that the November 13, 2007 appeal letter included a report by Dr. Dwyer, dated July 19, 2007. The document speaks for itself.

118.   In his report of July 19, 2007, Dr. Dwyer stated that "Prior visits to rheumatology at Jefferson and Cooper have resulted in diagnoses of fibromyalgia but no specific auto-immune condition." Dr. Dwyer further noted that "Neurologic examination shows some light touch sensation changes on his feet." Dr. Dwyer further noted in his report that "In review of all Bob's data, laboratory and x-ray results, it certainly is clear that he has some yet undiagnosed systemic disorder that causes manifestations as mentioned above. Although he clearly does have fibromyalgic symptoms, I feel that these are largely a secondary manifestation of the primary condition as well as perhaps aggravated by sleep apnea which continues to be an issue." (Exhibit 41)

**Response:**

Admitted. Dr. Dwyer's report, dated July 19, 2007, speaks for itself.

119.   The November 13, 2007 appeal is also supported by a current report from Dr. Petruncio, dated July 17, 2007, which provided a history of the illness as well as current observations including "outbreaks of diaphoresis [sweating] which is still unexplained." (Exhibit 41)

**Response:**

Admitted that the November 13, 2007 appeal letter also attached a report by Dr. Petruncio, dated July 17, 2007. The documents speak for themselves.

120.   Dr. Petruncio's report of July 17, 2007 indicates that "During this time, he was referred to multiple specialists, and in July, 2005 was given a diagnosis of fibromyalgia and reactive depression resulting from his disability and continued symptoms of unknown etiology." (Exhibit 41)

**Response:**

Admitted. The document speaks for itself.

121.   By letter dated November 16, 2007, further documentation was submitted in support of Mr. Conrad's appeal including 4 more monthly timesheets May, 2007 through June, 2007 all signed by Mr. Conrad's immediate supervisor, Stan Hadam, indicating that due to disability, Mr. Hadam had authorized Mr. Conrad to work only 52 hours in March, 2007; 58.5 hours in April, 2007; 43 hours and 40 minutes in May, 2007; and 39 hours and 50 minutes in June, 2007. (Exhibit 42) This documentation was submitted on a monthly

basis to Liberty Mutual as part of the Return to Work Program in which Mr. Conrad was participating. ("If you are receiving disability benefits from Wachovia, the Liberty Case Manager may develop a return to work plan in conjunction with your attending physician and Wachovia manager.") (Exhibit 3, p.81)

**Response:**

Denied that Mr. Hadam "authorized" Mr. Conrad to work any set number of hours or that the hours worked were "due to disability." Admitted that Mr. Conrad submitted additional documentation in support of his appeal. The documents speak for themselves.

122. By letter dated January 18, 2008, Liberty Mutual denied Mr. Conrad's appeal. For the first time in over two years, Liberty claimed that Mr. Conrad's December 2003 STD claim was denied by a letter purportedly dated January 19, 2004. (Exhibit 43)

**Response:**

Admitted that Liberty denied Mr. Conrad's appeal on January 18, 2008. Denied that this was the first time Liberty claimed that Mr. Conrad's December 2003 STD claim was denied by letter dated January 19, 2004.

123. Mr. Conrad attempted to appeal the January 18, 2008 denial with a further appeal dated June 26, 2008 including a current sleep study among other things. The sleep study confirmed that even with the use of a C-Pap machine, slow wave sleep was absent as was Stage 3 sleep and Stage 4 sleep. REM sleep was decreased at 7.1% with 20-25% being normal. (Exhibit 41)

**Response:**

Admitted that Mr. Conrad attempted to appeal the denial on June 26, 2008, well after the 60-day deadline.

124. Wachovia refused to accept Mr. Conrad's appeal and also refused to accept the additional information as ongoing documentation of his disability on an intermittent chronic successive disability basis, even though it was submitted within a six month time period as proof of an ongoing chronic disability. (Exhibit 45)

**Response:**

Admitted. Wachovia did not consider additional documentation because the appeal was untimely.

125. At no point in the entire administrative process did either Liberty Mutual or Wachovia speak to Stan Hadam, Mr. Conrad's immediate supervisor in order to confirm the physical manifestations of Mr. Conrad's illness and the effect of the illness on Mr. Conrad's ability to work full-time. (Certif. of plaintiff)

**Response:**
    Admitted.

126.   At no point in the entire administrative process did either Liberty Mutual, or Wachovia make a determination that Mr. Conrad was capable of full-time work in his own occupation.

**Response:**
    Denied. Initially, Mr. Conrad was determined to be disabled from his own occupation on a full-time basis. Then, after his physicians cleared him to return to work on a part-time basis, Mr. Conrad was determined to be partially disabled from his own occupation. Finally, after receiving full or partial LTD benefits for two years, Mr. Conrad was determined to no longer be partially disabled from his own or any other occupation under the LTD Plan's terms. It was determined that he could work full-time at several different occupations, including his own. (*See Liberty/Conrad 346-352; 100-107; and 339-341.*)

127.   Not one of the approximate two dozen letters sent by Liberty Mutual to Mr. Conrad between January 2005 and July 2007 contests that Mr. Conrad's initial December 2003 STD claim received only a telephone call response. (Exhibits 5, 6, 9, 17, 18, 19, 20, 23, 25, 27, 32; Certif. of Plaintiff)

**Response:**
    Denied. The documents speak for themselves. See also McGee Certif. ¶¶ 6-10. Wachovia states that these allegations are irrelevant because Conrad failed to pursue his 2003 STD claim or appeal its denial.

128.   Mr. Conrad's right to participate in the Wachovia Long Term Disability Plan exists not just for the benefit of Mr. Conrad, but for the benefit of Wachovia itself. Mr. Conrad's supervisor, Stan Hadam, asked Mr. Conrad to try to work part-time as best as he could so that Wachovia could retain the benefit of Mr. Conrad's clientele. In fact, at one point Mr. Hadam specifically told Mr. Conrad that he wanted him to come back to work so that the commissions which Mr. Conrad would earn, albeit only part of what he had been earning, would be credited to his performance/unit. (Certif. of Client)

**Response:**
    Denied. The Court should disregard these assertions because they are not supported by specific citations to the administrative record compiled in connection with plaintiff's benefit claim. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir. 2007); *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 48 n.8 (3d Cir. 1993).

**Defendant's Objections to Plaintiff's Other Unsubstantiated Assertions of Fact**

The following are defendant's objections to certain unsubstantiated assertions of fact made by plaintiff in his moving brief which were not made reference to by plaintiff in his Statement of Uncontested Material Facts and as to which no record evidence has been adduced. (See Pb. pp.17-19.)

**Plaintiff's Unsubstantiated Assertion No. 1**
(a) Evaluation of Mr. Conrad's claim under the "total disability/any occupation" standard as opposed to "partial disability/Return to Work program" standard demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

**Defendant's Objection**
Contrary to plaintiff's assertion, Mr. Conrad's claim was not "evaluated" under the "total disability/any occupation" standard **rather than** the "partial disability/Return to Work" standard. Mr. Conrad's claim was reviewed according to **all** the terms of Wachovia's LTD Plan. Pursuant to those terms, for the first 24 months of receiving LTD benefits, Mr. Conrad was required to meet the Plan definition of "Disabled" for that time period which was "the inability to perform all of the material and substantial duties of his or her own occupation." (See Facts ¶ 29, 42.) For that time period in which Mr. Conrad was cleared to return to work on a part-time basis, he was required to meet the Plan definition of "Partially Disabled" which was "the ability to perform 1 or more, but not all, of the material and substantial duties of his or her own or any other occupation on an Active Employment or a part-time basis." (CounterStmt Facts ¶ 16.) Pursuant to the terms of the Plan, after reaching his 24-month anniversary, Mr. Conrad was then required to meet the next applicable Plan definition of "Disabled" which was "the inability to perform all of the material and substantial duties of his or her own **or any other** occupation" (Facts ¶ 29, 42, emphasis added.) or "Partially Disabled" which was "the inability to perform all of the material and substantial duties of his or her own **or any other** occupation on a part-time basis." (CounterStmt Facts ¶ 16, emphasis added.) Since Mr. Conrad clearly could perform all of the material and substantial duties of his own occupation on a part-time basis and could even (according to the Independent Medical Peer Review and Transferable Skills Analysis reports) perform all of the material and substantial duties of his own or other occupations on a full-time basis, Mr. Conrad no longer met the Plan definition of "Disabled" or "Partially Disabled" for purposes of receiving LTD benefits, under the terms of the Plan.

**Plaintiff's Unsubstantiated Assertion No. 2**
(b) Failure to properly review Mr. Conrad's claim by refusing to contact his immediate supervisor who had the opportunity to observe him on a regular basis and who had

submitted multiple Certifications authorizing part-time duties on account of Mr. Conrad's health and/or disability demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

**Defendant's Objection**

Contrary to plaintiff's assertion, firstly, Mr. Conrad's supervisor did not submit "Certifications authorizing part-time duties on account of Mr. Conrad's health and/or disability." Mr. Stan Hadam had nothing to do with the determination that Mr. Conrad should or could work part-time or the reasons therefore. He simply submitted monthly time records and earnings reports to Liberty in order for Liberty to be able to properly calculate Mr. Conrad's disability payments. Secondly, Liberty did not "refuse" to contact Mr. Conrad's immediate supervisor. In fact, Liberty exchanged certain necessary paperwork with Mr. Conrad's supervisors, including Manager's Disability Reporting Forms; notifications regarding the approval or denial of disability benefits; and the submission of monthly time records and earnings reports. (*See e.g. Liberty/Conrad 143-146,209,216,223,224,325,328,334,336,343,358,359,364,365,395,398,471,729,731,749, 760,766,822,830,848,853,863,896,900,1107,1121*.) Additionally, Liberty telephoned Mr. Conrad's supervisors on occasion to update them as to the status of Mr. Conrad's claim. (*See e.g. Liberty/Conrad 4,6,7,9,10,12-15,23-25,31,34,42-45*.) Liberty did **not** reach out to Mr. Conrad's supervisors in order to solicit opinions or impressions regarding Mr. Conrad's health, disability or job performance as that would have been inappropriate.

**Plaintiff's Unsubstantiated Assertion No. 3**

(c) Terminating Mr. Conrad's benefits based upon the conclusion that he was capable of performing certain low level jobs on a full-time basis which paid less than he was actually earning on a part-time basis from Wachovia and only a small fraction (approximately 15%) of Mr. Conrad's average pre-disability earnings demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

**Defendant's Objection**

Contrary to plaintiff's assertion, Liberty did not "terminate Mr. Conrad's [LTD] benefits based upon the conclusion that he was capable of performing certain low level jobs on a full-time basis which paid less than he was actually earning on a part-time basis." Liberty quite simply determined that Mr. Conrad no longer met the Plan definitions of "Disabled" or "Partially Disabled" because, after 24 months of receiving LTD benefits, Mr. Conrad clearly could perform all of the material and substantial duties of his own occupation on a part-time basis and he could even (according to the Independent Medical Peer Review and Transferable Skills Analysis reports) perform all of the material and substantial duties of his own or certain other occupations on a full-time basis. Pursuant to the terms of the Plan, therefore, Liberty was required to discontinue Mr. Conrad's LTD benefits.

**Plaintiff's Unsubstantiated Assertion No. 4**

(d) Failure to properly calculate Mr. Conrad's "benefits eligible compensation" ("BEC") as of the onset date of his disability demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

## Defendant's Objection

Contrary to plaintiff's assertion, Liberty did not fail to properly calculate Mr. Conrad's BEC as of the onset date of his disability. Pursuant to the terms of both the STD Plan and the LTD Plan, Mr. Conrad's BEC had to be calculated based upon the start date of his approved disability leave. (STD Plan §3.1, pp.8-17, *Wachovia/Conrad 59-68* and LTD Plan §3.1, pp.11-19, *Wachovia/Conrad 110-118*.) Mr. Conrad was NOT approved for STD benefits in 2003. He was denied for failure to provide supporting medical documentation and never appealed. (CounterStmt Facts ¶ 13.) He also failed to satisfy the requisite Elimination Period. (CounterStmt Facts ¶ 12.) Mr. Conrad **was** approved for STD benefits in August 2004. (Facts ¶ 27.) A BEC calculation based upon that approved disability start date is when Mr. Conrad's BEC should have been, and, in fact, was based upon.

## Plaintiff's Unsubstantiated Assertion No. 5

(e) Refusal of Liberty Mutual to even attempt to properly calculate Mr. Conrad's pre-disability earnings, claiming that it was Wachovia's responsibility – and refusing to communicate with Wachovia concerning that issue demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

## Defendant's Objection

Contrary to plaintiff's assertion, Liberty did not refuse to "even attempt" to properly calculate Mr. Conrad's pre-disability earnings, because calculation of BEC was Wachovia's responsibility. Nor did Liberty refuse to "communicate with Wachovia concerning that issue."

## Plaintiff's Unsubstantiated Assertion No. 6

(f) Failure to properly consider medical information substantiating Mr. Conrad's disability demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

## Defendant's Objection

Contrary to plaintiff's assertion, Liberty did not fail to properly consider medical information substantiating Mr. Conrad's disability. All the medical documentation submitted was reviewed both internally and by an independent medical doctor retained to conduct a peer review. Paul F. Howard, M.D., Board certified in Internal Medicine, with a sub-specialty in Rheumatology, assessed Mr. Conrad's functional ability, based upon his review of all the medical documentation submitted. (Facts ¶ 45-47.) Liberty also obtained a Transferable Skills Analysis, based upon Dr. Howard's findings. (Facts ¶ 48-

49.)  Together, those reports contributed to Liberty's conclusion that Mr. Conrad no longer met the Plan definition of "Disabled" or "Partially Disabled." (Facts ¶ 50.)

## Plaintiff's Unsubstantiated Assertion No. 7

(g) Denying that the Plan contained a provision for Intermittent Chronic Disabilities demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

## Defendant's Objection

Contrary to plaintiff's assertion, Liberty did not deny that the STD Plan contained a provision for Intermittent Chronic Disabilities. (STD Plan §1.1, p.2, *Wachovia/Conrad 53*.) Liberty did deny that the LTD Plan contained such a provision and was correct in doing so. The LTD Plan does not provide for benefits based on an intermittent chronic disability but merely refers to the STD Plan which recognizes an intermittent chronic disability as a means to satisfy the 8-day elimination period for STD disability benefits. (Facts ¶ 28-29.)

## Plaintiff's Unsubstantiated Assertion No. 8

(h) Denial of Mr. Conrad's initial claim for short term disability benefits by telephone without any written response demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

## Defendant's Objection

Contrary to plaintiff's assertion, Liberty did not deny Mr. Conrad's 2003 claim for STD by telephone without any written response. On January 19, 2004, Liberty Case Manager Tosha Darby sent two (2) denial letters to plaintiff, one regarding the denial of his STD claim and the other regarding the denial of his New Jersey Temporary Disability Benefits claim. (CounterStmt Facts ¶8.) The first letter stated that if plaintiff submitted supporting medical documentation within 60 days, his claim would be reopened. The second letter stated that if plaintiff wanted to appeal this decision, he could do so by writing to the Division of Temporary Disability Insurance, Irregular and Disputed Claims, Section CN957, Trenton, NJ 08625-0967. (Id.) Also on January 19, 2004, Ms. Darby wrote to the New Jersey Department of Labor, enclosing copies of plaintiff's claims file and the denial letter that was sent to plaintiff on that same date. (CounterStmt Facts ¶ 9.) On January 19, 2004, Ms. Darby also telephoned both the plaintiff and his manager, Mr. Nicholas J. Mekosh, to inform them of the denied STD claim. Ms. Darby left voicemail messages for both of them. (CounterStmt. Facts ¶ 10.) On January 20, 2004, Ms. Darby formally advised plaintiff's manager, Mr. Mekosh, by letter, that plaintiff's STD claim had been denied, stating, "Please note that if the requested medical documentation is submitted, we will provide you with an update of the claim status at that time." (CounterStmt. Facts ¶ 11.) And, on January 20, 2004, Mr. Conrad telephoned Ms. Darby to discuss the denial of his claim. (CounterStmt. Facts ¶ 12.)

## Plaintiff's Unsubstantiated Assertion No. 9

(i) Refusal to supply without a subpoena Mr. Conrad's attendance records necessary to demonstrate the onset date of his disability (despite the fact that Mr. Conrad was precluded from instituting suit because administrative remedies had not been exhausted) demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

**Defendant's Objection**
Contrary to plaintiff's assertion, Mr. Conrad's attendance records were not necessary to demonstrate the onset date of his disability and Liberty's refusal to supply them without a subpoena did not demonstrate ongoing bad faith and bias because 1) Conrad was required to comply with the STD and LTD Plans' requirement for the submission of medical documentation to establish a participant is "disabled" under the Plan; and 2) any submitted proofs of absence from work due to an intermittent chronic disability would only be relevant to support a claim for disability that has not already been denied and for which the time to appeal has not already long since expired.

**Plaintiff's Unsubstantiated Assertion No. 10**
(j) Failure to provide any reasoning whatsoever why the disability date did not commence in September 2003 as opposed to August 2004 demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

**Defendant's Objection**
Contrary to plaintiff's assertion, Liberty did not fail to provide "any reasoning whatsoever why the disability date did not commence in September 2003 as opposed to August 2004." Beginning with a letter, dated January 11, 2005, Liberty informed Mr. Conrad that if he continued to meet his Plan's definition of disability beyond January 31, 2005, he might be eligible for long-term disability benefits and that if approved for LTD, the plan would pay a benefit equal to 60% of his base monthly salary **at the time his disability commenced**. (Pltf's Exhibit 5, emphasis added.) In Liberty's letter to Mr. Conrad, dated February 1, 2005, he was told that he was approved for LTD benefits and that "You must satisfy an Elimination Period of 26 weeks which begins on the first day of Disability. Your date of disability was August 3, 2004. Therefore, your LTD benefit effective date is February 1, 2005." (Pltf.'s Exhibit 6.) Furthermore, a letter from Wachovia to Mr. Conrad, dated June 23, 2005, stated, "we have confirmed with Liberty that currently you have an approved long-term disability claim. Your date of disability was August 3, 2004 and your LTD benefit commencement date was February 1, 2005." The letter also stated as follows:

> Although initially it appeared that your letter was an appeal
> properly filed with this Committee, [w]e had subsequently
> confirmed that the request you make in your letter to the
> Committee (e.g. a request for an adjusted date of disability of
> September 2003 which you believe in turn would result in an
> adjustment to your BBR which you feel would result in your

receipt of a greater benefit) did not follow the required claims procedure as communicated to employees in the Summary Plan Description for the Wachovia Short-Term Disability Plan. Before any claim appeal concerning the adjustment of benefits comes to this Committee, an employee is required to have first gone through the claims appeal process with Liberty. We have confirmed with Liberty that they have not previously received a claim request to adjust your disability benefit. Therefore, we are not considering your letter in this regard to be a claim appeal but rather we are treating this as an inquiry/complaint concerning the calculation of your disability benefit.

The letter then goes on to quote the specific terms of the Plan regarding BEC calculation and states again, "Your BEC is based on your…**approved disability date of August 3, 2004.**" (Pltf's Exhibit 8.)

### Plaintiff's Unsubstantiated Assertion No. 11

(k) Stating in its denial letter of May 23, 2007 that Mr. Conrad's "last day worked" was August, 2004 when, in fact, Mr. Conrad continued to work part-time demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

### Defendant's Objection

Contrary to plaintiff's assertion, Liberty did not make an isolated statement about Mr. Conrad's "last day worked" evidencing Liberty's ignorance or bad faith with regard to his return to work on a part-time basis. On the contrary, Liberty stated in its letter dated May 23, 2007, "A review of your file indicates your date last worked was August 2, 2004 and your date of disability was August 3, 2004. According to our records, you were approved for LTD benefits effective February 1, 2005 with the diagnoses of sleep apnea, chronic fatigue and depression. You initially received LTD benefits on the basis of your inability to perform your own occupation as of your LTD benefit effective date. **You subsequently returned to work in a reduced hours capacity, which Wachovia accommodated, and thus you began receiving Partial LTD benefits effective October 10, 2005.**" (Pltf's Exhibit 32, emphasis added.) For plaintiff to take that one phrase out of context shows his own bad faith and bias.

### Plaintiff's Unsubstantiated Assertion No. 12

(l)     Refusal to provide Mr. Conrad with a copy of the Summary Plan Description until January, 2005, over a year after the onset of his disability demonstrated "ongoing bad faith and bias" on the part of the Claims Administrator.

### Defendant's Objection

Contrary to plaintiff's assertion, Liberty did not refuse to provide Mr. Conrad with a copy of the Summary Plan Description (SPD) until January 2005. As explained in defendant's moving papers, Conrad did not make a written request for the SPD in accordance with

ERISA. All employees of Wachovia Securities, LLC are provided with a Summary Plan Description ("SPD") for both the Wachovia Corporation STD Plan and LTD Plan, respectively, through electronic access via the *My Wachovia Benefits* website which is accessible to all employees. (Facts ¶ 4). The SPD posted on Wachovia's website advised employees (under the section entitled, "Your Rights Under ERISA") that they can also view the official plan documents which legally govern the operation of the STD and LTD Plans, by submitting a written request to the Plan Administrator. (Facts ¶5). Each year all employees of Wachovia Securities, LLC are also given access to an Employee Handbook (via the company intranet) which summarizes the parameters of the current STD and LTD Plans, with electronic links to the actual SPD. (Facts ¶ 6).